# EXHIBIT A



Home | Previous Page

**U.S. Securities and Exchange Commission**

## Special Study:
## Report of Examinations of Day-Trading Broker-Dealers

*Office of Compliance Inspections and Examinations*
*U.S. Securities and Exchange Commission*

**February 25, 2000**

## Contents

**I.** **Introduction**
**II.** **Results in Brief**
**III.** **Background**
    A. Day Trading in Context
    B. Characteristics of Day-Trading Firms
    C. Characteristics of a Day Trader
**IV.** **Examination Findings and Recommendations**
    A. Organizational Structures
    B. Fees and Costs
    C. Common Characteristics of Day Traders
    D. Complaints from the Public
    E. Disclosure and Investor Education
        1. General Risk Warnings
        2. Web Site Information Concerning Risks of Day Trading
        3. Written Information Concerning the Risks of Day Trading
    F. Advertising
    G. Financial Responsibility and Record Keeping Rules
        1. Net Capital Compliance
        2. Books and Records
        3. Annual Audited Financial Statements
        4. Net Capital Restrictions on the Withdrawal of Partnership Capital
    H. Broker-Dealer Lending Practices
        1. Proposed Margin Rules for Day Trading
        2. Lending in Excess of Margin Requirements
        3. Arranging for Loans by Others
            a. Customer-to-Customer Lending
            b. Loans by Others
        4. Lending Disclosures
        5. Joint Back Office Arrangements
    I. Short Sales

1. Violations
2. Synthetic Short Sales
J. Suitability and Appropriateness
1. Suitability
2. Appropriateness
K. Training Programs
L. Supervision and Registration
1. Supervisory Weaknesses
2. Registration

**V. Conclusion**

**Appendix A.** Summary of SEC and SRO Regulatory Action Concerning Day Trading
**Appendix B.** Summary of SEC Day Trading Enforcement Efforts

## I. Introduction

The Staff from the Securities and Exchange Commission's ("SEC") Office of Cor
Inspections and Examinations ("Staff") conducted an examination sweep of 47
broker-dealers providing day-trading facilities to the general public ("day-tradir
Examinations were conducted from October 1, 1998 through September 30, 19
Report by the Commission's Staff summarizing the results of these examinatior
of the examinations was to review each firm's compliance with federal securitie
regulatory organization ("SRO") rules. In addition, examiners reviewed how day
activities fit within the current securities regulatory structure and identified reg
that may require further consideration.

The examinations generally focused on the following issues:

- Structure of day-trading firms

- Information provided to customers concerning risk

- Advertising

- Net capital compliance

- Lending practices

- Short sale compliance

- Suitability

- Training

- Supervision and Registration

During the on-site examinations, the Staff conducted extensive interviews with
to better understand the business of day trading and characteristics unique to ε
Staff also analyzed trade data, exception reports, account documentation, and
and records.

This Report also describes recent regulatory actions relating to day trading, incl
and new SRO rules relating to risk disclosure and margin (Appendix A). Finally,
summarizes recent and ongoing Commission enforcement efforts (Appendix B).

The Staff, in coordination with the NASDR, is conducting additional examinatior
firms. Specifically, the Staff is examining all day-trading firms that have not ye
to ensure that they are complying with the law. The staff is also conducting ad
examinations to follow up on previous examination findings. In addition, the St
a review of the internal controls and risk management procedures utilized by fir
trades for day-trading firms.

## II. Results in Brief

While the Staff's examinations did not reveal widespread fraud, examiners four
serious securities law violations warranting referrals to the SEC's Enforcement s
firms. These violations related to net capital, margin and lending disclosure. At
however, the examinations revealed less serious violations, but indicated that r
to take steps to improve their compliance with net capital, short selling, and su
Firms at which examiners found violations or deficiencies generally were issued
letters, and corrective action was required.

While the deficiencies found are not unique to day-trading firms, the Staff belie
nature of day trading itself -- frequent, fast and risky trading -- makes complia
securities laws difficult to achieve without an automated compliance infrastructi
while disclosure of the risks of day trading is not explicitly required by current S
the examinations revealed that, as of the time of the examinations, many firms
their customers with information concerning the risks of day trading. Recent re
trading firms' advertising and disclosure indicate improved practices -- many fir
more balanced advertising and providing potential customers with better inforn
concerning the risks of day trading.

Specific findings from the examinations are detailed below, and italics indicate t
conclusions.

## Information Provided to Customers Concerning Risk

- In September 1999, the Staff reviewed the web sites of 22 day-trading fi
  the firms had little or no disclosure concerning the risks of day trading, ar
  sites contained statements that, while not fraudulent under the federal se
  were exaggerated or unbalanced. A follow-up review in February 2000 inc
  trading firms generally have enhanced their risk disclosure.

- The Staff found that, as of the time of the examinations, although not ex|
  under the law, some day-trading firms did not provide customers with wr
  concerning the risks associated with day trading. A majority of firms prov
  written risk information to prospective customers, and only a few firms pi
  customers or prospective customers with detailed written risk informatior
  2000 review of seven large day-trading firms, however, indicated that the
  providing written risk information to potential customers. *These findings c
  importance of the SEC's examination effort and public education initiative
  risks of day trading. The NASD also has proposed a rule requiring day-tra
  provide customers with a risk disclosure statement outlining the risks of c*

*Some firms are already providing enhanced risk disclosure, similar to the
outlined in the proposed NASD rule. This proposal is summarized in Appe*

- *The Staff recommends that day-trading firms continue to enhance their r.
  educate customers about day trading. For example, firms should consider
  traders with specific data on the costs and fees associated with day tradir
  estimated break-even points. In addition, if firms tout the profitability of .
  should be prepared to provide specific information to support their claims*

### Advertising

- The Staff found that several firms' advertisements contained exaggerated
  claims. While these claims may not amount to violations of the antifraud
  federal securities laws, they appear to violate self-regulatory organization
  For example, some firms advertised services they did not actually offer. M
  appear to be aware of regulators' concerns about exaggerated or unbalan
  *Day-trading firms should continue to focus on presenting balanced adver
  continue to carefully scrutinize advertising of day-trading firms under SR(*

### Net Capital & Financial Record Keeping

- Several day-trading firms prepared inaccurate net capital computations d
  misapplication of the net capital rule, and a small number of firms experic
  deficiencies. Many examinations also revealed financial books and record:
  While net capital errors are not unique to day-trading firms, net capital is
  a focus of day-trading examinations by the SEC and SROs. In addition, SI
  efforts to educate firms about net capital compliance.

- The Staff's examinations revealed that many firms need to pay greater at
  monitoring intra-day net capital compliance, as day traders often maintai
  and short positions in volatile securities throughout the trading day. It dic
  most firms monitored intra-day net capital compliance. Day-trading firms
  demonstrate that they are in net capital compliance throughout the tradir
  recently reminded its members of their obligations to maintain "moment-
  capital compliance. Other SROs will emphasize to their members their ob
  maintain net capital compliance at all times. The Staff also is evaluating c
  monitoring of introducing firms' intra-day positions.

- Nearly one-half of the day-trading firms that are members of the Philadel
  Exchange did not file required annual audited financial statements with th
  Stock Exchange, due to their erroneous assumption that they were exem
  requirement. *The Philadelphia Stock Exchange recently issued a Notice tc
  emphasizing the need for compliance with net capital and financial recorc
  PHLX will conduct follow up examinations of its member firms.*

### Broker-Dealer Lending Practices

- Several firms extended credit in excess of that allowed by the margin req
  Regulation T and/or SRO maintenance margin rules. The Staff also found
  firms indirectly extended credit to customers in apparent violation of Reg

- The Staff found that day-trading firms generally complied with disclosure
  when extending credit within the guidelines of Regulation T. Several day-
  however, failed to adequately disclose the essential terms of credit when

directly or indirectly extended credit to meet a customer's margin obligat

- The Staff found that many day-trading firms arranged loans between cus
  third parties to customers. Broker-dealers may lawfully arrange these loa
  Reserve Board rules. The Staff found that firms generally provided writter
  customers authorizing these loans, but that these agreements did not typ
  key terms of the loan (i.e., when interest charges can be imposed, the ar
  interest, and how interest charges are computed). *The Staff believes that*
  *practice for broker-dealers that arrange loans between their customers to*
  *essential terms of the agreement are provided to both parties.*

- *The NYSE and NASD recently proposed rules addressing day-trading mar*
  *proposed rules would require day traders to maintain a minimum of $25,(*
  *accounts at all times (minimum equity for other accounts is $2,000), and*
  *calls in five days (rather than seven). Further, the rules would require tha*
  *deposited to meet maintenance margin calls on day-trading accounts rem*
  *at least two business days, and would prohibit pattern day traders from u*
  *guarantees" which allow two accounts to be considered together in comp*
  *maintenance margin. Under the proposed rules, day traders could borrow*
  *the equity in their accounts. These rules are described in Appendix A.*

- The Staff found that a significant number of day-trading firms structured
  liability companies and sole members of the Philadelphia Stock Exchange
  office ("JBO") arrangements with their clearing firms. These arrangement
  participating firms to have proprietary accounts that are exempt from ma
  result, day traders at these firms can obtain leverage from their firms far
  they could obtain in a regular margin account. Recent rules adopted by S
  the use of JBO arrangements. These rules are described in Appendix A.

### Short Sales

- The examination staff, in conjunction with the SEC's Office of Economic A
  conducted an analysis of day-trading firms' trading data to determine cor
  short sale rules. The Staff found several violations of those rules, includin
  short sales in violation of Exchange Act Rule 10a-1. In addition, several fi
  to mark or improperly marked order tickets and failed to make an affirma
  determination that they could locate and borrow stock being sold short. D
  need to enhance compliance with short sale rules. *In light of violations in*
  *and SRO examiners will continue to focus on short sale compliance. SROs*
  *continue to remind members of their obligations under SEC and SRO shoi*

### Suitability and Appropriateness

- The Staff found no evidence that NASD firms provided recommendations
  to specific securities (either directly or indirectly through training progran
  trigger a legal obligation for firms to evaluate the suitability of the securit
  customer. If broker-dealers recommend that their customers buy or sell s
  securities, they must ensure that the security is suitable for the customer

- *The NASD has proposed a rule requiring broker-dealers that promote day*
  *strategies to their non-institutional customers to determine whether day .*
  *"appropriate" strategy, based on the customer's financial situation, tax st*
  *employment status, prior investment and trading experience and investr*
  *This proposal is described in more detail in Appendix A.*

**Training**

- The Staff found that many day-trading firms refer potential customers to
  day-trading training. The Staff identified significant links (e.g., common p
  managers, or monetary or other forms of compensation) between the day
  reviewed and these training entities. Because these entities are not regist
  dealers, the Staff was unable to review the content of training programs
  these entities. The SEC's Division of Enforcement is also investigating cer
  web sites that provide daily stock recommendations to day traders for a s
  These sites generally hype possible returns from day trading using their
  recommendations, while making little or no risk disclosure.

