disclose any of the FDA regulations concerning the marketing of OTC drugs and how Vaso or BioChemics had purportedly determined that the Current Products "qualified under FDA OTC monographs" and (2) failed to correct the materially false and misleading statement in the Registration Statement that the Current Products had "received "FDA approval." Second, in the Company's 10-KSB/A, the Company revealed for the first time that none of the Current Products had a transdermal effect and none employed the VALE transdermal drug delivery technology, contrary to the representations concerning these products in the 10-KSB. Specifically, the 10-KSB/A stated for the first time that the Current Products used the Company's "PENtoCORE topical formulation," which, unlike VALE, was not covered by any patents and had only a topical effect, rather than the purported transdermal effect of VALE. In the Company's 10-KSB, PENtoCORE was described only as a registered trademark, not as a drug formulation distinct from VALE. There was no other mention of PENtoCORE included in the 10-KSB.

50. Also on March 26, 2004, Vaso held a conference call to discuss its year-end results. On the call, defendant Masiz said the Company expected the Company's annual gross revenues to grow form $53,000 to at least $12 million in 2005 based on the strategic marketing alliances the Company had closed in the prior 90 days. Surprisingly, the Company decided to conclude the conference call without providing participants with an opportunity to ask questions, which is the normal course.

51. In response to the abrupt conclusion of the conference call, Vaso's stock closed at $7.46 per share on March 26, 2004, down $0.59 per share, or 7.3%, from its closing price of $8.05

per share on March 25, 2004. The Company's stock price ultimately closed at $7.59 on March 31, 2004, the last day of the Class Period.

## POST CLASS PERIOD DISCLOSURES

52. On April 1, 2004, the day after the last day of the Class Period, the SEC suspended all trading in the Company's stock.

53. On April 7, 2004, Vaso issued a press release concerning the SEC's trading suspension, the Company's subsequent meetings with the Staff of the SEC, and the Company's decision to voluntarily delist its stock from Nasdaq:

> April 7, 2004--Vaso Active Pharmaceuticals, Inc. (NasdaqSC: VAPH) today announced that the U.S. Securities and Exchange Commission (the "Commission") temporarily suspended trading of the securities of Vaso Active Pharmaceuticals, Inc. ("VAPH"), effective 9:30 a.m. on April 1, 2004. The suspension, by its terms, terminates at 11:59 p.m. on April 15, 2004. The Commission also stated that it temporarily suspended trading in the securities of the Company because of questions regarding the accuracy of assertions by the Company and by others, in press releases, its annual report, its registration statement and public statements to investors concerning, among other things: (1) the U.S. Food and Drug Administration ("FDA") approval of certain key products, and (2) the regulatory consequences of the future application of their primary product. . . .
>
> On April 5, 2004, representatives of the Company, together with newly retained special securities counsel and newly retained FDA counsel, met with the Staff of the Commission (the "Staff") for the purpose of discussing the concerns that led to the suspension of trading of the Company's securities. During that meeting, the Company stated its intention to review its public disclosure, press releases and other public statements and to take whatever remedial action may be appropriate. It also represented that it would diligently seek to clarify the status of its products under current FDA regulations, would issue disclosure regarding the FDA regulation of its activities and products and the results of its dialogue with the FDA, and would endeavor to resolve on a timely basis any concerns communicated by the Staff. The Staff stated that it had been authorized by the Commission to seek injunctive relief against the Company, articulated the concerns that gave rise to the suspension of

18

trading, and informally requested that the Company provide certain information to the Staff. The Company agreed to cooperate with the Staff, committed to review its disclosure promptly and committed to take any remedial action that may be required

The Company cannot predict what, if any, actions may be taken by the Commission; nor is the Company aware whether the FDA is contemplating any action against the Company. The Company, through counsel, intends to commence dialogue with the FDA promptly to address any FDA concerns.

