UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re VASO ACTIVE PHARMACEUTICALS SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Master Docket No.04-0708(RCL) |

## MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE SETTLEMENT AND PLAN OF ALLOCATION

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Lead Plaintiffs, Edwin Choi, Richard Cheng and Joe Huback (collectively "Lead Plaintiffs") respectfully move this Court for an order approving the proposed settlement of the above-captioned action (the "Action") and approving the proposed plan of allocation (the "Plan of Allocation"), both of which the Court preliminary approved by Order dated October 4, 2005 (the "Preliminary Approval Order").[1]

### PRELIMINARY STATEMENT

The present settlement of $1,875,000 (the "Settlement"), as set forth in the Stipulation and Agreement of Settlement dated September 21, 2005 (the "Stipulation"),[2] and as procured by Plaintiffs' Lead Counsel, Schiffrin & Barroway, LLP ("Plaintiffs'

---

[1] Lead Plaintiffs are also submitting a separate Memorandum of Law in Support of Plaintiffs' Lead Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses.

[2] The Stipulation is attached as Exhibit 1 to the Declaration of David Kessler in Support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement, Plan of Allocation and Attorneys' Fees and Expense Application ("Kessler Decl. or "Kessler Declaration") submitted herewith. Unless otherwise noted, capitalized terms shall have those meanings contained in the Stipulation.

Lead Counsel"), represents a substantial recovery for the Class where, as here: (i) Defendant Vaso Active Pharmaceuticals, Inc. ("Vaso" or the "Company"), was in dire financial straits; (ii) the Company's directors and officer's liability insurance carrier initially rejected coverage; and (iii) Defendant Kashner Davidson Securities Corp. ("Kashner"), the underwriter for Vaso's December 9, 2003 initial public offering ("IPO"), did not have enough excess capital or insurance coverage to fund a larger settlement or to pay a judgment. Despite being faced with all of these obstacles, the proposed Settlement consists of: i) the contribution by Vaso of two-year 5% subordinated callable notes convertible at $1.75 per share having a face value of $750,000 (the "Settlement Notes"); ii) the payment by Vaso's insurer of $1,100,000 million in cash; and iii) the payment of $25,000 in cash by Kashner.

As more fully discussed below, and in the Kessler Declaration, the significant risks involved in taking this Action further into litigation and possibly onto trial, when measured against the immediate benefit of the Settlement Fund, justify the Court's approval of the Settlement. Also compelling is the overwhelmingly positive reaction of the Class to the Settlement. When given the opportunity to object or request exclusion, not a single Class Member has done, so demonstrating that the Settlement is fair, reasonable and adequate.

Prior to recommending the Settlement to Lead Plaintiffs, Plaintiffs' Lead Counsel has had ample time to assess the strengths and weakness of Lead Plaintiffs' case through filing of the initial complaint and the Amended Complaint (the "Complaint"), conducting a thorough investigation into and researching Lead Plaintiffs' claims and Defendants' defenses, consultations with experts, as well as assessing Defendants' financial ability to

fund a larger settlement or support any judgment. After engaging in these activities Plaintiffs' Lead Counsel believes the Settlement is in the best interests of all Class Members and recommends that the Court approve it.

## I.  HISTORY AND BACKGROUND OF THE ACTION

The Court is respectfully referred to paragraphs 7-32 of the accompanying Declaration for a full discussion of the factual background and procedural history of the Action.

### A.  Procedural History Leading to the Settlement

On February 17, 2005, at the request of counsel for Vaso, Plaintiffs' Lead Counsel sent Vaso a settlement demand to which Vaso responded on February 22, 2005, advising counsel that the Company's financial status was in peril and providing Lead Plaintiffs with a description of Vaso's limited assets. After additional correspondence between counsel, beginning in April 2005, Lead Plaintiffs, Vaso, and the Individual Defendants entered into protracted settlement negotiations for a possible resolution of the Action. After extensive arms-length negotiations, Lead Plaintiffs, Vaso, and the Individual Defendants reached a verbal settlement agreement in May 2005. At that time, Lead Plaintiffs were also engaging in arms' length negotiating with Kashner. Kessler Decl. ¶¶ 16-18.