**Supervision**

- The Staff found that many day-trading firms maintained inadequate writt
  procedures relating to: the review of exception reports, the process for o
  trading accounts, and compliance with short sale and margin rules. Some
  not adequately supervising branch offices.

- The Staff found that many day-trading firms relied heavily on automated
  perform certain supervisory functions, such as to ensure compliance with
  short sale rules. Examinations disclosed that many of these automated sy
  easily bypassed or disabled by traders. *Day-trading firms must ensure th
  adequate compliance and supervisory infrastructure. The SEC and the SR
  rigorously enforce existing supervisory obligations.*

- The Staff found instances where unregistered entities and persons were e
  activity that may require registration under the federal securities laws or
  *trading firms should ensure that all associated persons and branch offices
  registered with the SEC, SROs and state securities regulators. Firms also
  careful not to facilitate the violation of registration requirements by their*

## III. Background

### A. Day Trading in Context

While professional traders have long engaged in day trading, day trading as a s
employed by retail investors is a fairly recent phenomenon. The number of day
new industry is estimated to be less than 7, 000.[2] While this is an estimate of f
traders, there may be significantly more on-line investors who occasionally eng
trading. By comparison, according to some estimates, there are close to an est
million individuals who own stock and more than 5 million investors using the I
brokerage services.[3] Even though the number of day traders may be relatively
commentators suggest that their influence may be great -- by some estimates
accounts for approximately 15% of the Nasdaq's daily trading volume.[4]

### B. Characteristics of Day-Trading Firms

Day-trading firms, like all broker-dealers registered with the SEC under the Sec
Act of 1934 ("Exchange Act"), are required to comply with applicable federal se
SRO rules. They also have some unique characteristics. For example, day-tradii
advertise day trading and day-trading training, and generally offer their service

trading facilities, rather than through a registered representative or an Internet
day-trading firm generally provides its traders with direct access to market cen
speed computer linkages. The high-speed computer connections supply, among
access to Nasdaq Level II and ECNs -- services that are generally not available
customers.[5]

While day-trading firms are not required to identify themselves as such, in Febr
Staff identified 133 firms that appeared to meet the above characteristics of a c

## C. Characteristics of a Day Trader

In May 1999, Chairman Levitt defined a day trader as "an individual, not registe
dealer or as a registered representative, who trades stock at a firm that allow[s
real time' access to the major stock exchanges and the Nasdaq market."[6] The f
recently defined a day trader as "an individual who conducts intra-day trading i
consistent manner, with the primary goal of earning a living through the profits
this trading strategy."[7] Day traders generally attempt to derive a profit by exec
intra-day trades to take advantage of small price movements in stocks (e.g., 1/
point per trade).

The principal characteristic that distinguishes day traders from other market pa
mind-set. Day traders generally acknowledge that they are not investors, due t
they hold positions. Many day traders hold stocks for seconds or hours, seldom
closing out positions for small profits.

## IV. Examination Findings and Recommendations

## A. Organizational Structures

Day-trading firms are typically organized in one of two ways: as traditional corp
limited liability companies or partnerships ("LLC"). These organizational differer
day-trading firms into two specific operating models with fundamentally differen
characteristics.

Most day-trading firms are organized as traditional customer-based corporate e
members of the NASD. Customer-based firms are required to comply with fede
laws and regulations that are designed to further customer protection. Firms th
retail customer business must comply with NASD membership requirements; cu
requirements;[8] the Federal Reserve Board's initial margin[9] and SRO maintenan
requirements;[10] and SRO suitability rules.[11] The Staff estimates that there are
day-trading firms organized as retail brokerage firms.

The second model is the LLC partnership structure in which a firm operates a pi
business. These firms represent that they do not have customers, but "member
part owners of the firm. Day traders at these firms, as part owners, contribute
firm and in turn, trade the firm's capital. Most of these firms are members of th
are approximately 13 day-trading firms that are members of the PHLX. To beco
a day-trading firm structured as an LLC, individuals are required to sign operati
that designate the member's ownership rights including: profit sharing arrange
restrictions on withdrawals, provisions limiting losses, and other provisions com
partnership agreements. Because these firms are exempt from registering with

are not subject to the NASD Conduct Rules.[12]

Prior to a change in its rules, the PHLX allowed members of proprietary firms to proprietary accounts without being licensed representatives. Thus, proprietary firms were able to advertise day trading to the general public and accept memb not licensed. The PHLX recently amended PHLX Rule 604 to require individuals floor of the exchange to pass the Series 7 licensing examination.[13]

## B. Fees and Costs

Day traders incur significant trading costs. Day-trading firms generally charge o between $15-$25 per trade and charge a substantial amount for additional serv RealTick III data feeds, news, and exchange fees, which range between $50-$6 Day traders must factor in these fees and costs in determining the point at whi to make a profit. The following graph highlights the fees and costs of day tradi



For example, a day trader who makes 50 trades per day at a firm with modera per trade, $150 per month), must generate $16,850 each month in trading pro the costs of the trades.

In addition to the costs and fees described above, many firms stated that they prospective customers to have a minimum amount of money to open an accour 2000 review of seven large day-trading firms revealed that five firms required i ranging from $20,000 to $75,000. A few firms noted, however, that their initial requirements may be relaxed in certain circumstances, depending on the exper prospective day trader. Two of the seven firms did not indicate any minimum c. requirement.

## C. Common Characteristics of Day Traders

The Staff analyzed the limited customer information obtained by day-trading fir
a profile of day traders based on their self-reported age, income, and net worth
compiled age information on 224 day traders and found that over half (57%) w
and 39 years of age.[16] As shown in graph 2 below, there are fewer day traders
ages of 40 and 79.



The Staff also reviewed limited information on annual income for 166 traders.[17]
below, more than half (53%) of the day traders purportedly earned more than
annually. The data does not indicate whether any of this income is derived from



Net worth information was compiled for 168 day traders.[18] As shown below, mc
indicated that they had a net worth greater than $200,000. Six percent, howev
worth of less than $50,000.



Based on the information reviewed with regard to these day traders, most day
limited sample appear to be under the age of 40, earn more than $100,000 per
a net worth greater than $200,000.

The Staff did not determine whether day trading was generally profitable or unp
did seek to determine whether there were any factors common to traders who
accounts and common to traders who had unprofitable accounts (at the time of
examinations).[19] The Staff compiled year-end 1998 trading data for a sample o
and unprofitable accounts at each of seven day-trading firms.[20] The Staff revie
123 trading accounts. The average of the profitable accounts was $177,732, wl
of the unprofitable accounts was $73,756. The Staff did not find a correlation b
and profitability or prior trading experience and profitability. It appears that ma
with both profitable and unprofitable accounts had varying levels of prior profes
experience, ranging from no experience to significant experience.

### D. Complaints from the Public

The SEC has received relatively few complaints from the public concerning day
calendar year 1998, the SEC's Office of Investor Education and Assistance ("OI
total of 10,326 complaints, of which only 37 (or 0.36%) involved day-trading b
For calendar year 1999, OIEA received 73 complaints related to day-trading fir
total complaints received).[21] Complaints from the public related to day-trading
topics not unique to day-trading firms: failure to follow customer's instructions;
transactions; and errors in account records. Each complaint was reviewed and a
action taken.[22]

### E. Disclosure and Investor Education

The SEC is concerned about the potential for individuals to be seduced by pron
profits by day trading without fully understanding the risks.[23] While no current
explicitly mandate that firms disclose the risks of day trading, regulators have I
day-trading firms to provide potential customers with information concerning th
have urged day traders to be aware of the risks.[24]

1. General Risk Warnings

The SEC has posted on its Web site a list of facts and warnings about which eve[...]
day-trader should consider prior to engaging in day trading. The full text "Day [...]
Dollars at Risk" is at http://www.sec.gov/consumer/daytips.htm:

- Be prepared to suffer severe financial losses.

- Day traders do not "invest."

- Day trading is an extremely stressful and expensive full-time job.

- Day traders depend heavily on borrowing money or buying stocks on mar[...]

- Do not believe claims of easy profits.

- Watch out for "hot tips" and "expert advice" from newsletters and Web si[...]
  day traders.

- Remember that "educational" seminars, classes, and books about day tra[...]
  objective.

- Check out day-trading firms with your state securities regulator.

As noted, there is no rule expressly requiring firms to provide information to pc[...]
customers concerning the risks of day trading. A recent rule proposed by the N[...]
would require firms promoting day-trading strategies to provide customers with[...]
risk disclosure statement prior to opening an account for day trading stating:

- **Day trading can be extremely risky.**  Day trading generally is not app[...]
  someone of limited resources and limited investment or trading experienc[...]
  tolerance. You should be prepared to lose all of the funds that you use fo[...]
  particular, you should not fund day-trading activities with retirement savi[...]
  loans, second mortgages, emergency funds, funds set aside for purposes[...]
  education or home ownership, or funds required to meet your living expe[...]

- **Be cautious of claims of large profits from day trading.**  You should[...]
  advertisements or other statements that emphasize the potential for larg[...]
  trading. Day trading can also lead to large and immediate financial losses[...]

- **Day trading requires knowledge of securities markets.**  Day tradinç[...]
  depth knowledge of the securities markets and trading techniques and st[...]
  attempting to profit through day trading, you must compete with professi[...]
  traders employed by securities firms. You should have appropriate experi[...]
  engaging in day trading.

- **Day trading requires knowledge of a firm's operations.**  Under cert[...]
  conditions, you may find it difficult or impossible to liquidate a position qu[...]
  reasonable price. This can occur, for example, when the market for a stoc[...]
  drops, or if trading is halted due to recent news events or unusual tradinç[...]
  more volatile a stock is, the greater the likelihood that problems may be [...]
  executing a transaction. In addition to normal market risks, you may exp[...]
  due to system failures.

- **Day trading may result in your paying large commissions.**  Day tra[...]

you to trade your account aggressively, and you may pay commissions o
The total daily commissions that you pay on your trades may add to your
significantly reduce your earnings.