Due to the ongoing nature of this matter, the Company is unable to assess definitively its impact, except that the Company has committed not to sell its products until this matter has been concluded to the satisfaction of the Commission. The commitment to refrain from selling the Company's products may have a material adverse impact on the Company. The Company will make public announcements and will file public reports with the Commission, when appropriate, including a complete description of regulations applicable to the Company's products and operations, as well as disclosure regarding the status of its products under applicable FDA regulations. No estimate can be given as to the date when the Company's efforts to revise its disclosure will be completed; nor can any estimate be given as to the date when its securities will resume trading. However, the Company is reasonably certain that the necessary disclosures and filings will not be made prior to the termination of the current trading suspension, and, therefore, the Company believes that its securities will not be able to be traded at that time. The Company will not seek to have its securities resume trading until it is reasonably comfortable that the concerns that gave rise to the trading suspension have been satisfactorily resolved.

By letter dated April 2, 2004, the Nasdaq Listing Investigations department of The Nasdaq Stock Market, Inc. ("Nasdaq") notified the Company that it commenced an inquiry to ensure the Company's ongoing compliance with Nasdaq's inclusion requirements and requested certain information from the Company. The letter further disclosed that after review of the information provided by the Company, Nasdaq could take any action that may be appropriate under its Marketplace Rules including removal of the Company's securities from Nasdaq. In view of the substantial administrative and cash burdens being borne by the Company at this time, the Company has determined that it is in the best interest of shareholders to voluntarily cause its shares to be removed from Nasdaq so that the Company can focus its attention and resources on addressing the other issues addressed in this press release. The Company has been informed that its securities will be delisted, effective the opening of the markets on Thursday, April 8, 2004. At an appropriate time, the Company will seek to cause its securities to be quoted on an exchange, Nasdaq or an automated quotation system. There can be no

assurance that the Company will be successful.

THE COMPANY URGES INVESTORS NOT TO RELY ON THE COMPANY'S EXISTING REPORTS FILED PURSUANT TO THE EXCHANGE ACT, NOR ON ANY ANNOUNCEMENTS, PRESS RELEASES OR PUBLIC STATEMENTS ISSUED BY IT OR OTHERS RELATING TO ITS FINANCIAL CONDITION, RESULTS OF OPERATIONS OR ITS BUSINESS OR PRODUCTS GENERALLY, OR ANY EARNINGS GUIDANCE PREVIOUSLY RELEASED BY THE COMPANY. THE COMPANY FURTHER URGES INVESTORS TO REFRAIN FROM TRADING IN THE COMPANY'S SECURITIES UNTIL THE COMPANY PROVIDES FORMAL GUIDANCE THAT THE CONCERNS THAT ARE THE SUBJECT OF THIS RELEASE HAVE BEEN FULLY ADDRESSED.

54. After the SEC trading suspension expired on April 15, 2004, trading in the Company's stock resumed on the over-the-counter bulletin board on Friday, April 16, 2004. On that date, the price of the Company's stock closed at $1.75 per share, a $5.84 per share, or 77%, decline from its closing price of $7.59 per share on March 31, 2004.

55. On August 17, 2004, the SEC filed the SEC Complaint against the Company and defendant Masiz, alleging that these defendants made material misrepresentations and omissions in both public statements and filings made with the SEC by falsely claiming, among other things, that Vaso's Current Products had received FDA approval and were qualified under an FDA OTC monograph.

56. On August 27, 2004, Vaso announced that the SEC had formally approved the terms of a settlement regarding Vaso and defendant Masiz's alleged violations of the federal securities laws stemming from their issuance of materially false and misleading statements appearing in the Registration Statement, the 10-KSB, and the Company's website. Pursuant to the terms of the settlement, Vaso was permanently enjoined from violating the antifraud and reporting provisions of the Exchange Act,

and defendant Masiz paid a fine of $80,000 and agreed to be barred from serving as an officer or director of any public company for a period of 5 years.