Following the verbal agreement to settle, Lead Plaintiffs undertook confirmatory discovery and obtained further information regarding the financial condition of Vaso by conducting an interview of Defendant Frattaroli, the President and Chief Financial Officer of Vaso, on May 25, 2005. During Frattaroli's interview, he stated that the Company had $750,000 of working capital that could theoretically sustain the Company

3

through August 2005. He expected, however, that legal fees generated by this Action, the Derivative Actions, and the SEC investigation would burn "through it faster." The resolution of this Action removed a substantial impediment to the Company's ability to obtain additional financing, and indeed, following the public disclosure of this Settlement in August 2005, the Company obtained financing that has enabled it to maintain its operations to date. Kessler Decl. ¶¶ 19, 23.

The Company's financial information upon which Plaintiffs' Lead Counsel relied in making its determinations concerning Vaso's financial fortitude also is contained in its 10-Q for the quarter ended March 31, 2005. Kessler Decl. ¶ 24.[3] The 10-Q provides, "At March 31, 2005, we had working capital of approximately $750,000, which based on our current plans and assumptions relating to our operations, will be sufficient to satisfy our cash requirements through August 31, 2005." *See* Exh 3, at 11. The document also provides that Vaso's "efforts to attract and obtain additional financing are significantly hampered by the shareholder and derivative actions involving [the] Company." *Id.*

Lead Plaintiffs, Vaso, and the Individual Defendants executed a Memorandum of Understanding on June 1, 2005. Thereafter, Lead Plaintiffs and Defendant Kashner reached a verbal agreement that Kashner would join in the Settlement for an additional cash contribution. Kashner's participation in the Settlement was contingent upon its production of financial information demonstrating limited means to contribute to a settlement. Kashner produced its "focus" report, a report required to be generated by all broker/dealers and filed with the SEC quarterly, that contained information concerning its limited financial condition and ability to satisfy any judgment. The "focus" report

---

[3] A copy of Vaso's March 31, 2005 10-Q is attached to the Kessler Decl. as Exh. 3.

4

demonstrates that Kashner had only $59,000 in excess capital. Kashner also does not have insurance coverage. Kessler Decl. ¶¶ 21, 27.

### B. Notice Sent to Class Members

In accordance with the Preliminary Approval Order, the Claims Administrator, A.B. Data, mailed copies of the Joint Notice of Proposed Settlement of Class Action and Derivative Action, Application for Attorneys' Fees and Expenses, and Settlement Fairness Hearings (the "Notice") to 6,089 potential Class Members. The Notice informed potential Class Members, among other things, of the opportunity to object to any aspect of the Settlement, including the Settlement and the request for attorneys' fees and to request exclusion, and how to submit a Claim Form. On October 24, 2005, A.B. Data also published a summary notice in the *Investor's Business Daily* and on *PR Newswire*. *See* The Affidavit of Lakeeta King of A.B. Data, Ltd. ("A.B. Data"), the Claims Administrator in this Action ("King Aff."), attached hereto as Exh. 2, at ¶¶ 11-13.

The deadline for objections or request exclusion expired on November 30, 2005. Not a single Class Member has filed an objection to any aspect of the Settlement, fee request or Plan of Allocation, or requested exclusion. Kessler Decl. ¶ 5.

### II. FINAL CERTIFICATION OF A SETTLEMENT CLASS IS APPROPRIATE

Before assessing the fairness, reasonableness and adequacy of the Settlement, the Court must certify the Class, which was conditionally certified in the Preliminary Approval Order. Lead Plaintiffs now move, with the consent of Defendants, for final certification of the Class.[4] Courts within the First Circuit have demonstrated a preference

---

[4] In "'determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether

for certifying class actions in the securities context. *Priest v. Zayre*, 118 F.R.D. 552, 554-55 (D. Mass. 1988).