- **Day trading on margin or short selling may result in losses beyon**
**investment.** When you day trade with funds borrowed from a firm or sc
can lose more than the funds you originally placed at risk. A decline in th
securities that are purchased may require you to provide additional funds
avoid the forced sale of those securities or other securities in your accou
as part of your day-trading strategy also may lead to extraordinary losse
may have to purchase a stock at a very high price in order to cover a sho

These efforts seek to ensure that potential day traders are informed about the
day trading.[26]

2. Web Site Information Concerning Risks of Day Trading

In September 1999, the Staff conducted a survey to evaluate information that
firms were making available on their web sites, and whether these firms provid
concerning the risks of day trading. The Staff also reviewed whether these firm
exaggerated, unwarranted, or misleading claims as to the profitability of day tr
Staff's analysis of web sites from 22 day-trading firms revealed that:

- Eight sites had no disclosure pertaining to risks associated with day tradir

- Three sites had minimal disclosure on the risks associated with day tradir

- Eleven sites had considerable disclosure relating to risks associated with
  generally included most elements of the proposed NASD risk disclosure ru

Five of the sites reviewed included exaggerated statements -- generally puffing
performance that could be achieved by day trading. Some statements also imp
trading was a suitable strategy for anyone. Some examples of these statement

- One site stated that the objective of day trading is to enable the trader tc
  of five trading sessions and to keep losses from exceeding a certain thres

- Another site (for an affiliate of a day-trading firm) stated that the amoun
  can lose is directly related to your degree of discipline in following the tra
  the firm teaches. It assured the customer that the techniques taught in tl
  course could help the customer to keep losses at a minimum. It further s
  trading appeals to people with different backgrounds (i.e., executives, rel
  college graduates).

A follow up review of the same 22 web sites in February 2000 indicated that (o
with web sites still operational) many firms are providing significant risk warnin
disclosure statements, and links to information concerning the risks of day trad

- Thirteen had considerable disclosure relating to risks associated with day

- Two had minimal disclosure on the risks associated with day trading.

- Only one had no disclosure pertaining to risks associated with day tradinc

Most of the firms that provided information on their web sites concerning the ri
trading included the disclosure statement proposed by the NASD and/or links to
information ("Day Trading: Your Dollars at Risk") on the SEC's web site.

Some of the common warnings found on firms' web sites included:

- "Electronic day trading involves substantial risks."

- "Day trading may result in losses that exceed more than 100% of your in

- "You should only lose money you can afford to lose."

- "Commissions can be a significant cost for customers."

- "Increased leverage or margin can lead to losses in excess of your initial

Based on this sample, it appears that many day-trading firms have enhanced th
disclosure during the past year.

3. Written Information Concerning the Risks of Day Trading

During each examination, the Staff reviewed documents provided to potential c
determine if the firm provided written disclosure of the risks of day trading. Alth
no explicit law or rule requiring firms to provide such information, at the conclu
examinations the Staff recommended to firms that they provide information con
risks of day trading to all prospective customers. The firms examined fell into o
disclosure categories: no disclosure, limited disclosure, and considerable disclos
below.

**No Disclosure:**   A few firms did not provide any written disclosure to prospec
concerning the risks of day trading.

**Limited Disclosure:**   Most firms appeared to provide limited written disclosur
customers, although this information was not as comprehensive as that require
proposed NASD rule or suggested by the ETA. For example:

- One firm required the customer to sign a seven-page document that cont
  disclaimer concerning day trading: "You hereby state that you are aware
  inherent in this type of investment activity."

**Considerable Disclosure:**   A few firms distributed documents containing risk
were either the same as or similar to those contained in the proposed NASD rul
by the ETA. These firms also required the investor to acknowledge receipt by si
document. For example:

- One firm required customers to sign three documents prior to opening an
  first, the account application, disclosed the amount and types of risk that
  poses. The second document, the firm's risk disclosure statement, contai
  similar to those in the proposed NASD rule. The third document, a form t
  was required to sign to receive a demonstration of day trading, stated tha
  demonstration provides the trader with nothing more than an opportunity
  trading software. The trading results achieved during the demonstration a
  representative of the results the demo trader may achieve while actually

A February 2000 review of seven large day-trading firms indicated that all firms significant risk disclosures to potential customers concerning the risks of day tr these firms provided documents to potential customers that include the NASD's disclosure statements or their own statements with similar disclosures.

*These findings demonstrate the importance of the SEC's examinations and publ initiative regarding the risks of day trading. As noted, some firms are providing disclosures detailed in the NASD rule proposal.*

*The Staff also recommends that day-trading firms increase the information they concerning the costs of day trading. For example, the staff believes it is a good firms to provide traders with an estimate of the costs to break even based on a scenarios, such as 20 or 50 trades per day. Furthermore, if firms tout the profit trading, they should be prepared to provide specific information to support their*

## F. Advertising

The NASD and PHLX advertising rules are designed to ensure that broker-deale truthful advertising to the public and in some cases require that communication approved by the SRO prior to publication or broadcast.[27] NASD rules prohibit e: unwarranted or misleading statements in advertisements to the public by NASD The Exchange Act does not contain provisions exclusively tailored to advertising antifraud provisions of the Exchange Act make it unlawful to "make any untrue material fact or to omit to state a material fact necessary in order to make the made not misleading" in connection with the purchase or sale of a security.[29]

The day-trading firms reviewed utilized various methods to advertise to potenti Newspaper advertisements, magazine advertisements, web sites, and televisior were among the most popular advertising methods. Advertisements typically of "maximum leveraged capital of 10 to 1," "state-of-the-art trading systems," "al execution capability," "maximum profit potential," and "training by experienced The Staff was particularly concerned with claims or offers of services that firms provide. The Staff was also concerned with misleading advertising and puffery; advertisements that detailed the benefits of day trading, but did not adequately risks and costs associated with day trading. While this advertising may not rise violation of the antifraud provisions of the federal securities laws, it may violate advertising rules. Several firms were sent deficiency letters for advertisements include exaggerated claims or omitted required information. The Staff also four improperly maintained advertising files and lacked proper supervisory approval advertising. For example:

- One firm's web site displayed a newspaper article that quoted a day-tradi employee: "The number of trades at [the firm's] branch office doubled or days. One trader netted more than $50,000 on one of those days, when t Industrial Average plummeted several hundred points." The Staff found t employee's statements were exaggerated.

- One firm's pamphlet advertising a day-trading training program containec and unwarranted statements, including statements by one of the "trading graduates" who was actually an employee of the broker-dealer. The pamp represented that the trading school was the "top trading school in the nat appeared to be without basis.

- Several firms falsely advertised that they provided formal training progra

traders. In fact, these firms had no training programs.

- One firm's advertisements targeted inexperienced day-traders and emph;
ability to provide training to enable the customer to become a proprietary
the firm accepted only experienced traders, and referred new, inexperien
affiliated firm, in an apparent "bait and switch" tactic.

*Day-trading firms should continue to focus on presenting truthful and balanced
SROs will continue to carefully scrutinize advertising of day-trading firms under*

## G. Financial Responsibility and Record Keeping Rules

Day-trading firms, like all broker-dealers registered with the Commission, are s
financial responsibility rules under the Exchange Act. Specifically, all broker-de;
comply with the net capital rule (Section 15(c) of the Exchange Act and Rule 1!
thereunder). The net capital rule requires registered broker-dealers to maintair
amount of liquid assets as a method of protection for customers and creditors.
registered broker-dealers are required to make and keep current certain books
and to preserve these books and records.[30] Accurate and current books and re<
necessary to determine a broker-dealer's true financial condition and to suppor
reported net capital position.

### 1. Net Capital Compliance

Ensuring compliance with the net capital rule and financial record-keeping requ
important component in the Staff's examinations. Day-trading firms generally e
traders to end the trading day "flat," (i.e., without holding long or short securit
their accounts overnight), to limit the risk associated with these securities. The
however, that day-traders at several firms held sizeable leveraged long and she
intra-day and overnight. Day-trading firms must have an adequate capital base
dollar volume of intra-day and end-of-day positions. In accordance with the net
firms must be in net capital compliance at all times,[31] even if the intention of th
liquidate or cover the positions before the end of the day. During the examinati
the Staff found that most day-trading firms did not monitor for intra-day compl
net capital rule.

*Day-trading firms must be able to demonstrate that they are in net capital com
throughout the trading day. The NYSE reminded its members of their obligation
moment-to-moment net capital in NYSE Interpretation Handbook Release, Augu
Other SROs will emphasize to their members their obligation to maintain net ca
at all times.*

The Staff found net capital violations, including inaccurate computations and ne
deficiencies, at more than a quarter of the firms examined. These violations res
maintenance of erroneous books and records. Many of the inaccurate net capit;
resulted from firms' failure to properly apply generally accepted accounting prir
required by the net capital rule.[32]

*While net capital violations and errors are not unique to day-trading firms, the
compliance will remain a focus of day-trading examinations by the SEC and the*

### 2. Books and Records

Examinations also revealed numerous books and records violations. A sizable n

were cited for failing to maintain accurate financial records and/or for failing to
required documents. Several firms were cited for failing to maintain necessary
account documentation (i.e., customer confirmations and account statements)
memoranda of each brokerage order.

### 3. Annual Audited Financial Statements

Pursuant to Exchange Act Rule 17a-5(d), a broker-dealer is required to file an a
financial report with the SEC and its designated examining authority (SRO). The
almost half of the Philadelphia Stock Exchange firms, that we examined, failed
audited reports. Most of the firms had concluded that they were exempt from th
pursuant to a provision of the rule designed for market makers and specialists
stock exchange and subject to daily oversight by the exchange. The Staff found
these firms were incorrectly relying on the exception, and were required to file
reports.

*The Philadelphia Stock Exchange recently issued a Notice to Members remindin
their obligations under financial audit and books and records rules.[33] The PHLX
follow-up examinations to ensure compliance with books and records and finan
rules.*

### 4. Net Capital Restrictions on the Withdrawal of Partnership Capital

A proprietary firm may include the capital contributed by its members as an alle
net capital purposes. This practice may restrict the ability of the firm's member
their funds, if the withdrawal would place the firm in violation of the net capital
proprietary firms examined by the Staff had operating agreements restricting p
withdrawal of equity capital or capital contributions made by members of the fi
terms, the operating agreements stated that the general partner may restrict d
capital if such withdrawals would cause the firm to violate the requirements of
rule.