57.   On July 21, 2004, Vaso filed the 10-KSB/A, which for the first time disclosed the extensive regulatory requirements and procedures impacting the Company's OTC drug products. The 10-KSB/A also for the first time described the Current Products as having only a topical formulation and effect, and none were described as having FDA approval, qualifying under FDA OTC monographs, or employing the VALE technology, contrary to the representations made about the Current Products during the Class Period. In fact, the Company disclosed for the first time that it would not pursue the development and marketing of OTC drug products that employed the VALE technology until it "secured a partnership with a larger marketing partner specifically for those products." Similarly, the Company also changed the description of itself by stating that it was focused on the commercialization, marketing, and sale of OTC drug products that incorporate topical and transdermal formulation platforms, whereas during the Class Period, the Company's public disclosures stated that the Company was solely focused on OTC drug products that incorporated VALE. Thus, between the time of the IPO and July 2004, a mere 7 months, the business focus and competitive position of the Company had dramatically changed with the Company effectively abandoning VALE, the very technoloy that it had heavily touted to sell its stock in the IPO. In reality, and unknown to investors during the Class Period, Vaso was never in a position to market and sell OTC drug products incorporating VALE.

## ADDITIONAL SCIENTER ALLEGATIONS

58. As alleged herein, defendants Vaso, Masiz, and Carter acted with scienter in that they knew that the public documents and statements they issued or disseminated were materially false and misleading when made; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Vaso, their control over Vaso's materially false and misleading statements, and their associations with the Company and BioChemics which made them privy to confidential proprietary information concerning Vaso, participated in the fraudulent scheme alleged herein.

59. In an interview with The Wall Street Transcript published on March 8, 2004, defendant Masiz demonstrated his knowledge of the FDA regulations impacting the OTC drug market and Vaso's Current Products. In response to a question about regulatory requirements with respect to OTC drugs, defendant Masiz conceded that when an OTC drug incorporates a new method of delivery, or route of administration, such as Vaso's VALE drug delivery technology, typically no FDA OTC monograph applies and the drug must successfully go through Phase I, II and III clinical trials before receiving FDA approval. Specifically, defendant Masiz stated as follows:

> The over-the counter process, in some ways, can be a lot faster than the traditional prescriptive drug process. But it depends a lot upon the active ingredient. Generally if there has been an established monograph for a specific OTC active ingredient and the active ingredient is paired with others that are classified by the FDA as generally regarded as safe, you can typically file with the FDA. Then compliance should be made with the manufacturing, stability and packaging regulations. So it's a very fast

22

process and it can allow you to get an active from formulation creation into the market place roughly at 90 to 120 days. *That is, for actives where monographs have been established; in an area where they have not, you still have to go through the Phase I, II and II process but it's typically faster because you're not dealing with safety issues and efficacy issues. You're dealing with new delivery issues.* In other words, it's the equivalent of going from an oral delivery to a drink to a suppository or another form of delivery. Typically it is much more abbreviated. (Emphasis added).

60.  In addition, defendants Masiz and Carter were highly motivated to artificially inflate the price of Vaso's common stock by virtue of their significant personal holdings of Vaso stock and options. According to the Company's proxy statement on Form DEF 14A, which was filed with the SEC on March 26, 2004, for the year ended December 31, 2003, defendant Masiz received options to purchase 300,000 shares of the Company's common stock at an exercise price of $1.83 per share and defendant Carter received options to purchase 225,000 shares of the Company's common stock at an exercise price of $1.67 per share. 50% of these options vested on February 13, 2004 and 25% were scheduled to vest on the first and second anniversary of the option grant. In addition, Masiz by virtue of his sole beneficial ownership of 85.7% of BioChemics, owned more than 3.8 million shares of Vaso Class B common stock, which were convertible at any time into Class A common stock.[2] Thus, both Masiz and Carter stood to profit handsomely from any increase in the price of Vaso's stock, which they were able to accomplish before the SEC exposed their fraudulent scheme.

---

[2] BioChemics received 4.5 million shares of Vaso Class B common stock in exchange for the exclusive rights it granted Vaso to the VALE technology as it related to the OTC marketplace as well as to the existing BioChemics portfolio of OTC products. BioChemics agreed with Kashner to not exercise its registration rights with respect to its Vaso shares for a period of two years from December 11, 2003 without the prior consent of Kashner.