### A.  Lead Plaintiffs Satisfy the Requirements of Rule 23(a)

#### 1.  The Proposed Class is So Numerous that Joinder of all Members is Impracticable

To be certified, a class must be so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).[5] The Class is indeed numerous. During the Class Period, more than 5,000,000 shares of Vaso Class A common stock were outstanding and the trading volume was 44,500,000. *See In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38, 43 (D. Mass. 2003) (finding numerosity satisfied where millions of shares outstanding); *accord Kinney v. Metro Global Media, Inc.*, No. 990579 ML, 2002 U.S. Dist. LEXIS 18628, at *13 (D.R.I. Aug. 22, 2002). Numerosity is further confirmed by the fact that 6,089 Notices were mailed to potential Class Members.

#### 2.  There are Questions of Law and Fact Common to Each Class Member

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. Pr. 23(a)(2). The existence of one issue common to the entire class is sufficient. *In re Lupron,* 228 F.R.D. at 88; *McLaughlin v. Liberty Mutual Ins. Co.,* 224 F.R.D. 304, 309 (D. Mass. 2004).

In the present case, there are clearly questions of law and/or fact common to the Class, including: (1) whether Defendants' acts violated federal securities laws; (2)

---

the requirements of Rule 23 are met.'" *In Re Lupron Marketing and Sales Practices Litigation*, 228 F.R.D. 75, 88 (D. Mass. 2005) (citation omitted).

[5] "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Adver. Specialty Nat'l Ass'n v. Fed. Trade. Comm'n,* 238 F.2d 108, 119 (1st Cir. 1956).

whether statements contained in SEC filed documents, press releases, conference calls that were disseminated to the investing public and the Company's shareholders during the Class Period were materially false and misleading; (3) whether the market price of Vaso Class A common stock was artificially inflated due to Defendants' materially false and misleading statements; and (4) the extent to which Lead Plaintiffs and the Class suffered damages and the proper measure of damages.[6]  Accordingly, the requirements of Rule 23(a)(2) are easily satisfied.

### 3. Lead Plaintiffs' Claims Are Typical Of The Claims Of The Other Class Members

The typicality requirement of Rule 23(a)(3) is satisfied where the "plaintiff's injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims."  *Kinney,* 2002 U.S. Dist. LEXIS 18628, at *14 (internal quotations omitted).

Lead Plaintiffs' claims are typical of the claims of other Class Members because they arise from the same course of conduct by Defendants and are based on the same legal theories as those of other Class Members who purchased or otherwise acquired Vaso Class A common stock during the Class Period or pursuant to the IPO at prices that were artificially inflated as a result of Defendants' conduct.  The conduct at issue is the same throughout the Class Period.

---

[6]  This Court has repeatedly found that common questions of law and fact exist where, as here, the alleged fraud involves material misrepresentations allegedly made in statements disseminated to the investing public.  *See, e.g., Kinney,* 2002 U.S. Dist. LEXIS 18628, at *12-13; *Opiela v. Bruck,* 139 F.R.D. 257, 259-60 (D. Mass. 1990); *Grace v. Perception technology Corp,* 128 F.R.D. 165, 167 (D. Mass. 1989); *Kirby v. Cullinet Software, Inc.,* 116 F.R.D. 303, 306 (D. Mass. 1987).

### 4. Lead Plaintiffs Will Fairly and Adequately Protect The Interests Of The Class

To satisfy the adequacy test of Rule 23(a)(4): 1) there must be an absence of potential conflict between the named plaintiffs and the class members and 2) there must be an assurance that plaintiffs' counsel is qualified, experienced, and able to vigorously conduct the litigation. *See, e.g., In re Lupron*, 228 F.R.D. at 90; *In re Polymedica Corp. Sec. Litig.*, 224 F.R.D. 27, 36 (D. Mass. 2004). Both prongs of this test are satisfied here.