The SEC's staff has issued an interpretive letter relating to the net capital treat
temporary capital contributions.[35] Under the interpretive letter, if an individual
capital to a broker-dealer with an understanding that the contribution can be w
option of the individual, the contribution may not be included in the firm's net c
computation and must be re-characterized as a liability. In addition, the letter s
withdrawal of capital by that individual within a year (other than a withdrawal t
tax payments and reasonable compensation to partners as described in Exchan
15c3-1), shall be presumed to have been contemplated by the individual at the
contribution. The Staff believes that this interpretation is consistent with the po
emphasized for some time and should clarify a day-trading firm's obligation to
permanent capital under the net capital rule.

### H. Broker-Dealer Lending Practices

Section 7 of the Exchange Act prohibits broker-dealers and other persons from
in contravention of the rules and regulations promulgated by the Board of Gove
Federal Reserve ("Federal Reserve Board").[36] The Federal Reserve Board has a
Regulation T, which imposes initial margin requirements for broker-dealers.[37]

Under Regulation T, a broker-dealer must ensure that a customer deposit, or ha
a margin account, 50% of the cost of a transaction; the broker-dealer may lend
the other 50% using the securities as collateral.[38] This calculation is performed

day and includes transactions that occur that day.[39] If the customer's funds are
meet the 50% requirement, the broker-dealer issues a Regulation T margin cal
customer must deposit the additional capital within five business days.[40]

In addition to Regulation T initial margin requirements, broker-dealers must co
requirements commonly referred to as "maintenance margin."[41] Under these ru
dealers must ensure that customers maintain a specified minimum amount of e
accounts at all times. Currently, a customer is required to maintain capital in hi
equal to 25% of all long positions. Similar to Regulation T, this calculation is pe
brokerage firms at the end of the day and, in the event of a deficiency, the firm
call which must be met as promptly as possible and in any event within 15 busi
seven business days for day trading accounts.[43] Thus, every day-trading firm n
separate margin calculations for each customer every day, one for Regulation T
for SRO maintenance margin.

Regulation T and SRO margin requirements are designed to work in tandem. Fo
because Regulation T is calculated on the position in the account at the end of t
for most day traders' accounts would be flat, a Regulation T margin call would r
unless the account activity resulted in a loss. During the course of the day, how
broker-dealer has extended credit to the customer for intra-day positions and v
risk. Accordingly, the SROs amended the maintenance rules to capture these da
transactions. In effect, the rules require an individual to demonstrate that he/sh
margin call if he/she did not unwind the largest open positions by the end of ea
addition to these amendments, the SROs have disseminated interpretive releas
addressing day trading margin issues.

1. Proposed Margin Rules for Day Trading

The NYSE and NASD have proposed rules that would require day-trading firms
use of margin by active day traders. Both the NYSE's and NASD's rule proposal
January 14, 2000, the SEC issued the NYSE's rule proposal for public comment
11, 2000, the SEC issued the NASD rule proposal for public comment.[46]

The proposed amendments would adopt a new term, "pattern day trader," whic
any customer that executes four or more day trades within five business days,
number of trades is more than six percent in the account for the five day perio
proposed amendments, a pattern day trader would be required to maintain a m
of $25,000 at all times. If the account falls below the $25,000 requirement, the
trader would not be permitted to day trade until the account is restored.

The proposed amendments would require special maintenance margin for patte
equal to 25% of the cost of all day trades made during the day. In effect, this w
pattern day trader to have buying power of four-times the equity in the pattern
account. In addition, the pattern day trader would be permitted to maintain ma
the largest aggregate open position during that day.

Under the proposed amendments, if the pattern day trader exceeds his/her buy
during the day, the pattern day trader would receive a margin call, which is rec
within five business days. If the margin call is not met, the pattern day trader's
would be reduced to two-times the equity in the account and the pattern day tr
requirement would be based on the pattern day trader's cumulative positions d
not the largest aggregate open position during the day. This would have the eff
substantially limiting the day-trading activity. In addition, if the margin call is n
the required five business days, no trades on margin would be allowed for 90 d

margin call is met.

In addition to these new margin requirements for pattern day traders, the prop also require a pattern day trader that makes a deposit to satisfy a margin defic the deposit in the account for at least two business days. Further, a pattern day be prohibited from using cross guarantees to satisfy a margin requirement. Tog requirements are designed to provide greater financial stability to pattern day t and effectively require pattern day traders to utilize funds actually on deposit in

## 2. Lending in Excess of Margin Requirements

A broker-dealer violates Regulation T and SRO maintenance rules when the brc directly or indirectly, extends credit in excess of the requirements set forth in tl dealers that extend credit beyond the 50% Regulation T or 25% SRO margin ol effect, meeting the margin obligations of the customer. For example, in a typic; customer who purchases securities in his/her margin account at a cost of $10,0 required to deposit 50%, or $5,000, of the transaction cost. The broker-dealer customer the remaining 50%, or $5,000, using the securities as collateral. If th unable to meet his/her 50% obligation, the broker-dealer is required to issue a margin call. Contrary to the rule, examinations revealed that several day-tradir loaned funds to customers to meet their margin obligations -- in addition to anc credit extended for initial margin. As a result, the customer was left with a high security transaction in excess of the amount contemplated by the rules.

## 3. Arranging for Loans by Others

Until recently, broker-dealers were prohibited from facilitating the arrangement their customers to purchase securities. In 1996, the Federal Reserve Board adc amendments to Regulation T that allowed broker-dealers to arrange loans that otherwise extend.[47] The law allows a broker-dealer to arrange for the extensior of credit for customers provided the loan does not otherwise violate federal cre The Staff found that many day-trading firms arrange credit either between cust other persons or entities unrelated to the broker-dealer, in order to allow custo margin calls and to continue to trade. These practices are described below.

### a. Customer-to-Customer Lending

Day-trading firms often arrange for customers to lend funds from their account customers. These loans are authorized by customers using a "letter of authoriz; trading firms typically provide these letters of authorization to customers. In th authorization, the lender agrees that he/she will make funds available to the bc for the purpose of meeting margin calls. When needed, the funds are transferre from one customer's account to another to meet margin requirements at the er The funds are generally returned the next business day with interest and, if nec process is repeated the following day. The interest paid on the loans reviewed t generally ranged from .05-.1% overnight (18-37% annualized). These loans as lawful under the federal securities laws. Nevertheless, the Staff is concerned th the lending may be unaware of terms and risks of such lending.[49]

*The NYSE and NASD have proposed rules addressing day-trading margin. The ; would require funds deposited to meet maintenance margin calls on pattern da accounts to remain in the account at least two business days. The proposals als pattern day traders from utilizing "cross guarantees," which consolidate accoun maintenance margin based on the net positions of both accounts.*

*b. Loans by Others*

In addition to arranging credit between customers, the Staff found that some d
arrange loans for customers from outside entities such as private partnerships.
firm may inform its customers of the availability of credit from an outside lende
margin calls. These transactions are generally structured as simple loan agreen
lender receiving interest for the credit extended. The rate of interest paid on th
by the Staff generally ranged from .03 - .04% overnight (10-15% annualized).
arrangements as described are lawful under the federal securities laws.

The Staff believes however, that these arrangements may violate Regulation T
is so closely related to the broker-dealer that the broker-dealer may be indirect
to customers. For example, the lending entity may be affiliated with the broker
principals of the broker-dealer are also partners of the lending entity. In anothe
broker-dealer's employees appear to be lending funds to customers. If a strong
established, the broker-dealer arguably may be lending funds to customers bey
requirements. In at least two examinations, examiners found a connection or a
between the broker-dealer and the lender, indicating possible violations of Regu

4. Lending Disclosures

The SEC adopted Exchange Act Rule 10b-16[50] to parallel the intent of the Truth
which focuses on full and meaningful disclosure of credit terms by financial inst
other firms engaged in the extension of credit, enabling consumers to compare
understand its costs.[51] Rule 10b-16 makes it unlawful for any broker or dealer
directly or indirectly, to any customer in connection with any securities transact
broker or dealer has established procedures assuring that each customer receiv
statement disclosing certain characteristics of the credit extended, and the stat
account.[52] The broker-dealer must notify the customer at the time of opening a
certain items including:

- when interest charges can be imposed;

- the annual rate of interest that can be imposed; and

- the method of computing the interest charges.

The day-trading examinations generally revealed that firms complied with Rule
they extended credit within the guidelines of Regulation T. However, several da
were cited for violations of Rule 10b-16 when they either directly or indirectly t
associated person extended credit to meet a customer's Regulation T margin ob

As noted above, many firms engaged in arranging loans between customers an
There are no rules directly governing disclosures that must be provided when b
arrange credit. While the Staff generally found that firms provided written lette
authorization when arranging loans for the firm's customers, these agreements
uniformly contain the same types of information about the lending arrangemen
necessarily include the information required by Rule 10b-16.

*When broker-dealers themselves extend credit they must ensure that lending a
include the information required by Rule 10b-16 (i.e., when interest charges ca
the annual rate of interest, and the method of computing interest charges). The
that it is a sound practice for broker-dealers that facilitate lending arrangement
essential terms of the lending arrangement are provided to both parties.*

### 5. Joint Back Office Arrangements

Proprietary day-trading firms often enter into joint back office ("JBO") arrangen clearing firms.[53] These arrangements allow day-trading firms to receive prefere treatment from their clearing firms. Specifically, a day-trading firm that particif arrangement can receive credit from its JBO clearing firm on "good faith" terms customer margin requirements found in Regulation T and SRO rules do not limi of credit to a JBO participant. Rather, credit can be extended for up to 100 perc purchase price of securities. Because of the borrowing power permitted by JBO the leverage of day-trading firms using a JBO is limited only by the net capital i trading firm participating in a JBO must maintain equity in its account equal to percentages under the net capital rule.

JBO arrangements are lawful. Under Regulation T, a clearing firm may finance t of any of its owners if the clearing firm is owned jointly or individually by other Typically, introducing firms establish the required ownership interest by purcha partnership shares in the clearing firm.

While individual clearing firms allow proprietary firms to have different amount: day-trading firms examined by the Staff received leverage in amounts that grea the amounts permitted under Regulation T and SRO maintenance rules.[55] The e revealed that several firms allowed member day traders up to ten times the eq accounts intra-day, while limiting overnight positions to approximately four tim At several other firms, there appeared to be no stated trading limits either for i overnight trading positions. Finally, a few firms maintained more conservative I maximum of four times the equity in the account both intra-day and overnight.