23

61. Defendants Vaso, Masiz, and Carter were also motivated to misrepresent material facts about Vaso's Current Products and its business prospects, and to artificially inflate the price of its common stock, in order to raise working capital for the Company and to secure and pay for services. Specifically, as announced by the Company on March 17, 2004, Vaso raised $7.5 million through a private placement sale of an 18 month 2% Convertible Note and warrants to purchase 166,667 shares of Vaso Class A common stock at an exercise price of $8.75. At the option of the Company, the note was convertible into roughly 833,000 shares of Vaso Class A common stock at a conversion rate of $9.00 per share. The Riverview Group LLC ("Riverview"), the private equity arm of hedge fund Millennium Partners, was the purchaser of the note and warrants.

62. As announced by the Company on April 8, 2004, Vaso ultimately was forced to repay the $7.5 million to Riverview, pursuant to the terms of a settlement agreement between the two companies.

63. During the Class Period, Vaso was also able to use its artificially inflated share price to secure and pay for marketing, promotion, and brand development services. Specifically, pursuant to the terms of a marketing agreement dated January 1, 2004, Vaso issued to Commotion, LLC ("Commotion") five year warrants to purchase up to 225,000 shares of Vaso Class A common stock. The warrants were issued as of January 16, 2004 in three tranches of 75,000 warrants each. The first tranche of 75,000 warrants carried an exercise price of $1.67 per share, the second tranche carried an exercise price of $2.00 per share, and the third tranche had an exercise price of $2.17 per share. The day before the agreement was entered into between Vaso and Commotion, the Company's common

24

stock closed at $2.01 per share on December 31, 2003. At the time the 225,000 shares of common stock underlying the warrants were registered by Vaso on February 13, 2004, the Company's Class A common stock closed at $6.50 per share on February 13, 2004.

64. In a February 9, 2004 press release to announce the agreement with Commotion, Commotion's founder, Greg Gorman stated: "In our opinion, the products offered by Vaso Active exemplify the standard by which others will be measured. For this reason we couldn't be more excited about working with the management team at Vaso Active." Thus, through their material misrepresentations about Vaso's Current Products and the resulting artificial inflation in the price of Vaso's Class A common stock, defendants Vaso, Masiz, and Carter were able to secure valuable services from a reputable marketing and advertising firm, which they would not have otherwise been able to secure absent the material misrepresentations alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

65. At all relevant times, the market for Vaso's Class A common stock was an efficient market for the following reasons, among others:

(a) During the Class Period, Vaso's Class A common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient market;

(b) as a regulated issuer, the Company filed periodic public reports with the SEC and regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases;

(c) the misrepresentations and omissions alleged herein were material and would tend to

induce a reasonable investor to misjudge the value of Vaso common stock; and

(d) Plaintiffs and the members of the Class (defined below) purchased their common stock during the Class Period without knowledge of the omitted and misrepresented facts.

66. Based on the foregoing, the market for Vaso's common stock promptly digested current information regarding Vaso from all publicly available sources and reflected such information in Vaso's stock price. Under these circumstances, Plaintiffs and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market for Vaso Class A common stock for the purpose of class certification as well as for ultimate proof of their claims on the merits.

## CLASS ACTION ALLEGATIONS

67. Plaintiffs brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of themselves and a class (the "Class"), consisting of all those who purchased the Class A common stock of Vaso between December 9, 2003 to March 31, 2004, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Vaso common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class.

26

69. Plaintiffs' claims are typical of the claims of the members of the Class, because Plaintiffs and all of the Class members sustained damages arising out of Defendants' conduct complained of herein.

70. Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class actions and securities litigation.

71. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impractical for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

72. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the Company's publicly disseminated statements during the Class Period misrepresented material facts;

(c) Whether, with respect to the Exchange Act claims, defendants Vaso, Masiz, and Carter participated in and pursued the fraudulent scheme or course of business complained of;

(d) Whether, with respect to the Exchange Act claims, defendants Vaso, Masiz, and

Carter acted willfully, with knowledge, or recklessly, in misrepresenting material facts;

(e) Whether during the Class Period, the market price for Vaso common stock was artificially inflated due to the material misrepresentations complained of herein; and

(f) Whether members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## COUNT I

### [Against Defendants For Violations Of Section 11 Of The Securities Act]

73. Plaintiffs repeat and reallege each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 11 claim, including without limitation, scienter. The claim asserted in Count I is not based on any allegation of fraud set forth in this Complaint, and no such allegation is incorporated in this Count.

74. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against Defendants, on behalf of all acquirers, other than those excluded from the Class, of Vaso Class A common stock in connection with the IPO pursuant, or traceable, to the Registration Statement, as described above.

75. As alleged above, the Registration Statement was inaccurate and misleading, contained untrue and misleading statements of material facts, and omitted to state other material facts necessary to make the statements made not misleading.

76. Vaso was the registrant for the IPO. Kashner was the lead underwriter for the IPO as defined in section 11(a)(5) of the Securities Act. Defendants were responsible for the contents and

28

dissemination of the Registration Statement and caused its filing with the SEC.

77. As the registrant for the Registration Statement and issuer of the Class A common stock, Vaso is liable to acquirers of Vaso common stock in connection with the IPO for the material misstatements and omissions contained in the Registration Statement.

78. As an underwriter for the IPO, Kashner is liable to acquirers of Vaso common stock in connection with the IPO for the material misstatements and omissions contained in the Registration Statement.

79. Defendants Masiz, Carter, and Frattaroli, and the Outside Director Defendants, either individually or through an attorney-in-fact, signed the Registration Statement and are responsible for the contents and dissemination of the Registration Statement.

80. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in or incorporated by the Registration Statement were true and without omissions of any material facts and were not misleading.

81. Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public which were contained in or incorporated by the Registration Statement, which misrepresented or failed to disclose the facts set forth above. By reasons of the conduct herein alleged, Defendants violated Section 11 of the Securities Act.

82. Plaintiffs, as well as other similarly situated members of the Class, acquired Vaso Class A common stock pursuant, or traceable, to the Registration Statement and were damaged thereby, because the value of Vaso's common stock was artificially inflated at the time of acquisition due to

29

Defendants' violations of the federal securities laws described herein.

83. At the times they acquired Vaso Class A common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to April 1, 2004. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs filed this Complaint. Less than three years have elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public to the time Plaintiffs filed this Complaint.

## COUNT II

### [Against defendants Masiz and Carter For Violations of Section 15 of the Securities Act]

84. Plaintiffs repeat and reallege each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter. The claim asserted in Count II is not based on any allegation of fraud set forth in this Complaint, and no such allegation is incorporated in this Count.

85. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77m, against defendants Masiz and Carter on behalf of all acquirers, other than those excluded from the Class, of Vaso Class A common stock in connection with the IPO pursuant, or traceable, to the Registration Statement, as described above.

86. As alleged above, Defendants violated Section 11 of the Securities Act. Defendants Masiz and Carter were each control persons of Vaso and each other by virtue of their position as

senior officers, directors, and/or substantial shareholders of Vaso.

87. The defendants named in this Count were participants in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having participated in the process that allowed the IPO to be successfully completed, and defendants Masiz and Carter's participation is further shown by their having signed the Registration Statement. As a result, defendants Masiz and Carter are liable jointly and severally with defendants Vaso and Kashner under Section 15 for the Company's primary violations of Section 11 of the Securities Act.

## COUNT III

### [Against Defendants Vaso, Masiz, and Carter For Violations Of Section 10(b) Of The Exchange Act]

88. Plaintiffs repeat and reallege each and every allegation contained above.

89. This Count is asserted against defendants Vaso, Masiz, and Carter and is based upon violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

90. During the Class Period, the defendants named in this Count, and each of them, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which these defendants knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and the other members of the Class. The purpose and effect of the scheme, plan, and unlawful

31

course of conduct was, among other things, to induce Plaintiffs and the other members of the Class to purchase or acquire Vaso Class A common stock during the Class Period at artificially inflated prices.