First, Lead Plaintiffs are adequate representatives and no such potential conflict exists with Class Members. Second, Plaintiffs' Lead Counsel have extensive experience litigating complex securities class actions and have demonstrated their willingness to represent the interests of all Class Members by the extensive efforts devoted to the prosecution of this Action since its inception. *See* Exhibit 3 to the Affidavit of Andrew L. Barroway ("Barroway Aff.") attached to the Kessler Declaration as Exh. 4. Accordingly, the adequacy requirement of Rule 23(a)(4) is easily met.

### B.   The Requirements Of Rule 23(b)(3) Are Also Satisfied

In addition to satisfying the Rule 23(a) requirements, Lead Plaintiffs also have met the requirements of Rule 23(b)(3).

### 1. During the Class Period, Common Questions Of Law And Fact Predominate Over Individual Questions

In the discussion of Rule 23(a)(2) above, Lead Plaintiffs set forth some of the many common issues of fact and law during the Class Period. These common issues certainly "predominate" over any individual or non-common issues that may arise. Indeed, these central issues are virtually identical to the types of common questions that courts have found predominate over individual questions. *See In re Polymedica Corp.*

*Sec. Litig.*, 224 F.R.D. at 36-37; *Kinney*, 2002 U.S. Dist. LEXIS 18628, at *4.

As previously discussed, the common questions are demonstrated by the central claims that the misrepresentations of Defendants during the Class Period stated claims under Section 10(b) of the Exchange Act and Rule 10b-5, and Section 11 of the Securities Act. Therefore, the predominance requirement of Rule 23(b)(3) is fulfilled.

### 2. A Class Action Is Superior To Other Available Methods Of Adjudication

Rule 23(b)(3) requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). This requirement "ensures that resolution by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 54 (D. Mass. 2005) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). The superiority of class litigation in securities fraud cases, which generally involve many defrauded investors whose individual claims are not large enough to support separate actions, is well recognized.[7]

In this case, in light of the fact the other elements of Rule 23 are satisfied, a class action is clearly the favored means to resolve Lead Plaintiffs' claims. Indeed, the Settlement comports with the policies behind Rule 23 by allowing a number of

---

[7] *See Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 273 (D. Mass. 2005) (piecemeal adjudication of numerous separate lawsuits covering the same or substantially similar issues -- i.e., the Defendants' allegedly illegal conduct and the impact thereof . . . would be an inefficient allocation of limited court resources"); *see also Randle v. SpecTran*, 129 F.R.D. 386, 393 (D. Mass. 1988); *Grace*, 128 F.R.D. at 171.

individuals with relatively little losses, to bring suit with others who have similar losses.[8]

### III. THE STANDARDS FOR JUDICIAL APPROVAL OF CLASS ACTION SETTLEMENTS UNDER RULE 23 FAVOR THIS SETTLEMENT

#### A. The Law Favors and Encourages Class Action Settlements

The settlements of complex class actions are undoubtedly favored in the First Circuit. *Durrett v. Housing Auth. of Providence,* 896 F.2d 600, 604 (1st Cir. 1990); *Hawkins v. Comm'r of the N.H. HHS,* No. 02-cv-3150, 2004 U.S. Dist. LEXIS 807, at *15 (D.N.H. Jan. 23, 2004); Rule 16.4(a) Local Rules D. Mass. ("The judicial officer shall encourage the resolution of disputes by settlement").[9]

In deciding whether or not to approve a class action settlement, a court should refrain from ruling on the merits of the dispute. *Bussie v. Allmerica Fin. Corp*, 50 F. Supp.2d 59, 76 (D. Mass. 1999); *see also In re Compact Disc Min. Advertised Price Litig.,* 216 F.R.D. 197, 211 (D. Me. 2003). A court also should refrain from looking towards the highest amount that could be awarded to Lead Plaintiffs. *Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54, 68 (D. Mass. 1997). Instead, a court should attach a presumption in favor of settlement if "sufficient discovery was provided and the parties have bargained at arms-length." *City P'shp Co. v. Atlantic Acquisition Ltd. P'shp.,* 100 F.3d 1041, 1043 (1st Cir. 1996).