Recently, the Commission approved SRO rule changes relating to JBO arrangen new SRO rules adopt additional requirements for the creation and maintenance arrangements. Specifically, the rule changes establish capital and equity requir brokers and JBO participants and are designed to protect the safety and soundi arrangements. The rule changes require a JBO broker to: (1) maintain a minim million in tentative net capital or $7 million in net capital if the JBO broker's pri clearing options market-maker; (2) provide prompt written notification to the S tentative net capital or net capital (whichever applies) would fall below the pres requirements; (3) resolve any net capital deficiency within three business days permitted to accept additional transactions through the JBO arrangement;[57] (4 written risk analysis methodology for assessing the amount of credit extended participant; and (5) deduct from its net capital each JBO participant's haircut re excess of the equity maintained in the JBO participant's account.

In addition, the rule changes generally require a JBO participant to: (1) be a re dealer subject to SEC Rule 15c3-1; (2) maintain an ownership interest in the JE accordance with Regulation T; and (3) maintain a minimum liquidating equity o account with the JBO broker. Under the rule changes, if a JBO participant's liqu would fall below the required $1 million, the JBO participant must deposit the d five business days or lose its JBO participant status and become subject to the requirements under Regulation T and the other SRO maintenance requi SEC's staff believes that these rule changes will address the risks associated wi arrangements and fulfill the Federal Reserve Board's mandate for the SROs to | that "ensure the reasonableness of JBO arrangements."[58]

### I. Short Sales

A short sale occurs when a market participant sells a stock that he does not ow
declines, he can buy the stock later at the lower price and deliver it to the purc
price rises, however, he will have to buy the stock at the higher price, incurring
traders frequently sell stock short, hoping that they can capture small increme
stock prices decline. Short selling is lawful and not unique to the day-trading in
Exchange Act specifically authorizes the SEC to address short selling with rules.

The SEC adopted Exchange Act Rule 10a-1 to prevent the added downward mo
price of a stock that short selling may cause.[60] Rule 10a-1(a)(1) provides that,
certain exceptions, an exchange-listed security may be sold short: (i) at a price
at which the immediately preceding sale was effected (plus tick), or (ii) at the l
it is higher than the last different price (zero-plus tick).[61] Conversely, short sal
permitted on minus ticks or zero-minus ticks, subject to narrow exceptions.[62] T
referred to as the "tick test."

The NASD's rules prohibit short selling National Market System ("NMS") stocks
current best (inside) bid when the current (inside) bid as displayed on NASDAQ
preceding best (inside) bid in the security.[63] This is commonly referred to as th
Basically, the tick test and bid test prohibit selling stock short at a price lower t
different trade price (or last best inside bid).

In addition to these provisions, there are other SEC and NASD requirements th
selling. In order to comply with the tick test and other short sale rules, broker-
first determine whether a potential sale is long or short.[64] Broker-dealers cann
effect long sales unless they determine that the seller has the security and it w
for delivery.[65] Further, NASD member firms that sell a stock short or allow thei
sell short must first make sure that the shares can be borrowed or that they ca
of the stock to the purchaser by the settlement date.[66]

Once it is determined whether a sale is long or short, Rule 10a-1 requires broke
mark all orders in exchange-listed securities as "long" or "short," and prohibits
orders that are not marked.[67] Similarly, an NASD rule[68] requires that firms ma
order tickets as "long" or "short."[69] These marking requirements are essential t
short sales are executed in accordance with the short sale rules. In a recent no
members, the NASD reiterated its longstanding position that members must co
short sale rules when receiving orders by telephone, electronically through a pr
electronic order routing system, via the Internet, or otherwise.[70]

## 1. Violations

An analysis conducted by the Staff of the trading activity at eight day-trading fi
that numerous firms permitted short sales on a minus or zero minus tick in viol
10a-1.[71] In fact, a significant percentage of each of these firms' total short trac
executed unlawfully -- in one instance, as many as 40% of the firm's short sale
A significant number of the firms also failed to mark order tickets or improperly
tickets. Non-compliance rates at these firms ranged from 10% to 59% of all sh
being marked as short sales. Several of the firms also violated the NASD's affir
determination rule. The firms with significant short sale violations appeared to |
automated compliance systems to identify and mark short sales.

Below is a short sale analysis of five proprietary day-trading firms.



*Day-trading firms need to enhance compliance with the short sale rules. Given*
*violations, SEC and SRO examiners will continue to focus on compliance with th*
*rules during examinations.*

2. Synthetic Short Sales

The Staff found instances of "synthetic short sales" by day-traders who took sir
positions in equity options and shares of stock underlying the options. The indiv
components of the synthetic transaction do not violate any law, but, when aggr
positions may effectively be short sales. The examinations revealed three types
short sales: Married Puts,[72] Cougars,[73] and Jaguars.[74] For example:

- At one firm, in 54 of 75 Married Put transactions reviewed (72%), securit
  short below the price at which the last sale was effected, or, on a zero-m
  placing the purchase order. Since the purchase order had not yet been e>
  instances, the firm was effectively short the security at the time at which
  executed either on a down-tick or a zero-minus tick.

*The Staff is reviewing these findings and analyzing whether these strategies co*
*violation of the short sale rules.*

## J. Suitability and Appropriateness

1. Suitability

The suitability doctrine stems from the antifraud provisions of the federal secur
various SRO rules. Generally, if a broker-dealer makes a recommendation to a
must have a reasonable basis for believing that the recommendation is suitable
customer based on the customer's security holdings, financial situation and inve
objectives.[75] The Staff focused on whether customer-based day-trading broker
recommending the purchase, sale, or exchange of specific securities to their cu

Most of the firms examined represented to the Staff that they were discount bri
did not make "recommendations", and accepted and executed only unsolicited i
customers. Therefore, the firms reviewed generally did not believe they had an

determine the suitability of any customer transactions with the firm.[76] The Staf
indications that firms were recommending specific securities. If broker-dealers
their customers buy or sell specific securities, they must ensure that the securi
the customer.

## 2. Appropriateness

The NASD has proposed a rule that would require broker-dealers that promote
their non-institutional customers to determine, prior to opening an account for
whether day trading is an "appropriate" strategy based on the customer's finan
and investment goals. In making this determination, the broker-dealer would b
exercise reasonable diligence to ascertain the essential facts relative to the cus
his/her financial situation, tax status, employment status, prior investment and
experience and investment objectives.[77] The proposed day-trading rule, which
established NASD account approval guidelines, would require firms that recomm
trading strategy to an individual to approve the account for day trading. Prior t
account, firms also would be required to provide a disclosure statement to the
describing the risks of day trading (discussed *infra*).

In general, a firm would be "promoting" a day-trading strategy if it affirmativel
trading through advertising, training seminars, or direct outreach programs. If
customers were generally engaged in day trading, it would reinforce a determin
firm had affirmatively promoted day trading. However, merely providing access
to trading mechanisms that allow for intra-day trading would not necessarily cc
"promotion" of a day-trading strategy under the proposed rule.

*The SEC is considering the NASD's rule proposal and public comments on the p*

## K. Training Programs

The Staff found that about half of the firms reviewed offered formal training prc
day traders.[78] Some of these programs were offered "in-house" and some were
independent, unregistered entities.

Of the firms that offered training programs, more than half were offered throuç
the broker-dealer or through an outside vendor. Graph 6 below depicts the typ
delivery methods:



**Firms Offering Day Trading Training**

42%

41%    17%

- ■ Training Through the Broker-Dealer
- ■ Training Through an Affiliate
- □ Training Through an Outside Vendor

The Staff found that the firms that did not offer formal, organized training prog

offered some sort of informal instruction or allowed traders to gain "hands-on" strategies recommended by fellow traders who were often associated with the f these firms also maintained very structured trading environments and traders h mock transactions according to specific trading systems or strategies.

Because many of the training programs are conducted by unregistered entities, SEC has no examination authority, it was difficult for the Staff to obtain trainin{ ascertain what type of instruction was given to the day-traders in these trainin{ Staff is particularly concerned that these training entities may be touting the be trading without discussing the risks and costs associated with day trading.

## L. Supervision and Registration

Broker-dealers and their supervisory personnel must comply with the federal se which they are subject and make reasonable efforts to ensure that persons sub supervision also comply with such laws. Specifically, the SEC can impose admir sanctions upon a broker or dealer, or an associated person who, in connection of the federal securities laws, has "failed reasonably to supervise" persons subj supervision with a view to preventing such a violation.[79]

Broker-dealers will not be liable for a securities law violation for failing to super broker or dealer has: (i) established both procedures and a system for applyinc that should reasonably be expected to detect and prevent a securities law viola subject to the broker's or dealer's supervision; and (ii) reasonably discharged t obligations imposed by the procedures and system without having reasonable c that the procedures and system were not being followed.[80]

Under NASD rules, firms are required to adopt and implement a supervisory sy: tailored specifically to the member's business and that addresses the activities registered representatives and associated persons.[81] Firms are also required to appropriate supervisory personnel to assume authority and responsibility for in supervision, control, and maintenance over their supervisory system.[82]

1. Supervisory Weaknesses

The Staff found numerous supervisory deficiencies in the firms examined. Seve examined lacked adequate supervision and control of branch offices and remote example:

- Many margin violations occurred in branch offices. In addition, several da failed to designate appropriate supervisory personnel in these branch offi

The volume of electronic trading and the vast number of accounts maintained a trading firms make manual supervision alone ineffective. As a result, most day· rely heavily on automated supervisory systems to perform compliance function: execute transactions utilizing an automated order entry computer system, whic means for day traders to effect transactions efficiently from main and branch o remote trading locations. Day-trading firms are required to have the supervisor monitor electronic customer order entries and trading patterns. The examinatio day-traders at some firms had the ability to by-pass electronic compliance func example:

- One firm's automated system for capturing and alerting traders to possib violations (selling on a down tick) was easily disengaged by traders.

Written supervisory procedures are a critical part of an overall supervisory syst
supervisory procedures document the overall system and identify the individua
supervisory responsibility to prevent violations of the securities laws and SRO r
day-trading firms examined by the Staff failed to maintain written supervisory
adequately addressed all areas of their day-trading operations. For example, so
have written supervisory procedures for: the review of exception reports; the p
opening new day-trading accounts; compliance with short sale rules; supervisio
offices; and compliance with limit overages and margin maintenance. At some
written policies resulted in no one person being designated with authority or re
particular compliance functions, and no procedures for handling particular comp

*Day-trading firms must ensure that they have adequate compliance and superv*
*infrastructure to ensure compliance with rules. The SEC and the SROs will rigor*
*existing supervisory rules.*

2. Registration

Examinations revealed instances where unregistered entities or persons were e
activity that may require registration under the federal securities laws or SRO r
these situations were not widespread.