91.  During the Class Period, defendants Vaso, Masiz, and Carter, pursuant to this scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance and preparation of deceptive and materially false and misleading statements to the investing public, as particularized above.

92.  As a result of the dissemination of the false and misleading statements set forth above, the market price of Vaso Class A common stock was artificially inflated at all relevant times during the Class Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by defendants Vaso, Masiz, and Carter, Plaintiffs and the other members of the Class relied, to their detriment, on the integrity of the market price of the Company's common stock in purchasing such stock. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased Vaso shares or would not have purchased them at the inflated prices that were paid.

93.  In addition to the duties of full disclosure imposed on defendant Vaso, Masiz, and Carter, as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors, in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §210.01 et seq.) and other SEC regulations, including truthful, complete and accurate information with respect to the Company's

principal products, operations and performance, and regulatory compliance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete and accurate information.

94.  Plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

95.  By reason of the foregoing, defendants Vaso, Masiz, and Carter directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class in connection with their purchases of Vaso Class A common stock during the Class Period.

## COUNT IV

### [Against Defendants Masiz and Carter For Violations of Section 20(a) of the Exchange Act]

96.  Plaintiffs repeat and reallege each and every allegation contained above.

97.  This Count is asserted against defendants Masiz and Carter, and each of them.

98.  Defendants Masiz and Carter, and each of them, acted as controlling persons of Vaso within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions, their substantial stock ownership, participation in and/or awareness of the

33

Company's operations and/or intimate knowledge of the status of the Company's Current Products, and/or its true financial condition, defendants Masiz and Carter had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are materially false and misleading. Defendants Masiz and Carter were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

99. Defendants Masiz and Carter were each culpable participants in the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged above.

100. As set forth above, Vaso and defendants Masiz and Carter violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Vaso, defendants Masiz and Carter are also liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendant Vaso, Masiz, and Carter's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment:

    a.    Determining that the instant action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

b.　Awarding compensatory damages and/or rescission as appropriate against Defendants, in favor of Plaintiffs and all members of the Class for damages sustained as a result of Defendants' wrongdoing;

c.　Awarding Plaintiffs and members of the Class the costs and disbursements of this suit, including reasonable attorneys' and experts' fees; and

d.　Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: December 3, 2004

Respectfully Submitted,

*[signature]*

Thomas G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
**SHAPIRO, HABER & URMY LLP**
Exchange Place
53 State Street
Boston, Massachusetts 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

*Local Counsel for Plaintiffs*

**SCHIFFRIN & BARROWAY, LLP**
Marc I. Willner
Karen E. Reilly
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004
Telephone:　(610) 667-7706
Facsimile:　(610) 667-7056

*Lead Counsel for Plaintiffs*

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY MAIL-HAND-FAX ON 12/3/2004
*[signature]*

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, (print name) Richard A. Ruterman ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the Complaint and authorizes its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transaction(s) in the Vaso Active Pharmaceuticals (Nasdaq: VAPH) security that is the subject of this action during the Class Period is/are as follows[1]:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 50 | Buy | 1/28/04 | 9.38 |
| 25 | Buy | 2/23/04 | 27.50 |
| 225 | Sell | 4/16/04 | 1.25 |

[1] List additional transactions on a separate sheet of paper, if necessary.

5. Plaintiff has complete investment authority and is the agent and attorney-in-fact with full power and authority to bring a suit to recover for investment losses.

6. During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party or a class in the following actions filed under the federal securities laws (if none, so indicate): NO.

7. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of April, 2004.

Signature: [signed] Richard A. Ruterman

Print Name: Richard A. Ruterman

Address: _____

City, State, Zip: _____

Telephone Number (Daytime): _____

Telephone Number (Evening): _____

E-Mail Address: _____

Are you a current or former employee of the Company?

Current Employer: _____

**REDACTED**