Here, the Court should presume that the Settlement is fair and adequate as Lead Plaintiffs and their counsel obtained sufficient information regarding the merits of the

---

[8] In addition, the Settlement renders moot any issues as to manageability. *Amchem* 521 U.S. at 620 (1997).
[9] The decision to grant or deny approval of a settlement lies within the broad discretion of the trial court and should be exercised in light of the general policies favoring settlements. *See Durrett,* 896 F.2d at 604.

claims, as well as their ability to obtain a greater recovery, and reached the present Settlement through arms'-length negotiations.

      **B.    The Fairness Factors Counsel in Favor of Approval.**

          **1.    The First Circuit's Standard Governing Approval of Class Action Settlements Militates in Favor of Settlement**

The First Circuit employs a fair, reasonable and adequate standard for reviewing the proposed settlement of a class action. *City P'shp. Co.*, 100 F.3d at 1043. Although the First Circuit has not identified a particular set of factors to consider when deciding whether to approve a proposed class action settlement, district courts in this jurisdiction have recently applied the following criteria:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Relafen*, 231 F.R.D. at 58 (D. Mass. 2005) (internal citations omitted); *In re Lupron,* 228 F.R.D. at 75.

The application of the above factors overwhelmingly demonstrates why the Settlement is fair, reasonable and adequate. Indeed, there is serious doubt that a more favorable result could be obtained if this case were litigated further and therefore the Settlement warrants approval.

            **a)    Defendants' Inability to Withstand a Greater Judgment Overwhelmingly Supports the Settlement**

11

Defendants are incapable of withstanding a greater judgment. This inquiry is a "defendant oriented consideration." *Relafen*, 231 F.R.D. at 58; *see In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 186 (E.D. Pa. 1997) (considering company's asset base and insurance coverage in assessing ability to withstand greater judgment); *Great Neck Capital Appreciation Inv. P'shp,* 212 F.R.D. 400, 410 (D. Wis. 2002) (finding that defendant company's recent emergence from bankruptcy indicated its inability to withstand greater judgment).

Due to the lack of liability insurance, the financial condition of Vaso, and the amount of excess net capital held by Kashner, none of the Defendants had the ability to withstand a greater judgment. As Frattaroli stated during his interview, the resolution of this Action removed a substantial impediment to Vaso ability to obtain additional financing. But for the Settlement, the Company may have filed for bankruptcy and would not have been able to contribute any funds or notes to the Settlement. Kessler Decl. ¶ 24.

The same holds true for the Individual Defendants and Kashner. The insurance carrier rejected coverage on the Individual Defendants' $1 million and $4 million policies. According to Frattaroli, the insurance carrier had reserved the right to seek rescission on the basis that the Company's application included false or incomplete statements. In addition, counsel for Vaso represented that the Individual Defendants would not be able to make meaningful contributions to a settlement. Kessler Decl. ¶¶ 16. Therefore, absent coverage, the Individual Defendants would not have been able to contribute to any judgment in the Action. Similarly, Kashner did not have insurance and already has agreed to pay more than 40% of its excess net capital. Kessler Decl. ¶ 21.

Thus, it is highly unlikely that Defendants could withstand a greater judgment and this factor demonstrates that the Settlement is fair, reasonable and adequate.