Examinations revealed that some day-trading firms may not be registering all c
as required by SRO rules.[84] Most day-trading firms allow traders to be physical
remote trading sites (*i.e.* , away from the headquarters or registered branch of
firm). Day-trading firms use terms such as "remote locations," "satellite offices
to describe these non-branch locations. The Staff found that a number of these
locations were branch offices that were required to be registered under SRO rul

Finally, the Staff found numerous situations where customers had been grantec
authority to trade the accounts of others. Trading with discretionary authority i
day trading. In fact, it is relatively common among family members and betwee
representatives and their customers. The Staff is concerned, however, that son
customers may be acting as investment advisers or broker-dealers requiring re
the law.[85]

*Day-trading firms should ensure that all associated persons and branch offices*
*registered with the SEC, SROs and state securities regulators. Firms also need*
*to facilitate the violation of registration requirements by their customers.*

**V. Conclusion**

In summary, while the Staff's examinations did not reveal widespread fraud, ex
indications of serious securities law violations warranting referrals to the SEC's
staff at several firms. These violations related to net capital, margin, and lendir
most firms, however, the examinations revealed less serious violations, but ind
firms need to take steps to increase compliance with net capital, short selling, a
rules. Firms at which examiners found violations or deficiencies were issued det
and corrective action was required.

While the deficiencies found are not unique to day-trading firms, the Staff belie
nature of day trading itself -- frequent, fast and risky trading -- makes complia
securities laws difficult to achieve without an automated compliance infrastruct

while disclosure of the risks of day trading is not explicitly required by current S
the examinations revealed that, as of the time of the examinations, many firms
their customers with information concerning the risks of day trading. Recent re
trading firms' advertising and disclosure indicate improved practices -- many fil
more balanced advertising and providing potential customers with better inform
concerning the risks of day trading.

The Staff intends to continue to focus examination resources on day-trading bro
coordination with the SROs, to ensure that firms comply with securities laws an
additional new rules that may govern their operations.

## Appendix A: Summary of SEC and SRO Regulatory Action Concerning Da

### NASD Appropriateness and Risk Disclosure Proposed Rules

On August 20, 1999, the NASD proposed rules that focus on disclosing the basi
engaging in a day trading strategy and assessing the appropriateness of day tra
for individuals. The proposed rules were published for comment on September
Commission is considering the comments received.

One of the proposed rules would require that a risk disclosure document be pro
institutional customers." A "non-institutional customer" is one with an account t
qualify as the account of: 1) a bank, savings and loan association, insurance co
registered investment company; 2) an investment adviser; or 3) any other enti
assets of at least $50 million. The firm may provide the customer with the risk
statement proposed by the NASD, or another statement substantially similar to
proposed that has been approved by the NASD's Advertising Department.

The other proposed rule would require members who promote a day-trading str
determine that a new account for a non-institutional customer is appropriate fo
2) obtain a written agreement that the non-institutional customer does not inte
account for day trading activities. A firm would not be permitted to rely on the
agreement from the customer if the firm knows that the customer intends to us
for day trading, or the firm later determines that the account is being used for

In order to approve the customer's account for day trading, the member firm m
reasonable grounds for believing that the day trading strategy is appropriate. Ii
determination, the member must exercise reasonable diligence to ascertain ess
about the customer, including the customer's financial situation, tax status, em
prior investment and trading experience, and investment objectives. The firm v
to prepare a record setting forth the basis on which the firm has approved the
account.

### Temporary Capital

On February 23, 2000, the SEC staff issued an interpretive letter relating to the
treatment of temporary capital contributions.[87] This letter makes it clear that if
contributes capital to a broker-dealer with an understanding that the contributi
withdrawn at the option of the individual, the contribution may not be included
capital computation and must be characterized as a liability. In addition, the int
letter states that any withdrawal of capital by an individual within a period of or
than a withdrawal to make required tax payments and reasonable compensatio

described in Rule 15c3-1, shall be presumed to have been contemplated by the
time of the contribution. This interpretation is consistent with the position the s
emphasized in the past, and should clarify a day trading firm's obligation to ma
permanent capital under the net capital rule.

**Day Trading Margin Proposed Rules**

The NYSE and NASD have proposed rules that would require day trading firms t
use of margin by active day traders. The NYSE and NASD rule proposals are su
similar. On January 14, 2000, the SEC issued the NYSE's rule proposal for publi
the comment period closed on February 15.[88] On February 11, 2000, the SEC i
NASD's rule proposal for public comment, and the comment period will close 3(
published in the Federal Register.[89]

The proposed amendments would adopt a new term "pattern day trader," whicl
any customer that executes four or more day trades within five business days,
number of trades is more than six percent in the account for the five day perioc
proposed amendments, a pattern day trader would be required to maintain a m
of $25,000 at all times. If the account falls below the $25,000 requirement, the
trader would not be permitted to day trade until the account is restored to a $2
level.

The proposed amendments would also require special maintenance margin for
traders equal to 25% of the cost of all day trades made during the day. This, in
permit a pattern day trader to have buying power of four-times the equity in th
trader's account. In addition, if the day trading firm keeps a record showing the
of each trade as evidence of the sequence of the day trades, the pattern day tr
permitted to maintain margin based on the largest aggregate open position dur

Under the proposed amendments, if the pattern day trader exceeds his/her buy
during the day, the pattern day trader would receive a margin call, which must
five business days. If the margin call is not met, the pattern day trader's buyin
be reduced to two-times the equity in the account and the pattern day trader's
requirement would be based on the pattern day trader's cumulative positions d
not the largest aggregate open position during the day. In addition, if the marg
within the required five business days, no trades on margin would be allowed fc
until the margin call is met.

In addition to these new margin requirements, the proposed rules would also re
day trader that makes a deposit to satisfy a margin deficiency to keep the depc
account for at least two business days. Further, a pattern day trader would be |
using cross guarantees to satisfy a margin requirement. Together, these requir
designed to provide greater financial stability to pattern day trader accounts an
require pattern day traders to utilize funds actually on deposit in their accounts

**Joint Back Office Proposed Rules**

A Joint Back Office (JBO) arrangement is where a clearing firm effects and finar
for other broker-dealers, or JBO participants, that are also owners of the cleari
clearing firm"). Under Regulation T, a JBO clearing firm may extend credit to it!
participants without requiring Regulation T margin. This exemption from Regul;
treats a JBO participant as a self-clearing broker-dealer, whose proprietary sec!
transactions are not subject to margin rules.

Recently, the SEC approved SRO rule changes relating to JBO arrangements.[90]
changes establish capital and equity requirements for JBO clearing firms and JE
and are designed to protect the safety and soundness of JBO arrangements. Ge
changes require a JBO clearing firm to: (1) maintain a minimum of $25 million
capital or $7 million in net capital if its primary business is clearing for options
(2) provide prompt written notification to its SRO if its tentative net capital or r
whichever applies, falls below the prescribed requirements; (3) resolve any net
deficiency within three business days or not be permitted to accept additional t
through the JBO arrangement;[91] (4) maintain a written risk analysis methodolc
the amount of credit extended to each JBO participant; and (5) deduct from its
JBO participant's haircut requirement in excess of the equity maintained in the
account.

In addition, the rule changes generally require a JBO participant to: (1) be a re
dealer subject to SEC Rule 15c3-1; (2) maintain an ownership interest in the JE
in accordance with Regulation T; and (3) maintain a minimum liquidating equit:
an account with the JBO clearing firm. Under the rule changes, if a JBO particip
equity falls below the required $1 million, the JBO participant must deposit the
5 business days or lose its JBO participant status and become subject to the ma
requirements under Regulation T and the other SRO maintenance margin requi

### Series 7 Proposed and Approved Rules

On August 20, 1999, the Commission approved a Phlx rule change that require:
trader that is a limited partner in one of these firms to pass the Series 7 exami
rule becomes effective on February 25, 2000, which means that all currently re
associated persons who trade off the floor of Phlx must successfully pass the Se
date. In addition, all new persons that become associated with member organiz
participant organizations must successfully complete the exam prior to conduct

The Commission also approved similar changes to the Pacific Exchange[93] and C
Exchange's[94] rules, and anticipates approval of the Boston Stock Exchange's ru

### Appendix B: Summary of SEC Day Trading Enforcement Efforts

### 1. Investigations

The SEC's Division of Enforcement currently has several active investigations in
trading entities and other firms that provide stock recommendations to day tra
Enforcement staff is reviewing their activities for, among other things:

- extensions and/or arrangements of margin credit by broker-dealers and t
  contravention of Regulation T;

- illegal short sales;

- net capital and record-keeping;

- registration violations by entities that provide training or other services t

- trading ahead of recommendations and scalping (undisclosed selling whil

recommendations) by operators of web sites that provide daily stock pick and

- misrepresentations about the performance track record of web sites that stock picks to day traders.

## 2. Enforcement Actions

On February 22, 2000, the SEC instituted administrative proceedings against tv firms for margin violations. Specifically, the Division of Enforcement alleged tha failed to comply with the margin lending provisions of the Exchange Act and Re

*In the Matter of All-Tech Direct, Inc.*

The SEC instituted administrative and cease-and-desist proceedings against All Inc., a registered broker-dealer, and seven All-Tech associated persons. The SE Instituting Proceedings alleges that All-Tech repeatedly breached the limits imp Regulation T by extending short-term loans to customers to meet margin calls from the accounts of three All-Tech associated persons. It is alleged that these person accounts funded at least 103 loans totaling more than $3.6 million to Al customers. The SEC's Order also alleges that All-Tech violated Exchange Act Ru failing to provide customers with certain written disclosures concerning the fee: essential terms of the loans.

*In the Matter of Investment Street Company*

In a settled matter, the SEC instituted cease-and-desist proceedings against tw Investment Street Company and Dynamic Trading of Miami, Inc., and Investme president as well as one its directors. Investment Street is a registered broker- Florida which specializes in facilitating day trading by its customers. Dynamic T Florida corporation that provides administrative services to Investment Street.

The SEC's Order found that Investment Street repeatedly exceeded the Regulat extending short-term loans to customers to meet margin calls with funds from controlled by Emilio Sardi, a director of the firm. According to the SEC's Order, least 22 such loans, totaling $250,000. The Order also finds that Investment St Exchange Act Rule 10b-16 by failing to provide customers with certain written concerning the fees and other essential terms of the loans.

Separate from the margin violations, the SEC's Order found that Investment St Dynamic Trading were liable for violations arising from the conduct of two Dyna These two employees regularly used Investment Street's facilities to trade for t account without registering.