### b) The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks in Litigation Supports Court Approval of the Settlement

The range of reasonableness of the Settlement Fund in light of the best possible recovery and the attendant risks in litigation both support approval of the Settlement. The Settlement Fund represents a significant recovery for the Class in light of the strong possibility that Lead Plaintiffs could receive nothing if the case proceeded. As this Court recently stated, "a fine-tuned equation by which to determine the reasonableness of the size of a settlement fund does not exist." *Relafen,* 231 F.R.D. at 64 (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972) ("In any case there is a range of reasonableness with respect to a settlement")). In assessing the reasonableness of the Settlement, the Court should balance the benefits afforded to the Class, including the immediacy and certainty of the recovery against the continuing risks of litigation.

The Settlement averts all of the risks and expenses that would be involved with moving forward in the litigation, especially when viewed against the uncertainties of the Company's deteriorating financial condition, Kashner's financial status, and the costs of discovery, summary judgment and trial. By settling at this point, Lead Plaintiffs have maximized their recovery, while minimizing costs, as well as the risks of Defendants incurring additional defense costs associated with this Action and the Derivative Action. Taking in account the fate of many additional years of litigation and inevitable appeals in the absence of the Settlement, the risk of no recovery, this Settlement is well within the range of reasonableness against which settlements are measured. Kessler Decl. ¶ 44.

### c) The Complexity, Expense, and Likely Duration of the Litigation Favors Settlement

This factor "captures the probable costs, in both time and money, of continued litigation." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 546 (3d Cir. 2004) (internal quotations omitted). The potential delay caused by this Action weighs heavily in favor of the Settlement.[10] Further prosecution of this case would impose tremendous costs on all parties.

Defendants, by electing to answer the Complaint, as opposed to moving to dismiss, waived their right to the stay of discovery imposed by the PSLRA. Lead Plaintiffs, therefore, were prepared to engage in full discovery of their claims, which involve numerous complex legal, financial and factual issues that would have required Lead Plaintiffs to conduct voluminous paper discovery, depositions and extensive expert discovery to determine whether Defendants accurately portrayed their products as approved by the FDA. Engaging in this type of discovery would have undoubtedly added considerable expenses and duration to the litigation. Of course, summary judgment, and preparation for trial, and a trial itself, would cause the parties tremendous additional expenses and require many hours of the Court's time and resources. Kessler Decl. ¶ 45. Thus, Lead Plaintiffs may have been precluded from obtaining any relief at all.

### d) The Risks of Proving Liability and Damages Also Support Approval of the Settlement

While Lead Plaintiffs believe they would have uncovered documents and admissions from Defendants during discovery that would establish liability, they also

---

[10] "When comparing the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future . . . there are clearly strong arguments for approving settlement." *Rolan v. Cellucci,* 191 F.R.D. 3, 10 (D. Mass. 2000) (internal citations omitted).

acknowledge the significant hurdles to proving liability and particularly damages in a securities class action.[11] Courts have long recognized that "[s]tockholder litigation is notably difficult and unpredictable." *Maley v. Del Global Techs. Corp.,* 186 F.Supp.2d 358, 364 (S.D.N.Y. 2002).

The Complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and Sections 11 and 15 of the Securities Act. To prevail under the Exchange Act, the Class must show that Defendants made a misstatement or omission of a material fact with scienter in connection with the sale or purchase of securities. *See, e.g., Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999). Although Defendants elected to answer the Complaint and did not contest Lead Plaintiffs' ***pleading*** of scienter, Lead Plaintiffs still would have been required to ***prove*** scienter and make the requisite showings of reliance and causation.

To prevail on their Securities Act claims, Lead Plaintiffs would be required to prove that Defendants made false and misleading statements in the Registration Statement in connection with the IPO and that Kashner was not only responsible for the contents and dissemination of the Registration Statement, but that it could not assert a successful due diligence defense. *See, e.g., Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1204-05 (1st Cir. 1996). These issues are all questions of fact, the resolution of which is uncertain and unobtainable for at least several years - and not without great cost to all parties.