All of the respondents agreed to settle this matter. The settlement includes cea orders against all respondents, civil money penalties ranging from $5,500 to $2 month and 90-day broker-dealer suspensions for Investment Street's president respectively.

The SEC has also brought other enforcement actions related to day trading:

*Tokyo Joe*

On January 5, 2000, the SEC filed an action in federal district court charging Yu

a/k/a Tokyo Joe ("Park") and Societe Anonyme, a corporation under Park's con...
engaging in a scheme to defraud members of his Internet stock recommendatio...
the investing public. The SEC's complaint alleges that Park, who charged his cli...
$200 per month to receive stock recommendations over the Internet, (i) made
misrepresentations about the recommendations and engaged in scalping; (ii) [i]l...
least one issuer by failing to disclose the receipt of compensation from that iss...
misrepresented his track record of success. The SEC's complaint charges violat...
10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 17(b) of the Se...
Sections 206(1) and (2) of the Advisers Act. The action is currently pending.

## Footnotes

[1] Examiners from the SEC headquarters, regional and district offices participate...
The staff of the NASD Regulation, Inc. ("NASDR") and the Philadelphia Stock E...
("PHLX") conducted additional examinations. The examination findings describe...
those of the Staff, and are not findings of the Commission.

[2] See Day Traders Working Hard to Influence How the Profession is to be Define...
Week (McGraw-Hill Companies, Inc.), May 24, 1999, at 3.

[3] ICI and SIA, Equity Ownership in America, Fall 1999, at 14.

[4] Day Traders Working Hard to Influence How the Profession is to be Defined, su...

[5] Several on-line broker-dealers provide direct access to market centers for acti...
customers. See Rebecca Buckman, Online Brokers, Day-Trade Firms Start To E...
Others Cyber Turf, Wall St. J., Oct. 6, 1999, at C1; David Barboza, Why Big Fir...
Day Traders, N.Y. Times, Aug. 13, 1999, at C1.

[6] Chairman Arthur Levitt, Speech by SEC Chairman: Plain Talk About On-line In...
1999) http://www.sec.gov/news/speeches/spch274.htm

[7] Mary L. Schapiro, Testimony on the Securities Day-Trading Industry, Testimor...
Permanent Subcommittee on Investigations, Senate Committee on Governmen...
16, 1999) http://www.nasdr.com/1420/schapiro_14.htm.

[8] 17 C.F.R. § 240.15c3-3 (1998).

[9] Regulation T, 12 CFR § 220 (1998).

[10] E.g., NASD Conduct Rule 2520, NASD Manual (CCH) (1999); NYSE Rule 431,
(CCH) ¶ 2431, at 3751 (Oct. 1998).

[11] E.g., NASD Conduct Rule 2310, NASD Manual (CCH) (1999); NYSE Rule 405,
(CCH) ¶ 2405, at 3696 (Oct. 1998).

[12] Exchange Act Section 15(b)(8) provides that if a broker-dealer executes or a...
execute the purchase or sale of any security, the broker-dealer must be registe...
NASD. 15 U.S.C. § 78o(b)(8) (1999). However, Exchange Act Rule 15b9-1 pro...
broker or dealer required by Section 15(b)(8) to become a member shall be ex...
requirement if it (1) is a member of a national securities exchange, (2) carries...
accounts, and (3) has annual gross income derived from purchases and sales o...

otherwise than on a national securities exchange of which it is a member in an
greater than $1,000." 17 C.F.R. § 240.15b9-1 (1998).

[13] Exchange Act Release No. 41776 (Aug. 20, 1999), 64 Fed. Reg. 47214 (1999
requirement becomes effective on February 25, 2000. Other regional exchange
or proposed rules to impose a Series 7 licensing requirement on their off-floor t
traders.

[14] In comparison, over the past year, the average commission paid by U.S. inve
generally between $19 and $21. *See* Kathy Bergen, *On-Line Investing Price Cu*
*Brokerages Going for Broke on Commissions*, Chi. Trib., Sept. 5, 1999, at C1.

[15] The Staff gathered age data, annual income information, and net worth data
294 day traders from ten NASD member firms, three PHLX member firms, and
member firm. This was not a scientific sample and the information was self-rep
information was obtained from customer account forms, U-4 forms, and/or cor
questionnaires. Not all of the firms maintained information on traders in all thr
each area was analyzed independently. The Staff also attempted to compile inf
regarding prior trading and investing experience of day-traders, but source doc
limited information in these areas.

[15] Age information was compiled from 11 firms.

[17] Annual income information was compiled from 11 firms.

[18] Net worth data was compiled from 11 firms.

[19] The North American Securities Administrators Association, Inc. ("NASAA") Pr
Report on Day Trading states that, based on a sample of 26 accounts, "70% of
will not only lose, but will almost certainly lose everything they invest." *See* No
Securities Administrators Association, Inc., Day Trading Project Group Report: |
Recommendations (Aug. 9, 1999) nasaa.org/nasaa/scripts/fu_display_list.asp?
Electronic Traders Association ("ETA") states, "after an initial period of three to
losses, 60–65% netted in the range of $28,000 per month, with the balance of
$6,000-$8,000 per month." The ETA concluded that "the majority of those who
training do not lose money." Statement of Electronic Traders Association, Hear
Permanent Subcommittee on Investigations (Sept. 16, 1999) http://electronic-
traders.org/state030.html

[20] Profits and losses were net of any fees charged to the trader for the trades.

[21] The ETA pointed to the relative dearth of complaints as evidence that day-tr
getting "wiped out" in the high numbers many regulators claim they are. Statel
Electronic Traders Association, *supra* note 19. Some commentators believe that
complaints is due solely to the current bull market.

[22] OIEA typically contacts firms to request a response to the complaint and the
complainant of the firm's response. OIEA makes referrals to the SROs or the Di
Enforcement where appropriate.

[22] Chairman Arthur Levitt, Testimony Before the Senate Permanent Subcommitt
Investigations Committee on Governmental Affairs Concerning Day Trading (Se
www.sec.gov/news/testimony/tsty2199.htm.

[24] NASDR has stated that investors should be made aware that day trading is "a
speculative activity, and even the most experienced day traders may suffer sev
unexpected financial losses, even beyond their initial investment." Mary Schap
NASAA has expressed concerns that day-trading firms provide inadequate risk
potential customers. NASAA, supra note 19. The ETA has also expressed concer
of the recent attention day trading has received, many individuals may be enc
undertake the activity without the benefit of a clear understanding of the poten
involved. ETA, supra note 19.

[25] Exchange Act Release No. 41875 (Sept. 14, 1999), 64 Fed. Reg. 51165 (Sep
amended by Exchange Act Release No. 42452 (Feb. 23, 2000).

[26] The ETA also adopted a Model Risk Disclosure Statement to help inform pote
of the risks associated with day trading. The statement includes the following:

- Successful Electronic Day trading typically requires skill and discipline as
  experience and knowledge of capital markets.
- Each trade generates a commission and the total daily commission on su
  of trading can be in excess of any earnings.
- Persons new to day trading should limit number of trades in order to redu
- Losses may be more than initial capital.
- Placing contingent orders, such as "stop-loss" or "stop-limit" orders will n
  limit losses.
- Under certain market conditions you may find it difficult or impossible to
  position quickly at a reasonable price.
- In addition to market risks, you may experience losses due to system fail
- The use of margin or leverage in an account can work against you as wel
- You should consult your broker concerning the nature of the protections
  safeguard funds or property deposited in your account.

See http://electronic-traders.org/state02l.html

[27] NASD Conduct Rule 2210, NASD Manual (CCH) (1999); PHLX Rule 605, 1 PHl
2605, at 2203 (1998).

[28] NASD Conduct Rule 2210(d)(1)(B), NASD Manual (CCH) (1999).

[29] 17 C.F.R. § 240.10b-5 (1998).

[30] SEC Books and Records Rules, 17 C.F.R. § 240.17a-3 and 17a-4 (1998).

[31] Moment to Moment Net Capital, NYSE Interpretation Memorandum No. 99-8,

[32] The firms examined generally fell into two categories, those with a $5,000 mi

capital requirement and those with a $100,000 minimum net capital requireme
day-trading firms that effect more than ten transactions in their proprietary acc
subject to a minimum net capital requirement of $100,000. 17 C.F.R. § 240.15
(1998).

[33] PHLX Circular 2000-01, (Jan. 3, 2000).

[34] SEC Net Capital Rule, 17 C.F.R. § 240.15c3-1 (1998). The Net Capital Rule in
restrictions and limitations on the withdrawal of equity capital from a broker-de
stockholder or partner. The rule also obligates a broker-dealer to provide writte
the SEC and its SRO of a withdrawal or expected withdrawal, if the withdrawal
withdrawal exceeds a certain percentage of the firm's net capital.

[35] Letter to Mr. Raymond J. Hennessy, Vice President, New York Stock Exchange
Susan DeMando, Vice President, NASD Regulation from Michael A. Macchiaroli,
Director, Securities and Exchange Commission, dated February 23, 2000.

[36] 15 U.S.C. § 78g (1999).

[37] Regulation T, supra note 9. Any "broker or dealer, or any person associated w
dealer" is a "creditor" for purposes of Regulation T. 12 C.F.R. § 220.2 (1998). F
associated with a broker-dealer generally include partners, officers, directors, t
managers, and employees, 15 U.S.C. § 78c(a)(18) (1999).

[38] 12 C.F.R. § 220.4(b) (1998) (describing the initial margin customers must de
securities transactions). The margin required for equity securities is generally 5
current market value of the security or the percentage set forth by the SROs, w
greater. 12 CFR § 220.12(a) (1998).

[39] The firm combines all transactions that occur on the same day to determine w
additional margin is necessary. Additional margin is required on any day when
transactions create or increase a margin deficiency. The additional margin requ
amount of the margin deficiency created or increased. 12 C.F.R. § 220.4(c) (19

[40] Under Regulation T, a margin call must be satisfied "within one payment peri
margin deficiency was created or increased." 12 C.F.R. § 220.4(c)(3)(i). A payr
business days," 12 C.F.R. § 220.2 (1998). The standard securities settlement
defined as the "number of business days in the standard securities-settlement
three business days," 17 C.F.R. § 240.15c6-1(a) (1998).

[41] See NYSE Rule 431(c), 2 NYSE Guide (CCH) ¶ 2431, at 3751-3 (Oct. 1998); f
Rule 2520(c), NASD Manual (CCH) (1999).

[42] E.g., NYSE Rule 431(f)(6), 2 NYSE Guide (CCH) ¶ 2431, at 3771 (Oct. 1998).