In addition to liability, Lead Plaintiffs also would incur significant risks in proving damages. "The very real risk that the Class would not recover if this Action

---

[11] "As any experienced lawyer knows, a significant element of risk adheres to any litigation taken to binary adjudication." *In re Lupron*, 228 F.R.D. at 97.

proceeded to trial also supports approval of the settlement because 'basic to the [fairness] inquiry is the need to compare the terms of the compromise with the likely rewards of litigation.'" *Bussie*, 50 F.Supp.2d at 76. (internal quotations omitted). While Lead Plaintiffs believe they could prove damages at trial, the Class would inevitably face a "battle of experts" on damages. Lead Plaintiffs' expert would need to prove loss causation, i.e. that the cause of the end of Class Period stock drop was due exclusively to a belated disclosure that Vaso was under investigation from the SEC for improperly disclosing that some of its products had procured FDA approval when in fact they did not. *See Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005);[12] While Plaintiffs' Lead Counsel believes that reliable and convincing expert testimony can be provided on the damages question, and that a judgment could ultimately be obtained for the full amount of damages available under the law, the Class is by no means assured that the Court will permit its damage experts to testify, that a jury will find Lead Plaintiffs' expert more persuasive than Defendants' expert and, most importantly, that Lead Plaintiffs will be able to recover nearly the amount provided for under the Settlement, or any amount at all. As a result of these considerations, the likely recovery by the Class, even assuming Lead Plaintiffs prevailed on the liability issue, is speculative. Kessler Decl. ¶¶ 46-47.

### e)     The Class' Reaction Supports the Settlement

The positive reaction of the Class also counsels in favor of the Settlement. *See Bussie,* 50 F. Supp.2d at 78. More than 6,089 copies of the Notice were mailed to potential Class Members and a summary notice was published advising Class Members

---

[12] *See also* 15 USCS § 78u-4(b)(4) ("Loss causation. In any private action arising under this title, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages.")

of their right to object to any aspect of the Settlement. Not a single Class Member has submitted any opposition to any aspect of the Settlement and/or requested exclusion. Kessler Decl. ¶ 31; *See* Exh. 2, ¶19. Indeed, "the absence of objectants may itself be taken as evidencing the fairness of a settlement." *Weiss v. A.H. Robins*, 700 F. Supp. 682, 684 (S.D.N.Y. 1988) (internal citations omitted).

### f) The Stage of the Proceedings and Discovery Completed Also Point in Favor of the Settlement

This factor focuses on whether the parties have obtained enough information to appreciate the strengths and weaknesses of their respective positions and requires the Court to consider the extent of discovery completed. *Duhaime,* 177 F.R.D. at 68. Plaintiffs' Lead Counsel has fully evaluated the merits of Lead Plaintiffs' claims, in light of the probability of achieving any recovery when deciding whether to settle this dispute.

Plaintiffs' Lead Counsel has achieved a balance between gaining knowledge necessary to assess Lead Plaintiffs' case and Defendants' defenses, and settling at a point in the process which maximizes the recovery for the Class. On the one hand, by the time the parties entered into an agreement to settle this Action, Plaintiffs' Lead Counsel had sufficient information in its possession, which allowed it to understand the issues and to evaluate the strengths and weaknesses of the claims of the Class, particularly in the area of damages and the potential for recovery of those damages due to Vaso's financial condition. On the other hand, at the time the parties reached an agreement in principle, the parties had not yet undertaken the most expensive aspects of litigation - the bulk of discovery, including depositions, expert discovery, summary judgment and trial. Kessler Decl. ¶ 49. "Formal discovery is not a prerequisite to settlement" approval. *Schwartz v. TXU Corp.,* 3:02-CV-2243-K, 2005 U.S. Dist. LEXIS 27077 at *65-66 (N.D. Tex. Nov.

8, 2005). Therefore, this Court should find that this factor supports approval of the Settlement.