[43] See e.g., NYSE Rule 431(f)(8)(C), 2 NYSE Guide (CCH) ¶ 2431, at 3771 (Oct.
Regulation T nor the SRO maintenance margin rules prevent a broker-dealer fr
more stringent margin requirements, such as imposing margin calls on an acco
day or requiring more margin for volatile securities. In fact, some firms provide
days to meet a margin call.

[44] E.g., NYSE Rule 431(f)(8)(B), 2 NYSE Guide (CCH) ¶ 2431, at 3771 (Oct. 199

[45] Exchange Act Release No. 42343 (Jan. 14, 2000), 65 Fed. Reg. 4005 (2000).

[46] Exchange Act Release No. 42418 (Feb. 11, 2000), 65 Fed. Reg. 8461 (2000).

[47] Board of Governors of the Federal Reserve System Docket No. R-0772 (Apr. ; Fed. Reg. 20386 (1996).

[48] 12 CFR § 220.3(g) (1998).

[49] A large broker-dealer responsible for clearing trades for several day-trading prohibited the practice of customer-to-customer lending to meet margin calls. ; *Day-Trading Firms Face Pressure on Practices*, Wall St. J., Aug. 17, 1999, at C1

[50] 17 C.F.R. § 240.10b-16 (1998).

[51] Exchange Act Release No.8773 (Dec. 8, 1969) (adopting Rule 10b-16), 34 Fe (1969). The Truth in Lending Act specifically exempted from its disclosure requ brokers' margin loans to customers because the Committee (Senate Committee Currency) preferred to allow the Commission to require substantially similar dis regulation.

[52] The Rule [10b-16] requires an initial disclosure and periodic disclosures. The is designed to insure that the investor, before his account is opened, understan and conditions under which credit charges will be made. This will enable him to various credit terms available to him and to understand the methods used in cc actual credit charges. The periodic statement will inform the investor of the act and, with the aid of the initial disclosure, enable him to accurately assess that c

[53] JBOs are not limited to proprietary day-trading firms. They are utilized by oth dealers as well. However, proprietary day-trading firms pass the proprietary be arrangement to their members.

[54] 12 C.F.R. § 220.7(c) (1998).

[55] JBO arrangements appear to increase the overall risk to the clearing firm. Thi focus of the initial series of exams, but will be reviewed in our examinations of management procedures of clearing firms.

[56] Exchange Act Release No. 42453 (Feb. 24, 2000) (order approving the follow changes: SR-NYSE-97-28; SR-CBOE-97-28; SR-Phlx-97-56; SR-PCX-97-49; SF SR-Amex-99-26).

[57] *See* SEC Net Capital Rule, *supra* note 34. Under the Rule, a broker-dealer is r maintain at all times a minimum level of net capital as prescribed under the Ru dealer's net capital falls below the prescribed minimum requirement under the R cease conducting a securities business.

[58] *See* Board of Governors of the Federal Reserve, *supra* note 47.

[59] 15 U.S.C. § 78j(a) (1999). Section 10(a) of the Exchange Act states that

[i]t shall be unlawful for any person, directly or indirectly, by the use of any me

instrumentality of interstate commerce or of the mails, or of any facility of any securities exchange [t]o effect a short sale, or to use or employ any stop-loss c connection with the purchase or sale, of any security registered on a national s exchange, in contravention of such rules and regulations as the Commission m necessary or appropriate in the public interest or for the protection of investors

On October 20, 1999, the Commission issued a concept release seeking public regulation of short sales of securities. The purpose of the concept release is to comments on possible amendments to Exchange Act Rule 10a-1 and other pote the Commission's regulation of short selling. Exchange Act Release No. 42037 1999), 64 Fed. Reg. 57996 (1999).

[50] 17 C.F.R. § 240.10a-1 (1998).

[51] *Id.* Exchange Act Rule 10a-1 applies to transactions in exchange-listed securi short sales on the national securities exchanges must comply with the Rule. Th have codified Rule 10a-1 as their short sale rule. *E.g.*, NYSE Rule 440B, 2 NYSE 2440B, at 3784 (Oct. 1998).

[52] 17 C.F.R. § 240.10a-1(e) (1998).

[53] NASD Conduct Rule 3350, NASD Manual (CCH) (1999).

[54] Exchange Act Rule 3b-3 defines short sales. 17 C.F.R. § 240.3b-3 (1998). Th definition to define short sales in NASD Conduct Rule 3350. Firms must aggreg positions in accounts that are under common control to determine the net long position. For customer short sales, the firm must aggregate all the customer's p accounts. For day traders that are trading for the firm's proprietary account, th aggregate all the day traders' positions with the firm's other positions to determ net long or short position before any sales are executed.

[55] 17 C.F.R. § 240.10a-1(c) and (d) (1998); NASD Conduct Rule 3370(b)(1), N/ (CCH) (1999).

[56] NASD Conduct Rule 3370(b)(2) ("Affirmative Determination Rule"), NASD Ma (1999). The Affirmative Determination Rule does not apply to a number of tran including "bona fide market making transactions," NASD Conduct Rule 3370(b) words, bona fide market makers may sell short without checking the availabilit stock to be used for delivery.

[57] 17 C.F.R. § 240.10a-1c (1998).

[58] NASD Conduct Rule 3110(b)(1), NASD Manual (CCH) (1999). Although this r to customer orders, short sales of NMS securities by members of LLCS still mus in accordance with the bid test. For exchange-listed securities, firms must also and proprietary short sale orders in accordance with Rule 10a-1 and any other exchange rules.

[59] NASD Conduct Rule 3350(e) states that: "No member shall knowingly, or with know, effect sales for the account of a customer or for its own account to avoid of this Rule." *See also*, NYSE Rule 440B.13, 2 NYSE Guide (CCH) ¶ 2440B, at 3

[70] NASD Notices to Members 99-98 (Dec. 1999).

[71] The SEC's Office of Economic Analysis conducted a more comprehensive anal trading activity at eight firms over a one-week period. The analysis focused on Rule 10a-1, and identified short sales by comparing actual trades with specific positions of the broker-dealer at the beginning and close of business. After sho identified, the transactions were tested for short sale rule compliance by match transactions against actual exchange data for time of trade.

[72] A Married Put is a strategy in which one owns an option to sell a security on a a predetermined price, while simultaneously purchasing the underlying security

[73] Cougars mimic a married put, consisting of a short call position and a long po common stock of the same issuer.

[74] A Jaguar employs an option strategy known as a conversion. The Jaguar cons position of 1,000 shares stock, a purchase of 10 deep-in-the-money puts and a that are out-of-the-money.

[75] NASDR Conduct Rule 2310(b), NASD Conduct Manual (CCH) (1999). The Rule require recommending the purchase, sale, or exchange of a security, a broker-dealer h grounds for believing that the recommendation is suitable for the customer bas customer's security holdings, financial situation, and needs. In meeting this du dealers must make reasonable efforts to obtain information concerning: (1) the financial status, (2) the customer's tax status, (3) the customer's investment o (4) any other information the broker considers reasonable in making a recomm customer.

[76] In its recent report on day trading, NASAA states that analogizing between di brokerage firms and day-trading firms may be incorrect. NASAA believes that " day trading as an investment program, often in conjunction with training cours trading firms generally do not make specific recommendations to customers, th supra note 19.

[77] Exchange Act Release No. 41875, supra note 25. Proposed NASD Conduct Ru term "intra-day trading strategy" as an overall trading strategy characterized b transmission by a customer of multiple intra-day electronic orders to effect bot sale transactions in the same security or securities.

[78] Formal training included a day-trading course or seminar. Many firms advert of the training programs on their web sites. Most of the firms charged fees for t trading instruction, ranging from $250 to $5,000, however, several firms provi seminars at no cost. A couple of firms offered rebates of the training cost back dollar increments if the trader opened an account and executed trades with the the training cost is refunded, the trader still incurs and pays the fees associate trade.

[79] 15 U.S.C. § 78o(b)(4)(E) (1999).

[80] Id.

[81] NASD Conduct Rule 3010, NASD Conduct Manual (CCH) (1999), PHLX Rule 748 also r member's supervisory system to diligently supervise all accounts to ensure con

securities laws and regulations, 1 PHLX Guide (CCH) ¶ 2748, at 2282 (1998).

82 See e.g., NASD Conduct Rule 3010(a)(2), NASD Manual (CCH) (1999).

83 SRO rules also require that members adopt appropriate written procedures fo[r] and control. See supra note 79.

84 See e.g., NASD By-Laws Article IV Section 8, NASD Manual (CCH) (1999); PH[LX] PHLX Guide (CCH) ¶ 2601, at 2201 (1998).

85 Persons are required to be registered with the SEC if they are engaged in the effecting transactions in securities for others, or are engaged in the business of selling securities for their own account. This definition does not include a bank, who buys or sells securities individually or as a fiduciary not as part of a regula[r] U.S.C. § 78c(a)(4) and (5) (1999). Persons are required to be registered with t[he] state securities regulator, as appropriate, as investment advisers if they are en business of advising others about securities for compensation. 15 U.S.C. § 80b-(1999).

86 Securities Exchange Act Release No. 41875 (September 14, 1999), 64 FR 51: 21, 1999) (as amended by Exchange Act Release No. 42452 (Feb. 23, 2000).

87 Letter to Mr. Raymond J. Hennessy, Vice President, New York Stock Exchang[e] Susan DeMando, Vice President, NASD Regulation from Michael A. Macchiaroli, Director, Securities and Exchange Commission, dated February 23, 2000.

88 Securities Exchange Act Release No. 42343 (January 14, 2000), 65 FR 4005 2000).

89 Securities Exchange Act Release No. 42418 (February 11, 2000), 65 FR 8461 2000).

90 Exchange Act Release No. 42453 (Feb. 24, 2000) (order approving the follow changes: SR-NYSE-97-28; SR-CBOE-97-28; SR-Phlx-97-56; SR-PCX-97-49; SR SR-Amex-99-26).

91 SEC Rule 15c3-1 requires a broker-dealer to maintain at all times its minimu[m] requirement prescribed under the Rule. Under SEC Rule 15c3-1, if a broker-de falls below its prescribed minimum requirement under the Rule, it must cease c securities business.

92 Securities Exchange Act Release No. 41776 (August 20, 1999), 64 FR 47214 1999).

93 Securities Exchange Act Release No. 41881 (September 17, 1999), 64 FR 51 24, 1999).

94 Securities Exchange Act Release No. 39874 (April 14, 1998), 63 FR 19990 (A

95 SR-BSE-99-13 was filed on December 30, 1999.