### g) The Risks of Maintaining a Class Though Trial Supports Settlement

Courts generally consider this inquiry futile in the context of a settlement and some have refused to consider it when assessing approval. *In re Lupron,* 228 F.R.D. at 95. Nonetheless, in this case the Class has not yet been certified. But for the Settlement, it is likely Defendants would have vigorously contested class certification in the first instance, and subsequently taken any opportunity to argue for decertification as the litigation progressed. *See In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 817 (3d Cir. 1995) (value of class action rests on certification of class since aggregation of claims and claimants enlarges the monetary value of the suit, facilitates proof on merits through the pooling of resources).

### IV.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

The proposed Plan of Allocation, as set forth in the Notice, provides the manner in which the Gross Settlement Fund, less any Settlement Cash and Settlement Notes used to pay fees and costs, as may be awarded by the Court (collectively, the "Net Settlement Fund"), shall be distributed to Authorized Claimants. Plaintiffs' Lead Counsel prepared the Plan of Allocation after careful, prolonged consideration, which involved detailed analysis by Lead Plaintiffs' damage experts. If the Court approves the Settlement, upon completion of the claim process and pursuant to a motion for distribution, the Net Settlement Fund will be distributed to members of the Class according to the Plan of Allocation. Kessler Decl. ¶ 51.

The approval of a plan of allocation of a settlement proceeds is "governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *In re Ikon Office Solutions, Inc.,* 194 F.R.D. 166, 184 (E.D. Pa. 2000) (internal quotations omitted). The adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims and whether the proposed allocation is fair and reasonable in light of that information. *In re PaineWebber Limited Partnerships Litig.,* 171 F.R.D. 104, 133 (S.D.N.Y. 1997). An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" counsel. *Maley,* 186 F. Supp.2d at 367 (citations omitted).

### A.   The Structure of the Plan of Allocation

The Plan of Allocation is based on the proposition that the price of Vaso Class A common stock was artificially inflated from the beginning of the Class Period on December 9, 2003, until the end of the Class Period on March 31, 2004. Lead Plaintiffs and their experts have used Vaso's closing stock price on April 16, 2004 to measure the Recognized Loss for Lead Plaintiffs because the SEC suspended trading of Vaso common stock once the truth was disclosed, on March 31, 2004, through and including April 15, 2004. As a result, the April 16 price reflects the market's reaction to the end of Class Period disclosures. Kessler Decl. ¶ 52.

Differences in treatment of Class Members are made only with respect to the timing of Class Members' purchases, acquisitions, and sales. Overall, if the total recognized losses for all Authorized Claimants exceeds the Net Settlement Fund, each Authorized Claimants' share of the Net Settlement Fund will be determined based upon

19

the percentage that his, her or its recognized loss bears to the total recognized losses for all Authorized Claimants.  The Plan was fully disclosed in the Notice and, as of the filing of the instant motion, there have been no objections to the Plan.  Kessler Decl. ¶ 54.

The Plan of Allocation in this case undoubtedly falls within the mainstream of allocation plans routinely approved.  As such, Plaintiffs' Lead Counsel believes that this method of allocation is fair, reasonable and adequate.

## V. CONCLUSION

The Settlement represents and outstanding achievement when viewed against the significant financial hurdles the parties had to overcome.   For all the reasons enumerated above, Lead Plaintiffs respectfully request the Court to find the Settlement fair reasonable and adequate.

DATED:  December 7, 2005          Respectfully submitted,


**/s/Theodore M. Hess-Mahan**
Thomas G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, Massachusetts 02109
(617) 439-3939

*Local Counsel for Plaintiffs*

**SCHIFFRIN & BARROWAY, LLP**
David Kessler
Kay E. Sickles
Jodi C. Murland
280 King of Prussia Road
Radnor, PA 19087
Telephone:    (610) 667-7706
Facsimile:     (610) 667-7056

*Lead Counsel for Plaintiffs*