EDGAR®pro
by EDGAR®Online®

# VASO ACTIVE PHARMACEUTICALS INC

## FORM 10QSB
(Quarterly Report of Financial Condition)

## Filed 08/14/07 for the Period Ending 06/30/07

| | |
|---|---|
| Address | 99 ROSEWOOD DRIVE, #260 |
| | DANVERS, MA 01923 |
| Telephone | 978-750-1991 |
| CIK | 0001232400 |
| Symbol | VAPH |
| SIC Code | 2834 - Pharmaceutical Preparations |
| Industry | Biotechnology & Drugs |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2007, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, DC 20549

# FORM 10-QSB

[X] Quarterly Report Pursuant To Section 13 or 15(d) Of The Securities Exchange Act Of 1934.

**FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2007**

OR

[ ] Transition Report Pursuant To Section 13 Or 15(d) Of The Securities Exchange Act Of 1934.

**For The Transition Period From _____ To _____**

*COMMISSION FILE NUMBER: 001-31925*

# VASO ACTIVE PHARMACEUTICALS, INC.
(Exact name of small business issuer as specified in its charter)

| | |
|---|---|
| DELAWARE | 02-0670926 |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| 99 ROSEWOOD DRIVE, SUITE 260 DANVERS, MA | 01923 |
| (Address of principal executive offices) | (Zip code) |

**ISSUER'S TELEPHONE NUMBER: (978) 750-1991**

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant is a shell company (as defined in rule 12b-2 of the exchange act) Yes [ ] No [X]

State the number of shares outstanding of each of the issuer's classes of common equity, as of the latest practicable date:

| | |
|---|---|
| Common stock, Class A, $0.0001 par value | 5,828,613 shares outstanding on August 14, 2007 |
| Common stock, Class B, $0.0001 par value | 4,500,000 shares outstanding on August 14, 2007 |

Transitional Small Business Disclosure Format (Check one): Yes [ ] No [X]

## VASO ACTIVE PHARMACEUTICALS, INC.

### INDEX TO FORM 10-QSB

| | Page |
|---|---|
| PART I.     FINANCIAL INFORMATION | |
| ITEM 1 - Condensed Financial Statements (unaudited): | |
| Condensed Balance Sheets as of June 30, 2007 and December 31, 2006 | 3 |
| Condensed Statements of Operations for the Three and six-month Periods Ended June 30, 2007 and 2006 | 4 |
| Condensed Statements of Cash Flows for the Six-Month Periods Ended June 30, 2007 and 2006 | 5 |
| Notes to the Condensed Financial Statements | 6 |
| ITEM 2 - Management's Discussion and Analysis of Financial Condition and Results of Operations | 7 |
| ITEM 3 - Controls and Procedures | 14 |
| PART II.     OTHER INFORMATION | |
| ITEM 6 - Exhibits and Reports on Form 8-K | 15 |
| Signature | 16 |

Unless the context requires otherwise, references in this Quarterly Report to "Vaso Active," "the Company," "we," "our" and "us" refer to Vaso Active Pharmaceuticals, Inc. Vaso Active, A-R Extreme(R), Termin8(R), RepiDerm(R), and our logo are trademarks of the Company. Osteon (R) and PENtoCORE(R) are registered trademarks of BioChemics, Inc. This Quarterly Report on Form 10-QSB may contain trademarks and trade names of other parties.

2

VASO ACTIVE PHARMACEUTICALS, INC.
CONDENSED BALANCE SHEETS

| | JUNE 30, 2007 | DECEMBER 31 2006 |
|---|---|---|
| | (UNAUDITED) | |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $      6,000 | $      8,627 |
| Restricted cash | 11,683 | 136,319 |
| Accounts receivable | 3,444 | 30,446 |
| Inventory | 45,297 | 93,608 |
| Debt issuance costs | -- | 68,713 |
| Prepaid expenses | 26,356 | 26,650 |
| TOTAL CURRENT ASSETS | 92,780 | 364,363 |
| Property and equipment net | 31,290 | 38,794 |
| | $    124,070 | $    403,157 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIENCY)** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $    571,757 | $    637,427 |
| Accrued compensation | 196,427 | 149,543 |
| Other accrued expenses | 150,927 | 73,510 |
| Obligations under capital leases - short-term portion | 2,514 | 2,510 |
| Senior secured convertible notes, net of discount | 2,612,500 | 2,389,503 |
| Notes payable | 870,000 | 870,000 |
| Due to parent company | 1,666,847 | 941,621 |
| Deferred revenue | 14,000 | 14,000 |
| TOTAL CURRENT LIABILITIES | 6,084,972 | 5,078,114 |
| **LONG-TERM LIABILITIES:** | | |
| Obligations under capital leases - long-term portion | 7,859 | 9,111 |
| | 6,092,831 | 5,087,225 |
| Commitments and contingencies (Note 1) | | |
| **STOCKHOLDERS' EQUITY:** | | |
| Preferred stock - $0.0001 par value; authorized 10,000,000 shares; issued and outstanding, none | -- | -- |
| Common stock - $0.0001 par value; authorized 60,000,000 shares; issued and outstanding, 10,328,613 | 1,033 | 1,033 |
| Additional paid-in capital | 8,950,098 | 8,858,178 |
| Deferred compensation | (34,209) | (64,411) |
| Accumulated deficit | (14,885,683) | (13,478,868) |
| TOTAL STOCKHOLDERS' DEFICIENCY | (5,968,761) | (4,684,068) |
| | $    124,070 | $    403,157 |

See notes to the unaudited condensed financial statements.

3

VASO ACTIVE PHARMACEUTICALS, INC.
UNAUDITED CONDENSED STATEMENTS OF OPERATIONS

|  | THREE-MONTH PERIOD ENDED JUNE 30, | | SIX-MONTH PERIOD ENDED JUNE 30, | |
|  | 2007 | 2006 | 2007 | 2006 |
|---|---|---|---|---|
| Net revenues | $    10,591 | $    10,607 | $    23,864 | $    16,150 |
| Cost of revenues | 12,016 | 11,113 | 18,586 | 27,493 |
| GROSS PROFIT | (1,425) | (506) | 5,278 | (11,343) |
| Costs and expenses: |  |  |  |  |
| Marketing, advertising and promotion | 49,366 | 30,393 | 115,414 | 63,489 |
| Selling, general and administrative (1) | 359,969 | 568,589 | 772,323 | 1,093,810 |
| Research and development | -- | -- | 150 | -- |
| Stock based compensation | 15,101 | 15,101 | 30,202 | 30,202 |
| Loss from operations | (425,861) | (614,589) | (912,811) | (1,198,844) |
| Other income (expense): |  |  |  |  |
| Interest income (expense), net | (140,674) | (194,499) | (337,511) | (388,884) |
| Charge for default premium on senior secured convertible notes | (112,500) | -- | (112,500) | -- |
| Debt restructuring (expense) | (43,993) | -- | (43,993) | -- |
|  | (297,167) | (194,499) | (494,004) | (388,884) |
| NET LOSS | $   (723,028) | $   (809,088) | $ (1,406,815) | $ (1,587,728) |
| Net loss per share - basic and diluted (Note 2) | $     (0.07) | $     (0.08) | $     (0.14) | $     (0.15) |
| Weighted average shares outstanding - basic and diluted (Note 2) | 10,328,613 | 10,328,613 | 10,328,613 | 10,328,613 |
| (1) Includes stock based compensation of: | $     45,960 | $     45,960 | $     91,920 | $     91,920 |

See notes to the unaudited condensed financial statements.

4

VASO ACTIVE PHARMACEUTICALS, INC.
UNAUDITED CONDENSED STATEMENTS OF CASH FLOWS

|  | SIX-MONTH PERIOD ENDED JUNE 30, | |
|  | 2007 | 2006 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | $(1,406,815) | $(1,587,728) |
| | | |
| Adjustments to reconcile net loss to net cash | | |
| used in operating activities: | | |
| Depreciation and amortization | 7,504 | 7,504 |
| Stock-based compensation (Note 4) | 122,121 | 122,117 |
| Amortization of discount and offering costs | | |
| associated with convertible debt | 179,211 | 268,814 |
| Inventory write-off | -- | 14,481 |
| Accrued debt restructuring expenses | 43,993 | -- |
| Increase in senior secured convertible notes | 112,500 | -- |
| Increase (decrease) in cash from change in: | | |
| Accounts receivable | 27,002 | (8,574) |
| Inventory | 48,311 | (185,868) |
| Prepaid expenses | 294 | 51,659 |
| Accounts payable | (65,670) | 344,953 |
| Accrued compensation | 46,884 | 44,805 |
| Deferred revenue | -- | 1,216 |
| Other accrued expenses | 33,424 | (67,329) |
| | | |
| Net cash used in operating activities | (851,241) | (993,951) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Decrease in restricted cash | 124,636 | 123,720 |
| | | |
| Net cash provided by investing activities | 124,636 | 123,720 |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Accrued legal settlement | -- | (15,000) |
| Obligations under capital leases | (1,248) | (1,177) |
| Due to/from parent company | 725,226 | 213,349 |
| | | |
| Net cash provided by financing activities | 723,978 | 197,173 |
| | | |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (2,627) | (673,058) |
| | | |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 8,627 | 707,640 |
| | | |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $    6,000 | $   34,582 |
| | | |
| SUPPLEMENTAL DISCLOSURES: | | |
| Interest paid | $  337,511 | $  388,884 |
| Income taxes paid | $     -- | $     -- |

See notes to the unaudited condensed financial statements.

5

## VASO ACTIVE PHARMACEUTICALS, INC.

### NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS

1. INTERIM FINANCIAL STATEMENTS

The accompanying unaudited interim financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission for reporting on Form 10-QSB. Accordingly, certain information and footnote disclosure required for complete financial statements are not included herein. It is recommended that these financial statements be read in conjunction with the financial statements and related notes of Vaso Active Pharmaceuticals, Inc. (the "Company") as reported in the Company's Annual Report on Form 10-KSB for the year ended December 31, 2006. In the opinion of management, all adjustments (consisting of normal recurring adjustments) considered necessary for a fair presentation of financial position, results of operations, and cash flows at the dates and for the periods presented have been included. The results of operations for the three and six months ended June 30, 2007 may not be indicative of the results that may be expected for the year ending December 31, 2007, or any other period.

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

GOING CONCERN - These financial statements have been prepared on the assumption that the Company will be able to realize its assets and discharge its liabilities in the normal course of business. This assumption is presently in question and contingent upon the Company's ability to raise additional funds. Management is in the process of identifying various fund-raising strategies it will pursue in 2007. These strategies may include an additional private placement of the Company's equity securities. There are no assurances that Management will successfully execute such strategies.

ACCOUNTS RECEIVABLE - Accounts receivable consist primarily of trade receivables from the sale of OTC pharmaceutical products. The allowance for doubtful accounts is based on the Company's assessment of the collectability of specific customer accounts and an assessment of economic risk as well as the aging of the accounts receivable. The Company's policy is to write-off uncollectible trade receivables after significant measures have failed to result in their collection. An allowance for doubtful accounts is established to represent the estimated uncollectible trade receivables. The allowance for doubtful accounts was $33,000 at December 31, 2006. Accounts receivable were not significant at June 30, 2007 and no reserve was recorded at June 30, 2007.

DUE TO PARENT - The Company reimburses the cost of certain administrative services provided by BioChemics as well as general overhead fees pursuant to agreements between the Company and BioChemics. The due to parent balance represents the net obligation from the Company to BioChemics at June 30, 2007 and December 31, 2006.

REVENUE RECOGNITION - The Company recognizes revenue from product sales in accordance with accounting principles generally accepted in the United States of America, including the guidance in Staff Accounting Bulletin ("SAB") Bulletin No. 104 "Revenue Recognition" and Statement of Financial Accounting Standards ("SFAS") No. 48, "Revenue Recognition When Right of Return Exists." Specifically, revenue is recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price is fixed and determinable and collectability is reasonably assured.

In general, revenue is recognized when products are shipped to customers. It is the Company's policy that all sales are final. As is common in the consumer products industry, customers return products for a variety of reasons including products damaged in transit, packaging changes, product discontinuance and shipping errors. As sales are recorded, the Company accrues an estimated amount for product returns as a reduction of revenue. These estimates are based on historical experience and known specific events such as product expiration dates.

### STOCK-BASED COMPENSATION

In the first fiscal quarter of 2006 the Company adopted Statement of Financial Accounting Standards No. 123(R) "Share-Based Payments" ("SFAS 123(R)"), which requires all share-based payments to employees, including stock options and stock issued under certain employee stock purchase plans, to be recognized in the Company's financial statements at their fair value. SFAS 123(R) requires the Company to estimate future forfeitures of stock-based compensation. The Company uses the Black-Scholes option pricing model to determine the fair value of options under SFAS 123(R) and has elected to use the modified-prospective transition method, in which prior period financial statements will not be restated but disclosure of the pro forma net loss calculation will be included in the footnotes to the financial statements for periods prior to fiscal 2006 and the adoption of SFAS 123(R).

The Company has an employee stock incentive plan and a non-employee director compensation plan, which are described more fully in Note 8 to the Company's Annual Report on Form 10-KSBA for the period ended December 31, 2006.

During the three months ended June 30, 2007 and 2006, the Company recorded stock compensation expense of $45,960 and $45,960 respectively in accordance with SFAS 123(R). During the six months ended June 30, 2007 and 2006, the Company recorded stock compensation expense of $91,920 and $91,920 respectively in accordance with SFAS 123(R).

NET LOSS PER SHARE - Basic net loss per share is computed by dividing net loss by the weighted average number of common shares outstanding for the period. Diluted net loss per share reflects, in addition to the weighted average number of common shares, the potential dilution if stock options and warrants outstanding were exercised and/or converted into common stock, unless the effect of such equivalent shares was anti-dilutive.

For the three-month and six-months periods ended June 30, 2007 and 2006, the effect of stock options and other potentially dilutive shares were excluded from the calculation of diluted net loss per common share as their inclusion would have been anti-dilutive.

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

## FORWARD-LOOKING INFORMATION

This Quarterly Report on Form 10-QSB contains "forward-looking statements" within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended (the "1934 Act"), that are based on management's exercise of business judgment as well as assumptions made by, and information currently available to management. When used in this document, the words "may," "will," anticipate," believe," estimate," intend," and words of similar import, are intended to identify any forward-looking statements. You should not place undue reliance on these forward-looking statements. These statements reflect our current view of future events and are subject to certain risks and uncertainties as noted below. Should one or more of these risks and uncertainties materialize, or should underlying assumptions prove incorrect, our actual results could differ materially from those anticipated in these forward-looking statements. We undertake no obligation and do not intend to update, revise or otherwise publicly release any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of any unanticipated events after the date hereof or to reflect the occurrence of any unanticipated events. Although we believe that our expectations are based on reasonable assumptions, we can give no assurance that our expectations will materialize.

Management's Discussion and Analysis should be read together with our condensed financial statements and related notes included elsewhere in this Quarterly Report on Form 10-QSB and the Company's Annual Report on Form 10-KSB for the fiscal year ended December 31, 2006. This Quarterly Report on Form 10-QSB, including the following discussion, may contain trend analysis and other forward-looking statements within the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Any statements in this Quarterly Report on Form 10-QSB that are not statements of historical facts are forward-looking statements. These forward looking statements made herein are based on our current expectations, involve a number of risks and uncertainties and should not be considered as guarantees of future performance.

Factors that could cause actual results to differ materially include without limitation:

o an inability to arrange additional debt or equity financing;
o our ability to finance our business;
o the impact of new technologies;
o changes in laws or rules or regulations of governmental agencies;
o outcome in pending litigation matters;
o interruptions or cancellation of existing contracts;
o impact of competitive products and pricing;
o product demand and market acceptance and risks;
o the presence of competitors with greater financial resources;
o product development and commercialization risks;

7

o our ability to maintain our current pricing model and/or decrease our cost of sales;
o continued availability of supplies or materials used in manufacturing at the current prices;
o adverse regulatory developments in the United States;
o adverse publicity related to our products or the company itself;
o adverse claims relating to our intellectual property licensed from Biochemics;
o the adoption of new, or changes in, accounting principles;
o legal proceedings;
o the costs inherent with complying with new statutes and regulations applicable to public reporting companies, such as the Sarbanes-Oxley Act of 2002;
o other new lines of business that the Company may enter in the future; and
o our ability to repay our indebtedness, including repayment of the notes issued recently.

These factors are not necessarily all of the important factors that could cause actual results to differ materially from those expressed in the forward-looking statements in this quarterly report. Other unknown or unpredictable factors also could have material adverse effects on our future results, including the factors described under the heading "Risk Factors" in the Company's Annual Report on Form 10-KSB for the fiscal year ended December 31, 2006. The forward-looking statements in this quarterly report are made only as of the date of this quarterly report, and we do not have any obligation to publicly update any forward-looking statements to reflect subsequent events or circumstances.

## BUSINESS OVERVIEW

Vaso Active is an early stage company, organized in January 2003, which focuses on commercializing, marketing and selling over-the-counter pharmaceutical products that we believe incorporate a proprietary PENtoCORE technology. Vaso Active's focus on pre-clinical testing and research on a patented vaso active lipid encapsulated ("VALE") technology has been has been limited due to working capital constraints.

We began our operations in January 2001, as a division of BioChemics, a privately-owned pharmaceutical company engaged in the development of transdermal and topical drug delivery systems. BioChemics is based in Danvers, Massachusetts. BioChemics was founded in 1989 by John J. Masiz and was incorporated in Delaware in 1991. BioChemics began developing the VALE technology in 1989 and has subsequently been issued four U.S. patents in connection with this technology. BioChemics has licensed the VALE patents and the PENtoCORE technology to us.

As an early stage company, we are subject to a number of risks typical of early stage companies including, but not limited to, our need to obtain additional financing and generate profitability and cash flows from operations. As a company engaged in the pharmaceutical industry, we are subject to a number of risks typical of pharmaceutical companies including, but not limited to, our need to adhere to strict governmental regulations, our ability to withstand intense competition from larger companies with greater financial resources and our ability to defend our intellectual property, as licensed from BioChemics.

Our general business strategy was adversely affected beginning in April 2004 by regulatory action taken against us and our former President, and by private securities actions taken against us and our management. At the same time, we suspended the marketing and sale of our products until we were reasonably sure that our product marketing was consistent with the FDA's requirements and policies. We also voluntarily delisted our common stock from trading on NASDAQ. As a result of our voluntary delisting, the action taken by the SEC against us, issues regarding the regulatory status of our products, and the significant decline in the market value of our securities concurrent with and subsequent to these matters, several shareholder actions were filed against Vaso Active and its officers and directors. Since February 17, 2006 our Class A common stock has been quoted on the Over the Counter Bulletin Board under the symbol "VAPH.ob".

In September 2005, the Company and certain of its officers and directors settled (i) a consolidated securities class action lawsuit that alleged that the Company and those individuals violated the federal securities laws with respect to certain disclosures concerning the Company; and (ii) derivative lawsuits based on the class action allegations. The parties to the agreements obtained the court's final approval of the settlements on December 14, 2005. For further information, see Item 3, "Legal Proceedings." on form 10KSB/A filed on April 24, 2007.

During 2006 the Company commenced wholesale distribution under purchase order to chain drug and grocery stores. At August 10, 2007 products are being distributed through eight drug and grocery chains totaling more than 1,000 retail stores plus 120 independent pharmacies. In addition our products have recently become available for purchase on Amazon.com, AmericaRX.com, HarmonDiscount.com, and AlleonPharmacy.net. Online sales have not been significant to date.

8

**CRITICAL ACCOUNTING ESTIMATES**

GOING CONCERN ASSUMPTION - The financial statements do not include any adjustments relating to the recoverability and classification of assets or the amounts and classification of liabilities that might be necessary should we be unable to continue as a going concern. If the financial statements were prepared on a liquidation basis, the carrying value of our assets and liabilities would be adjusted to net realizable amounts. In addition, the classification of the assets and liabilities would be adjusted to reflect the liquidation basis of accounting.

REVENUE RECOGNITION - We recognize revenue from product sales in accordance with generally accepted accounting principles in the United States, including the guidance in Staff Accounting Bulletin, or SAB, No. 104, "Revenue Recognition," which supersedes SAB No. 101, "Revenue Recognition in Financial Statements," and Statement of Financial Accounting Standards, or SFAS, No. 48, "Revenue Recognition When Right of Return Exists."

Revenue from product sales is recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price is fixed and determinable, and collectability is reasonably assured. However, because our products are sold with limited rights of return, revenue is recognized when the price to the buyer is fixed, the buyer is obligated to pay us and the obligation to pay is not contingent on resale of the product, the buyer has economic substance apart from the us, we have no obligation to bring about the sale of the product and the amount of returns can be reasonably estimated.

We record allowances for product returns, rebates and discounts, and report revenue net of such allowances. We must make judgments and estimates in preparing the allowances that could require adjustments in the future. For instance, our customers have the right to return any product that is held past the labeled expiration date. We base our estimates on historic patterns of returns and on the expiration dates of product currently being shipped, or as a result of an actual event that may give rise to a significant return amount such as the discontinuance of a product.

We do not recognize revenue unless collectability is reasonably assured. We maintain allowances for doubtful accounts for estimated losses resulting from the inability of our customers to make required payments. If the financial condition of our customers were to deteriorate and result in an impairment of their ability to make payments, additional allowances may be required.

EXPENSE ALLOCATIONS / MANAGEMENT FEES - BioChemics provides us with certain administrative, marketing and management services, as well as our facilities and general corporate infrastructure. Our statement of operations includes allocations of these costs that BioChemics and we considered to be reasonable.

INCOME TAXES - We account for income taxes and deferred tax assets and liabilities in accordance with SFAS No. 109 "Accounting for Income Taxes." Because we project future operating losses in the near term, we have provided a full valuation allowance against the deferred tax assets created by these losses.

STOCK-BASED COMPENSATION - As part of our compensation programs offered to our employees, we grant stock options. We grant stock options to employees based on the fair value of the Class A common stock at the grant date.

In the first fiscal quarter of 2006 the Company adopted Statement of Financial Accounting Standards No. 123(R) "Share-Based Payments" ("SFAS

123(R)"), which requires all share-based payments to employees, including stock options and stock issued under certain employee stock purchase plans, to be recognized in the Company's financial statements at their fair value. SFAS 123(R) requires the Company to estimate future forfeitures of stock-based compensation. The Company uses the Black-Scholes option pricing model to determine the fair value of options under SFAS 123(R) and has elected to use the modified-prospective transition method, in which prior period financial statements will not be restated but disclosure of the pro forma net loss calculation will be included in the footnotes to the financial statements for periods prior to fiscal 2006 and the adoption of SFAS 123(R).

The Company has an employee stock incentive plan and a non-employee director compensation plan, which are described more fully in Note 8 to the Company's Annual Report on Form 10-KSBA for the period ended December 31, 2006.

During the three months ended June 30, 2007 and 2006, the Company recorded stock compensation expense of $45,960 and $45,960 respectively in accordance with SFAS 123(R). During the six months ended June 30, 2007 and 2006, the Company recorded stock compensation expense of $91,920 and $91,920 respectively in accordance with SFAS 123(R).

9

**THREE MONTHS ENDED JUNE 30, 2007 AND 2006**

NET REVENUES - Net revenues decreased $16 to $10,591 for the three month period ended June 30, 2007 as compared to $10,607 in the prior comparable period. In the three months ended June 30, 2007 and in the three months ended June 30, 2006 we recognized revenue primarily from shipments to chain supermarkets. For the three months ended June 30, 2007 sales primarily consisted of re-orders as compared to initial orders in the prior comparable period.

COST OF SALES - Cost of sales increased $903 to $12,016 during the three month period ended June 30, 2007 from $11,113 in the comparable period in 2006. In general, our cost of sales is variable to our net revenues. However, certain manufacturing events such as inventory adjustments may distort our cost of sales, and therefore our gross profit, during any particular period.

GROSS PROFIT - Gross profit as a percentage of net revenues for both the three month period ended June 30, 2007 and June 30, 2006 are negative as a direct result of the matters discussed under the Cost of Sales discussion above. We do not believe that any comparison between periods is meaningful in our current stage of development.

MARKETING, ADVERTISING AND PROMOTION - Marketing, advertising and promotion expenses increased by $18,973 to $49,366 for the three-month period ended June 30, 2007 from $30,393 during the three-month period ended June 30, 2006. The increase is primarily related to additional print and television media advertising incurred in support of our product launch into retail chain supermarkets.

SELLING, GENERAL AND ADMINISTRATIVE - Selling, general and administrative expenses decreased by $208,620 to $359,969 during the three-month period ended June 30, 2007 as compared to $568,589 in the comparable period in 2006. The decrease resulted primarily from a decrease of approximately $169,000 in legal fees over the comparable period in 2006.

During the three months ended June 30, 2007, other selling, general and administrative expenses we incurred were $181,000 in salaries, wages and related personnel costs; approximately $38,000 in legal fees; approximately $38,000 for various insurance premiums typical of a public company; approximately $15,000 for board of director compensation, approximately $11,000 in management fees from BioChemics, approximately $17,000 in registered accountant fees, and approximately $11,000 in rent expense. The remaining selling, general and administrative expenses pertained to our general operations.

STOCK BASED COMPENSATION - We are required to record stock-based compensation when we grant options to purchase our common stock to employees and non-employees in accordance with SFAS 123R. The value of these options is calculated using the Black-Scholes option-pricing model. Stock based compensation for both the three-month periods ended June 30, 2007 and June 30, 2006 was $45,960 and $15,101 to employees and non-employees, respectively. Since no grants were made to employees or non-employees during these periods, the amount recorded was attributable to the normal amortization of fair value of these awards into expense over the vesting period of the awards.

INTEREST EXPENSE, net - Interest expense, net decreased by $53,825 to $140,674 during the three months ended June 30, 2007 from $194,499 in the comparable period in 2006. The decrease resulted from decreased interest charges of approximately $89,600 in connection with debt issuance costs and warrant costs being fully accreted on May 1, 2007. The prior comparable quarter in 2006 recorded three months of those charges. This decrease was partially offset by increased interest charges of approximately $33,000 from May 2, 2007 to June 30, 2007 because the interest rate on the Senior Secured Convertible Notes increased to 18% on May 2, 2007.

**SIX MONTHS ENDED JUNE 30, 2007 AND 2006**

NET REVENUES - Net revenues increased $7,714 to $23,864 for the six month period ended June 30, 2007 as compared to $16,150 in the prior comparable period. In the six months ended June 30, 2007 we recognized revenue primarily from re-order shipments to chain supermarkets. In the prior comparable period we recognized revenue primarily from initial shipments to chain supermarkets and from direct to consumer re-orders.

COST OF SALES - Cost of Sales decreased $8,907 to $18,586 during the six month period ended June 30, 2007 from $27,493 in the comparable prior period. In general, our cost of sales is variable to our net revenues. This decrease was due primarily to lower inventory write-offs and adjustments over the prior comparable period.

GROSS PROFIT - Gross profit as a percentage of net revenues was approximately 22% for the six month period ended June 30, 2007 compared to approximately (70%) for the prior comparable period. We do not believe that any comparison between periods is meaningful in our current stage of development.

MARKETING, ADVERTISING AND PROMOTION - Marketing, advertising and promotion expenses increased $51,925 or approximately 82% for the six-month period ended June 30, 2007 from $63,489 for the six-month period ended June 30, 2006. This increase is primarily related to increased print and television media advertising incurred in support of our product launch into retail supermarket chain stores.

SELLING, GENERAL AND ADMINISTRATIVE - Selling, general and administrative expenses decreased by $321,487 to $772,323 during the six-month period ended June 30, 2007 as compared to 1,093,810 in the comparable period in 2006. The decrease resulted primarily from a decrease of approximately $217,000 in legal fees plus savings in insurances and generally reduced expense budgets due to working capital constraints.

During the six-months ended June 30, 2007, other selling, general and administrative expenses we incurred were $357,208 in salaries, wages and related personnel costs; approximately $48,000 in legal fees; approximately $76,000 for various insurance premiums typical of a public company; approximately $30,000 for board of director compensation, approximately $23,000 in management fees from BioChemics, approximately $67,000 in registered accountant fees; approximately $30,000 in rent expense. The remaining selling, general and administrative expenses pertained to our general operations.

RESEARCH AND DEVELOPMENT - Research and development expenses increased by $150 to $150 for the six-month period ended June 30, 2007 as compared to $0 in the comparable prior period in 2006. Due to working capital constraints, we suspended substantially all research and development activities at the end of 2005.

**STOCK-BASED COMPENSATION -**

During the six months ended June 30, 2007 and 2006 the Company recorded stock compensation expense of $91,920 and $30,202 for employees and consultants, respectively, in accordance with SFAS 123(R).

INTEREST EXPENSE, net - Interest expense, net decreased by $51,373 to $337,511 during the six months ended June 30, 2007 from $388,884 in the comparable period in 2006. The decrease results from decreased interest charges of approximately $89,600 in connection with debt issuance costs and warrant costs being fully accreted on May 1, 2007. The prior comparable period in 2006 recorded six months of those charges. This decrease was partially offset by increased interest charges of approximately $33,000 from May 2, 2007 to June 30, 2007 because the interest rate on the Senior Secured Convertible Notes increased to 18% on May 2, 2007.

**LIQUIDITY AND CAPITAL RESOURCES**

The Company has incurred substantial operating losses and negative cash flows from operations since inception. In 2004 and 2005, until the completion of our private financing in August 2005, operations were financed primarily from the proceeds of our December 2003 initial public offering and from the exercise of warrants. Net of offering costs, we raised approximately $6.4 million and $450,000, respectively, through these transactions. Prior to our receipt of these proceeds, we relied on BioChemics, together with the proceeds from an offering of convertible notes in early 2003, as the source of our working capital. We have expended all of the funds raised from our initial public offering.

On August 16, 2005, under a Securities Purchase Agreement (the "Purchase Agreement"), we issued a series of Senior Secured Convertible Notes (the "Notes") due May 1, 2007 in the aggregate principal amount of $2,500,000. The Company received approximately $1,700,000 in net cash proceeds from financing after placement fees, legal expenses, other offering costs, and funding of an escrow for future interest payments on the Notes. Placement fees, legal expenses and other offering costs paid were approximately $360,000 and approximately $440,000 was placed into escrow to fund substantially all of the Company's interest payments on the Notes (assuming that the Notes continue to accrue interest at the initial rate of 10% per annum).

11

THE NOTES. The Notes had a term of 21 months, and the principal of the Notes was due and payable in a single payment on May 1, 2007. Prior to May 1, 2007 the Notes bore interest at the six month LIBOR plus 6% with a floor of 10.0% and a ceiling of 12.0%. As noted below, the Company was not able to repay the amounts outstanding under the Notes on May 1, 2007.

The Notes are secured by all of the assets of the Company. The Notes are convertible at any time into shares of the Company's Class A Common Stock at a price of $0.70 per share (subject to adjustment under certain circumstances, e.g., anti-dilution adjustments).

THE WARRANTS. The investors also received five-year warrants ("Warrants"), which entitle the investors to purchase a total of 1,298,701 shares of the Company's Class A Common Stock at an exercise price of $0.77 per share. The number of shares which may be purchased upon exercise of the Warrants and the exercise price per share of the Warrants are subject to adjustment under certain circumstances, e.g., anti-dilution adjustments.

ADDITIONAL INVESTMENT RIGHTS (AIRS). In addition, the investors received AIRs to purchase up to $1,875,000 in aggregate principal amount of additional Notes at any time through May 1, 2007, which is the maturity date of the notes, together with additional five-year Warrants to purchase a total of 974,026 shares of Class A Common Stock. Any additional Notes would be convertible and any additional Warrants would be exercisable at the same respective initial prices per share as the Notes and Warrants issued on August 16, 2005. The AIRs expired on May 1, 2007 without being exercised.

Under the Purchase Agreement, the Company is required to reserve, and has reserved, for the issuance of a total of 4,870,130 shares of Class A Common Stock, in connection with the possible conversion of Notes (excluding the additional Notes) and the possible exercise of the Warrants (excluding the additional Warrants).

At June 30, 2007, we had unrestricted cash of approximately $6,000 and working capital deficit of approximately $5.84 million. This deficit includes the senior secured convertible notes we sold in 2005 that matured on May 1, 2007. This deficit also includes approximately $1.67 million due to our parent, and approximately $237,000 in legal fees payable to our initial public offering counsel that we are contesting.

We are actively pursuing alternative financing sources for important funding to repay existing debt and to provide working capital, but we are uncertain whether we will be successful in obtaining any such financing, or if we obtain any such financing that it will be on favorable terms to the Company.

On May 1, 2007, the Company failed to pay the principal amount outstanding under the Notes. Under the terms of the Notes, this may be deemed to be an Event of Default, which gives the holders of the Notes the right to require the Company to repurchase the notes at 115% of the outstanding principal, plus interest or, if greater, 115% of the value of the shares that such holder could receive upon conversion of the Notes, based on a five day trading average price, (the "Event Price"). The default rate of interest on any unpaid amounts is 18%. In addition, Iroquois Master Fund, L.P. ("Iroquois"), as collateral agent for the purchasers of the Notes, may assert its rights under the Security Agreement, dated August 16, 2005, among the Company, Iroquois and the purchasers of the Notes.

The Company has been in discussions with representatives of Iroquois regarding the terms of a possible restructuring of these obligations, but no agreements have been reached. If the Company is unable to negotiate a forbearance, extension or other arrangement, may be forced to seek relief from its creditors in bankruptcy, or the holders of such notes might seek to foreclose on the Company assets, liquidate the Company, or have it declared insolvent.

On May 18, 2007, the Company received written notice (the "Notice") from Portside Growth and Opportunity Fund, ("Portside") that an Event of Default had occurred under the Portside Note and that Portside had elected to require the Company to redeem the Portside Note at the Event Price.

On July 17, 2007 Portside entered into a Secondary Securities Purchase Agreement (the "Agreement") with Frontier Holdings Company, Inc. ("Frontier") whereby Portside sold to Frontier an interest in its Senior Secured Convertible Note (the "Note") due May 1, 2007, representing $253,771.66 in principal amount of the Note of $341,616.66. John Masiz, a key employee and stockholder of the Company, holds a controlling interest in Frontier.

Simultaneously with the execution of the Agreement, Portside entered into an Amendment to Senior Secured Convertible Note (the "Amendment") with the Company. Under the terms of the Amendment, in exchange for an extension fee in the amount of $43,993.00, payable December 31, 2007, Portside has agreed to extend the original maturity date of its remaining $87,845.00 in principal amount of the Note. The amended maturity date is December 31, 2007. Upon the amended maturity date, the Company agrees to pay Portside (i) $87,845.00 representing the principal amount of the Note outstanding, (ii) any accrued and unpaid interest thereunder, and (iii) the extension fee in the amount of $43,993.00. As part of the Amendment, Portside waives any Default or Event of Default by the Company based on the failure by the Company to repay amounts due under the Note any time prior to December 31, 2007 and rescinds the Notice of an Event of Default previously disclosed in the Form 8-K dated May 18, 2007. Portside also agreed to dismiss the lawsuit it had filed in the Supreme Court in the State of New York. The Company also agreed that it would give Portside the benefit of any higher extension fee that it may agree to pay to other holders of the Company's Senior Secured Convertible Notes due May 1, 2007. The Company has recorded debt restructuring expense in the amount of $43,993 for the six months ended June 30, 2007 in connection with the Agreement.

On June 1, 2007, the Company received written notice (the "Smithfield Notice") from Smithfield Fiduciary, LLC ("Smithfield") that an Event of Default had occurred under the Smithfield Note and that Smithfield had elected to require the Company to redeem the Smithfield Note at the Event Price, as defined in the Smithfield Note. The Event Price is equal to 115% of the outstanding principal, plus accrued interest (or, if greater, 115% of the value of shares that such holder could receive upon conversion of the Smithfield Note, based on a five day trading average price). In addition, the default rate of interest on any unpaid amounts is 18%. In connection with receipt of the Smithfield Notice, the Company has recorded a charge for default premium on senior secured convertible notes in the amount of $112,500 during the six months ended June 30, 2007.

As of August 14, 2007 the Company has not received similar notices from the other note holders. If the Company had received similar notices from all the other remaining note holders, the Company would have recorded an additional charge for default premium on senior secured convertible notes in the amount of approximately $249,000 during the six months ended June 30, 2007.

Working capital has been provided to the Company by Biochemics, under a verbal agreement, in the form of cash advances and payments made on behalf of the Company. We expect Biochemics to continue to provide working capital although it is under no obligation to do so. There can be no assurance that Biochemics can or will be willing or able to continue to provide working capital to the Company.

Our ability to continue our business activities, including increasing our marketing support for our existing products, funding of the development of our product candidates through BioChemics and the commercialization of these product candidates, will depend upon, among other things, raising capital from third parties or receiving net cash flows from sales of our products. If we successfully generate cash through any of these methods, our priorities will be:
(i) to contribute to support our existing products; (ii) to bring our acne product candidate to market; and (iii) to commence clinical trials for our ibuprofen candidate.

## CONTRACTUAL OBLIGATIONS AND COMMITMENTS

The following table sets forth our contractual obligations and commitments for the next five years, as of June 30, 2007.

|  | TOTAL | LESS THAN 1 YEAR | 1-3 YEARS | 3-5 YEARS | 5-7 YEARS |
|---|---|---|---|---|---|
| Long-term debt | $      -- | $      -- | $      -- | $      -- | $      -- |
| Capital lease obligations | 11,002 | 3,024 | 7,978 | -- | -- |
| Operating lease obligations | -- | -- | -- | -- | -- |
| Note maturities | 3,370,000 | 3,370,000 |  |  |  |
| Unconditional purchase obligations | -- | -- | -- | -- | -- |
| Employment agreements | 2,205,000 | 315,000 | 630,000 | 630,000 | 630,000 |
| Total | $5,586,002 | $3,688,024 | $  637,798 | $  630,000 | $  630,000 |

The written employment agreements with Mr. Masiz and Dr. Carter terminate their initial terms on June 30, 2008, but are deemed automatically extended for successive periods of two years under the terms of their respective written agreements. This table is presented reflecting the effects of the deemed automatic extensions and it reflects $315,000 beyond 2009. This amount, $315,000, will be the annual ongoing obligation of the Company if the agreements for Mr. Masiz and Dr. Carter do in fact extend under the present agreements.

**OFF-BALANCE SHEET ARRANGEMENTS**

We have no material off-balance sheet financing such as a facility lease or other long-term commitments. We have employment agreements with two key employees. Please refer to "Contractual Obligations and Commitments" for a summary of the employment agreement obligations.

**OWNERSHIP STRUCTURE**

Through our parent company, Biochemics, John J. Masiz controls approximately 70% of the combined voting power of all classes of stock of the Company and approximately 44% of the combined equity interest of the Company. Biochemics owns 100% of the Class B Common Stock of the Company.

**ITEM 3. CONTROLS AND PROCEDURES**

As of the end of the period covered by this quarterly report, our Acting Chief Executive Officer and Chief Financial Officer (the "Certifying Officer") conducted evaluations of our disclosure controls and procedures. As defined under rules 13a-15(e) and 15d-15(e) of the 1934 Act, the term "disclosure controls and procedures" means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the 1934 Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the 1934 Act is accumulated and communicated to the issuer's management, including the Certifying Officer, to allow timely decisions regarding required disclosure. Based on this evaluation, the Certifying Officer has concluded that our disclosure controls and procedures were effective to ensure that material information is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the 1934 Act, and the rules and regulations promulgated thereunder.

Further, there were no changes in our internal control over financial reporting during the quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

14

**PART II - OTHER INFORMATION**

**ITEM 6 (A). EXHIBITS**

```
EXHIBIT
NUMBER          DESCRIPTION OF EXHIBIT
------          ----------------------

31.1            Certification of Joseph Frattaroli, Acting Chief Executive
                Officer and Chief Financial Officer, pursuant to Section 302
                of the Sarbanes-Oxley Act of 2002.(1)

32.1            Certification of Joseph Frattaroli, Acting Chief Executive
                Officer and Chief Financial Officer, pursuant to Section 906
                of the Sarbanes-Oxley Act of 2002.(1)
```

(1) Filed herewith.

15

## SIGNATURE

In accordance with Section 13 and 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on August 14, 2007

### VASO ACTIVE PHARMACEUTICALS, INC.

```
By: /s/ Joseph Frattaroli
    ----------------------------------------
Joseph Frattaroli
President and Acting Chief Executive Officer
Chief Financial Officer
```

16

EXHIBIT 31.1

## CERTIFICATION REQUIRED BY SECTION 302(A) OF THE SARBANES-OXLEY ACT OF 2002

I, Joseph Frattaroli, certify that:

1. I have reviewed this Quarterly Report on Form 10-QSB of Vaso Active Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

August 14, 2007

```
By: /s/ Joseph Frattaroli
    ---------------------------
Acting Chief Executive Officer (principal executive officer)
Chief Financial Officer (principal financial officer)
```

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**

SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Vaso Active Pharmaceuticals, Inc. (the "Company") on Form 10-QSB for the six month period ended June 30, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Joseph Frattaroli, Acting Chief Executive Officer and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

August 14, 2007

```
By: /s/ Joseph Frattaroli
    -------------------------------
Acting Chief Executive Officer (principal executive officer)
Chief Financial Officer (principal financial officer)
```

This certification is made solely for purpose of 18 U.S.C. Section 1350, subject to the knowledge standard contained therein, and not for any other purpose.



# VASO ACTIVE PHARMACEUTICALS INC

## FORM 10QSB
### (Quarterly Report of Financial Condition)

## Filed 11/14/07 for the Period Ending 09/30/07

| | |
|---|---|
| Address | 99 ROSEWOOD DRIVE, #260 |
| | DANVERS, MA 01923 |
| Telephone | 978-750-1991 |
| CIK | 0001232400 |
| Symbol | VAPH |
| SIC Code | 2834 - Pharmaceutical Preparations |
| Industry | Biotechnology & Drugs |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2007, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, DC 20549

# FORM 10-QSB

**[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2007**

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**FOR THE TRANSITION PERIOD FROM _____ TO_____**

*COMMISSION FILE NUMBER: 001-31925*

# VASO ACTIVE PHARMACEUTICALS, INC.
(Exact name of small business issuer as specified in its charter)

| | |
|---|---|
| DELAWARE | 02-0670926 |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| 99 ROSEWOOD DRIVE, SUITE 260 DANVERS, MA | 01923 |
| (Address of principal executive offices) | (Zip code) |

**ISSUER'S TELEPHONE NUMBER: (978) 750-1991**

Check whether the issuer (1) filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [_]

State the number of shares outstanding of each of the issuer's classes of common equity, as of the latest practicable date:

Common stock, Class A, $0.0001 par value  5,828,613 shares outstanding on November 6, 2007

Common stock, Class B, $0.0001 par value  4,500,000 shares outstanding on November 6, 2007

1

## VASO ACTIVE PHARMACEUTICALS, INC.

### INDEX TO FORM 10-QSB

Page

PART I.   FINANCIAL INFORMATION

ITEM 1 - Condensed Financial Statements (unaudited):

Condensed Balance Sheets as of September 30, 2007 and December 31, 2006 ....  3
Condensed Statements of Operations for the Three and nine-month Periods
    Ended September 30, 2007 and 2006 ...................................  4
Condensed Statements of Cash Flows for the Nine-Month Periods Ended
    September 30, 2007 and 2006 ........................................  5
Notes to the Condensed Financial Statements ..............................  6

ITEM 2 - Management's Discussion and Analysis of Financial Condition
    and Results of Operations ..........................................  8

ITEM 3 - Controls and Procedures .........................................  15

PART II.  OTHER INFORMATION

ITEM 6 - Exhibits and Reports on Form 8-K ................................  16

Signature ................................................................  17

Unless the context requires otherwise, references in this Quarterly Report to "Vaso Active," "the Company," "we," "our" and "us" refer to Vaso Active Pharmaceuticals, Inc. Vaso Active, A-R Extreme(R), Termin8(R), RepiDerm(R), and our logo are trademarks of the Company. Osteon (R) and PENtoCORE(R) are registered trademarks of BioChemics, Inc. This Quarterly Report on Form 10-QSB may contain trademarks and trade names of other parties.

2

VASO ACTIVE PHARMACEUTICALS, INC.
CONDENSED BALANCE SHEETS

| | SEPTEMBER 30, 2007 | DECEMBER 31, 2006 |
|---|---|---|
| | (UNAUDITED) | |
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| Cash and cash equivalents | $ 7,372 | $ 8,627 |
| Restricted cash | 11,683 | 136,319 |
| Accounts receivable | 16,395 | 30,446 |
| Inventory | 9,386 | 93,608 |
| Debt issuance costs | - | 68,713 |
| Prepaid expenses | 53,801 | 26,650 |
| TOTAL CURRENT ASSETS | 98,637 | 364,363 |
| Property and equipment - net | 27,538 | 38,794 |
| | $ 126,175 | $ 403,157 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIENCY)** | | |
| CURRENT LIABILITIES: | | |
| Accounts payable | $ 572,468 | $ 637,427 |
| Accrued compensation | 183,651 | 149,543 |
| Other accrued expenses | 264,352 | 73,510 |
| Obligations under capital leases - short-term portion | 2,528 | 2,510 |
| Senior secured convertible notes, net of discount | 2,612,500 | 2,389,503 |
| Notes payable | 870,000 | 870,000 |
| Due to parent company | 2,048,506 | 941,621 |
| Deferred revenue | 20,000 | 14,000 |
| TOTAL CURRENT LIABILITIES | 6,574,005 | 5,078,114 |
| LONG-TERM LIABILITIES: | | |
| Obligations under capital leases - long-term portion | 7,207 | 9,111 |
| TOTAL LONG-TERM LIABILITIES | 7,207 | 9,111 |
| | 6,581,212 | 5,087,225 |

Commitments and contingencies (Note 1)

STOCKHOLDERS' EQUITY:
Preferred stock - $0.0001 par value; authorized

```
   10,000,000 shares; issued and outstanding, none                          -                    -
Common stock - $0.0001 par value; authorized
   60,000,000 shares; issued and outstanding, 10,328,613              1,033                1,033
Additional paid-in capital                                         8,996,058            8,858,178
Deferred compensation                                                (19,108)             (64,411)
Accumulated deficit                                              (15,433,020)         (13,478,868)
                                                                ---------------      ---------------
TOTAL STOCKHOLDERS' DEPICIENCY                                     (6,455,037)          (4,684,068)
                                                                ---------------      ---------------
                                                            $        126,175     $        403,157
                                                                ===============      ===============
```

See notes to the unaudited condensed financial statements

3

VASO ACTIVE PHARMACEUTICALS, INC.
UNAUDITED CONDENSED STATEMENTS OF OPERATIONS

| | Three-Month Period Ended September 30, | | Nine-Month Period Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Net revenues | $ 14,804 | $ 42,783 | $ 38,668 | $ 58,933 |
| Cost of revenues | 12,535 | 21,066 | 31,121 | 48,559 |
| GROSS PROFIT | 2,269 | 21,717 | 7,547 | 10,374 |
| | | | | |
| Costs and expenses: | | | | |
| Marketing, advertising and promotion | 63,212 | 999 | 178,626 | 64,488 |
| Selling, general and administrative (1) | 357,750 | 407,256 | 1,130,073 | 1,501,066 |
| Research and development | - | - | 150 | - |
| Stock based compensation | 15,101 | 15,101 | 45,303 | 45,303 |
| | | | | |
| Loss from operations | (433,794) | (401,639) | (1,346,605) | (1,600,483) |
| | | | | |
| Interest income (expense), net | (113,543) | (197,452) | (451,054) | (586,336) |
| Charge for default premium on senior | | | | |
| Secured convertible notes | - | - | (112,500) | - |
| Debt restructuring expense | - | - | (43,993) | - |
| | (113,543) | (197,452) | (607,547) | (586,336) |
| | | | | |
| NET LOSS | $ (547,337) | $ (599,091) | $ (1,954,152) | $ (2,186,819) |
| | | | | |
| Net loss per share - basic and diluted (Note 2) | $ (0.05) | $ (0.06) | $ (0.19) | $ (0.21) |
| | | | | |
| Weighted average shares outstanding - basic and diluted (Note 2) | 10,328,613 | 10,328,613 | 10,328,613 | 10,328,613 |
| | | | | |
| (1) Includes stock based compensation of: | 45,960 | 45,960 | 137,880 | 137,880 |

See notes to the unaudited condensed financial statements.

4

VASO ACTIVE PHARMACEUTICALS, INC.
UNAUDITED CONDENSED STATEMENTS OF CASH FLOWS

| | Nine-Month Period Ended September 30, | |
|---|---|---|
| | 2007 | 2006 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | $ (1,954,152) | $ (2,186,819) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 11,256 | 11,256 |
| Stock-based compensation (Note 4) | 183,183 | 183,177 |
| Amortization of discount and offering costs associated with convertible debt | 179,211 | 403,222 |
| Inventory write-off | 22,591 | - |
| Accrued debt restructuring expenses | 43,993 | - |
| Increase in senior secured convertible notes for default premium | 112,500 | - |
| Increase (decrease) in cash from change in: | | |
| Accounts receivable | 14,051 | (40,633) |
| Inventory | 61,631 | (153,351) |
| Prepaid expenses | (27,151) | 51,812 |
| Accounts payable | (64,959) | 344,833 |
| Accrued compensation | 34,108 | 90,284 |
| Deferred revenue | 6,000 | 4,401 |
| Other accrued expenses | 146,848 | (63,213) |
| Net cash used in operating activities | (1,230,890) | (1,355,031) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Decrease (additions) in restricted cash | 124,636 | 186,636 |
| | | |
| Net cash provided by (used in) investing activities | 124,636 | 186,636 |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Accrued legal settlement | - | (15,000) |
| Obligations under capital leases | (1,886) | (1,778) |
| Due to/from parent company | 1,106,885 | 486,210 |

| | | | |
|---|---|---|---|
| Net cash provided by financing activities | | 1,104,999 | 469,432 |
| | | ---------------- | ---------------- |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | | (1,255) | (698,963) |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | | 8,627 | 707,640 |
| | | ---------------- | ---------------- |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ | 7,372 | $ 8,677 |
| | | ================ | ================ |
| SUPPLEMENTAL DISCLOSURES: | | | |
| Interest paid | $ | 451,054 | $ 586,336 |
| Income taxes paid | $ | - | $ - |
| NONCASH DISCLOSURES: | | | |
| Issuance of capital leases and acquired equipment | $ | - | $ - |

See notes to the unaudited condensed financial statements.

5

## VASO ACTIVE PHARMACEUTICALS, INC.

### NOTES TO UNAUDITED CONDENSED FINANCIAL STATEMENTS

1. INTERIM FINANCIAL STATEMENTS

The accompanying unaudited interim financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission for reporting on Form 10-QSB. Accordingly, certain information and footnote disclosure required for complete financial statements are not included herein. It is recommended that these financial statements be read in conjunction with the financial statements and related notes of Vaso Active Pharmaceuticals, Inc. (the "Company") as reported in the Company's Annual Report on Form 10-KSB for the year ended December 31, 2006. In the opinion of management, all adjustments (consisting of normal recurring adjustments) considered necessary for a fair presentation of financial position, results of operations, and cash flows at the dates and for the periods presented have been included. The results of operations for the three and nine months ended September 30, 2007 may not be indicative of the results that may be expected for the year ending December 31, 2007, or any other period.

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

GOING CONCERN - These financial statements have been prepared on the assumption that the Company will be able to realize its assets and discharge its liabilities in the normal course of business. This assumption is presently in question and contingent upon the Company's ability to raise additional funds. Management is in the process of identifying various fund-raising strategies it will pursue in the fourth quarter of 2007 and in 2008. These strategies may include an additional private placement of the Company's equity securities. There are no assurances that Management will successfully execute such strategies.

ACCOUNTS RECEIVABLE - Accounts receivable consist primarily of trade receivables from the sale of OTC pharmaceutical products. The allowance for doubtful accounts is based on the Company's assessment of the collectability of specific customer accounts and an assessment of economic risk as well as the aging of the accounts receivable. The Company's policy is to write-off uncollectible trade receivables after significant measures have failed to result in their collection. An allowance for doubtful accounts is established to represent the estimated uncollectible trade receivables. The allowance for doubtful accounts was $33,000 at December 31, 2006. No reserve was recorded at September 30, 2007.

DUE TO PARENT - The Company reimburses the cost of certain administrative services provided by BioChemics as well as general overhead fees pursuant to agreements between the Company and BioChemics. In addition, Biochemics has provided working capital to the Company during 2006 and 2007 under a verbal agreement. The due to parent balance represents the net obligation from the Company to BioChemics at September 30, 2007 and December 31, 2006.

REVENUE RECOGNITION - The Company recognizes revenue from product sales in accordance with accounting principles generally accepted in the United States of America, including the guidance in Staff Accounting Bulletin ("SAB") Bulletin No. 104 "Revenue Recognition" and Statement of Financial Accounting Standards ("SFAS") No. 48, "Revenue Recognition When Right of Return Exists." Specifically, revenue is recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price is fixed and determinable and collectability is reasonably assured.

In general, revenue is recognized when products are shipped to customers. It is the Company's policy that all sales are final. As is common in the consumer products industry, customers return products for a variety of reasons including products damaged in transit, packaging changes, product discontinuance and shipping errors. As sales are recorded, the Company accrues an estimated amount for product returns as a reduction of revenue. These estimates are based on historical experience and known specific events such as product expiration dates.

### STOCK-BASED COMPENSATION

In the first fiscal quarter of 2006 the Company adopted Statement of Financial Accounting Standards No. 123(R) "Share-Based Payments" ("SFAS 123(R)"), which requires all share-based payments to employees, including stock options and stock issued under certain employee stock purchase plans, to be recognized in the Company's financial statements at their fair value. SFAS 123(R) requires the Company to estimate future forfeitures of stock-based compensation. The Company uses the Black-Scholes option pricing model to determine the fair value of options under SFAS 123(R) and has elected to use the modified-prospective transition method, in which prior period financial statements will not be restated but disclosure of the pro forma net loss calculation will be included in the footnotes to the financial statements for periods prior to fiscal 2006 and the adoption of SFAS 123(R). The Company has an employee stock incentive plan and a non-employee director compensation plan, which are described more fully in Note 8 to the Company's Annual Report on Form 10-KSBA for the period ended December 31, 2006.

6

During the three months ended September 30, 2007 and 2006, the Company recorded stock compensation expense of $45,960 and $45,960 respectively in accordance with SFAS 123(R). During the nine months ended September 30, 2007 and 2006, the Company recorded stock compensation expense of $137,880 and $137,880 respectively in accordance with SFAS 123(R).

NET LOSS PER SHARE - Basic net loss per share is computed by dividing net loss by the weighted average number of common shares outstanding for the period. Diluted net loss per share reflects, in addition to the weighted average number of common shares, the potential dilution if stock options and warrants outstanding were exercised and/or converted into common stock, unless the effect of such equivalent shares was anti-dilutive.

For the three-month and nine-months periods ended September 30, 2007 and 2006, the effect of stock options and other potentially dilutive shares were excluded from the calculation of diluted net loss per common share as their inclusion would have been anti-dilutive.

7

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### FORWARD-LOOKING INFORMATION

This Quarterly Report on Form 10-QSB contains "forward-looking statements" within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended (the "1934 Act"), that are based on management's exercise of business judgment as well as assumptions made by, and information currently available to management. When used in this document, the words "may," "will," anticipate," believe," estimate," intend," and words of similar import, are intended to identify any forward-looking statements. You should not place undue reliance on these forward-looking statements. These statements reflect our current view of future events and are subject to certain risks and uncertainties as noted below. Should one or more of these risks and uncertainties materialize, or should underlying assumptions prove incorrect, our actual results could differ materially from those anticipated in these forward-looking statements. We undertake no obligation and do not intend to update, revise or otherwise publicly release any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of any unanticipated events after the date hereof or to reflect the occurrence of any unanticipated events. Although we believe that our expectations are based on reasonable assumptions, we can give no assurance that our expectations will materialize.

Management's Discussion and Analysis should be read together with our condensed financial statements and related notes included elsewhere in this Quarterly Report on Form 10-QSB and the Company's Annual Report on Form 10-KSB for the fiscal year ended December 31, 2006. This Quarterly Report on Form 10-QSB, including the following discussion, contains trend analysis and other forward-looking statements within the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Any statements in this Quarterly Report on Form 10-QSB that are not statements of historical facts are forward-looking statements. These forward looking statements made herein are based on our current expectations, involve a number of risks and uncertainties and should not be considered as guarantees of future performance.

Factors that could cause actual results to differ materially include without limitation:

o our ability to repay our indebtedness, including repayment of the Senior Secured Convertible Notes or the notes issued in connection with certain litigation.

o an inability to arrange additional debt or equity financing;

o our ability to finance our business;

o the impact of new technologies;

o changes in laws or rules or regulations of governmental agencies;

o outcome in pending litigation matters;

o interruptions or cancellation of existing contracts;

o impact of competitive products and pricing;

o product demand and market acceptance and risks;

o the presence of competitors with greater financial resources;

o product development and commercialization risks;

o our ability to maintain our current pricing model and/or decrease our cost of sales;

o continued availability of supplies or materials used in manufacturing at the current prices;

o adverse regulatory developments in the United States;

o entrance of competitive products in our markets;

o the ability of management to execute plans and motivate personnel in the execution of those plans;

o adverse publicity related to our products or the company itself;

o adverse claims relating to our intellectual property licensed from Biochemics;

o the adoption of new, or changes in, accounting principles;

o legal proceedings;

o the costs inherent with complying with new statutes and regulations applicable to public reporting companies, such as the Sarbanes-Oxley Act of 2002;

o other new lines of business that the Company may enter in the future; and

These factors are not necessarily all of the important factors that could cause actual results to differ materially from those expressed in the forward-looking statements in this quarterly report. Other unknown or unpredictable factors also could have material adverse effects on our future results, including the factors described under the heading "Risk Factors" in the Company's Annual Report on Form 10-KSB for the fiscal year ended December 31, 2006. The forward-looking statements in this quarterly report are made only as of the date of this quarterly report, and we do not have any obligation to publicly update any forward-looking statements to reflect subsequent events or circumstances.

## BUSINESS OVERVIEW

Vaso Active is an early stage company, organized in January 2003, which focuses on commercializing, marketing and selling over-the-counter pharmaceutical products that we believe incorporate a proprietary PENtoCORE technology. Vaso Active's focus on pre-clinical testing and research on a patented vaso active lipid encapsulated ("VALE") technology has been has been limited due to working capital constraints.

We began our operations in January 2001, as a division of BioChemics, a privately-owned pharmaceutical company engaged in the development of transdermal and topical drug delivery systems. BioChemics is based in Danvers, Massachusetts. BioChemics was founded in 1989 by John J. Masiz and was incorporated in Delaware in 1991. BioChemics began developing the VALE technology in 1989 and has subsequently been issued four U.S. patents in connection with this technology. BioChemics has licensed the VALE patents and the PENtoCORE technology to us.

As an early stage company, we are subject to a number of risks typical of early stage companies including, but not limited to, our need to obtain additional financing and generate profitability and cash flows from operations. As a company engaged in the pharmaceutical industry, we are subject to a number of risks typical of pharmaceutical companies including, but not limited to, our need to adhere to strict governmental regulations, our ability to withstand intense competition from larger companies with greater financial resources and our ability to defend our intellectual property, as licensed from BioChemics.

Our general business strategy was adversely affected beginning in April 2004 by regulatory action taken against us and our former President, and by private securities actions taken against us and our management. At the same time, we suspended the marketing and sale of our products until we were reasonably sure that our product marketing was consistent with the FDA's requirements and policies. We also voluntarily delisted our common stock from trading on NASDAQ. As a result of our voluntary delisting, the action taken by the SEC against us, issues regarding the regulatory status of our products, and the significant decline in the market value of our securities concurrent with and subsequent to these matters, several shareholder actions were filed against Vaso Active and its officers and directors. Since February 17, 2006 our Class A common stock has been quoted on the Over the Counter Bulletin Board under the symbol "VAPH.ob".

In September 2005, the Company and certain of its officers and directors settled (i) a consolidated securities class action lawsuit that alleged that the Company and those individuals violated the federal securities laws with respect to certain disclosures concerning the Company; and (ii) derivative lawsuits based on the class action allegations. The parties to the agreements obtained the court's final approval of the settlements on December 14, 2005. For further information, see Item 3, "Legal Proceedings." on form 10KSB/A filed on April 24, 2007.

9

During 2006 the Company commenced wholesale distribution under purchase order to chain drug and grocery stores. At November 14, 2007 products are being distributed through eight drug and grocery chains totaling more than 1,000 retail stores plus 120 independent pharmacies. In addition our products are available for purchase on Amazon.com, AmericaRX.com, HarmonDiscount.com, and AlleonPharmacy.net. Online sales have not been significant to date.

## CRITICAL ACCOUNTING ESTIMATES

GOING CONCERN ASSUMPTION - The financial statements do not include any adjustments relating to the recoverability and classification of assets or the amounts and classification of liabilities that might be necessary should we be unable to continue as a going concern. If the financial statements were prepared on a liquidation basis, the carrying value of our assets and liabilities would be adjusted to net realizable amounts. In addition, the classification of the assets and liabilities would be adjusted to reflect the liquidation basis of accounting.

REVENUE RECOGNITION - We recognize revenue from product sales in accordance with generally accepted accounting principles in the United States, including the guidance in Staff Accounting Bulletin, or SAB, No. 104, "Revenue Recognition," which supersedes SAB No. 101, "Revenue Recognition in Financial Statements," and Statement of Financial Accounting Standards, or SFAS, No. 48, "Revenue Recognition When Right of Return Exists."

Revenue from product sales is recognized when there is persuasive evidence of an arrangement, delivery has occurred, the price is fixed and determinable, and collectibility is reasonably assured. However, because our products are sold with limited rights of return, revenue is recognized when the price to the buyer is fixed, the buyer is obligated to pay us and the obligation to pay is not contingent on resale of the product, the buyer has economic substance apart from the us, we have no obligation to bring about the sale of the product and the amount of returns can be reasonably estimated.

We record allowances for product returns, rebates and discounts, and report revenue net of such allowances. We must make judgments and estimates in preparing the allowances that could require adjustments in the future. For instance, our customers have the right to return any product that is held past the labeled expiration date. We base our estimates on historic patterns of returns and on the expiration dates of product currently being shipped, or as a result of an actual event that may give rise to a significant return amount such as the discontinuance of a product. At September 30, 2007 we recorded deferred revenue in the amount of $20,000.

We do not recognize revenue unless collectibility is reasonably assured. We maintain allowances for doubtful accounts for estimated losses resulting from the inability of our customers to make required payments. If the financial condition of our customers were to deteriorate and result in an impairment of their ability to make payments, additional allowances may be required.

EXPENSE ALLOCATIONS / MANAGEMENT FEES - BioChemics provides us with certain administrative, marketing and management services, as well as our facilities and general corporate infrastructure. Our statement of operations includes allocations of these costs that BioChemics and we considered to be reasonable.

INCOME TAXES - We account for income taxes and deferred tax assets and liabilities in accordance with SFAS No. 109 "Accounting for Income Taxes." Because we project future operating losses in the near term, we have provided a full valuation allowance against the deferred tax assets created by these losses.

STOCK-BASED COMPENSATION - As part of our compensation programs offered to our employees, we grant stock options. We grant stock options to employees based on the fair value of the Class A common stock at the grant date.

In the first fiscal quarter of 2006 the Company adopted Statement of Financial Accounting Standards No. 123(R) "Share-Based Payments" ("SFAS 123(R)"), which requires all share-based payments to employees, including stock options and stock issued under certain employee stock purchase plans, to be recognized in the Company's financial statements at their fair value. SFAS 123(R) requires the Company to estimate future forfeitures of stock-based compensation. The Company uses the Black-Scholes option pricing model to determine the fair value of options under SFAS 123(R) and has elected to use the modified-prospective transition method, in which prior period financial statements will not be restated but disclosure of the pro forma net loss calculation will be included in the footnotes to the financial statements for periods prior to fiscal 2006 and the adoption of SFAS 123(R).

The Company has an employee stock incentive plan and a non-employee director compensation plan, which are described more fully in Note 8 to the Company's Annual Report on Form 10-KSBA for the period ended December 31, 2006.

During the three months ended September 30, 2007 and 2006, the Company recorded stock compensation expense of $45,960 and $45,960 respectively in accordance with SFAS 123(R). During the nine months ended September 30, 2007 and 2006, the Company recorded stock compensation expense of $137,880 and $137,880 respectively in accordance with SFAS 123(R).

### THREE MONTHS ENDED SEPTEMBER 30, 2007 AND 2006

NET REVENUES - Net revenues decreased $27,979 to $14,804 for the three month period ended September 30, 2007 as compared to $42,783 in the prior comparable period. Revenues for the three months ended September 30, 2006 consisted primarily of initial orders to new customers consisting of chain supermarkets. Revenues for the three months ended September 30, 2007 consisted primarily of re-orders as we did not ship any initial orders to new customers in this period.

COST OF SALES - Cost of sales decreased $8,531 to $12,535 during the three month period ended September 30, 2007 from $21,066 in the comparable period in 2006. In general, our cost of sales is variable to our net revenues. However, certain manufacturing events such as inventory adjustments may distort our cost of sales, and therefore our gross profit, during any particular period.

GROSS PROFIT - Gross profit as a percentage of net revenues for the three month period ended September 30, 2007 was a 15.3% as compared to a 50.1% the three month period ended September 30, 2006. We do not believe that any comparison between periods is meaningful in our current stage of development and due to our limited sales to date.

MARKETING, ADVERTISING AND PROMOTION - Marketing, advertising and promotion expenses increased by $62,213 to $63,212 for the three-month period ended September 30, 2007 from $999 during the three-month period ended September 30, 2006. The increase is primarily related to additional print and television media advertising and sampling programs incurred in support of our product launch into retail chain supermarkets.

SELLING, GENERAL AND ADMINISTRATIVE - Selling, general and administrative expenses decreased by $49,506 to $357,750 during the three-month period ended September 30, 2007 as compared to $407,256 in the comparable period in 2006. Legal and professional fees and investment banking fees decreased by approximately $11,000 and $25,000 respectively for the three months ended September 30, 2007 over the comparable period in 2006. The balance of the net savings pertained to a decrease in the level of general operations

During the three months ended September 30, 2007, selling, general and administrative expenses incurred were $177,955 in salaries, wages and related personnel costs; approximately $12,395 in legal fees; approximately $37,000 for various insurance premiums typical of a public company; approximately $15,000 for board of director compensation, approximately $11,463 in management fees from BioChemics, approximately $6,250 in registered accountant fees, approximately $21,171 in rent expense. The remaining selling, general and administrative expenses pertained to our general operations.

STOCK BASED COMPENSATION - We are required to record stock-based compensation when we grant options to purchase our common stock to employees and non-employees in accordance with SFAS 123R. The value of these options is calculated using the Black-Scholes option-pricing model. Stock based compensation for both the three-month periods ended September 30, 2007 and September 30, 2006 was $45,960 and $15,101 to employees and non-employees, respectively. Since no grants were made to employees or non-employees during these periods, the amount recorded was attributable to the normal amortization of fair value of these awards into expense over the vesting period of the awards.

INTEREST EXPENSE, net - Interest expense, net decreased by $83,909 to $113,543 during the three months ended September 30, 2007 from $197,452 in the comparable period in 2006. The decrease resulted from decreased interest charges of approximately $134,000 in connection with debt issuance costs and warrant costs. The debt issuance and warrant costs were fully accreted on May 1, 2007. Accordingly, the three months ended September 30, 2007 has no charge for these costs while the prior comparable recorded three months of those charges. This decrease was partially offset by increased interest charges of approximately $50,000 for the three months ended September 30, 2007 because the interest rate on the Senior Secured Convertible Notes increased to 18% on May 2, 2007.

11

**NINE MONTHS ENDED SEPTEMBER 30, 2007 AND 2006**

NET REVENUES - Net revenues decreased $20,265 to $38,668 for the nine month period ended September 30, 2007 as compared to $58,933 in the prior comparable period. Revenues for the nine months ended September 30, 2006 consisted primarily of initial orders to new customers consisting of chain supermarkets. Revenues for the nine months ended September 30, 2007 consisted primarily of re-orders.

COST OF SALES - Cost of Sales decreased $17,438 to $31,121 during the nine month period ended September 30, 2007 from $48,559 in the comparable prior period. In general, our cost of sales is variable to our net revenues. However, certain manufacturing events such as inventory adjustments may distort our cost of sales, and therefore our gross profit, during any particular period.

GROSS PROFIT - Gross profit as a percentage of net revenues for the nine month period ended September 30, 2007 was a 19.6% compared to a 17.6% for the nine month period ended September 30, 2006. We do not believe that any comparison between periods is meaningful in our current stage of development and due to our limited sales to date.

MARKETING, ADVERTISING AND PROMOTION - Marketing, advertising and promotion expenses increased $114,138 to $178,626 for the nine-month period ended September 30, 2007 from $64,488 for the nine-month period ended September 30, 2006. The increase is primarily related to additional print and television media advertising and sampling programs incurred in support of our product launch into retail chain supermarkets

SELLING, GENERAL AND ADMINISTRATIVE - Selling, general and administrative expenses decreased by $370,993 to $1,130,073 during the nine-month period ended September 30, 2007 as compared to $1,130,073 in the comparable period in 2006. Approximately $228,000 of the savings was realized through lower legal fees. The balance of the net savings pertained to a decrease in the level of general operations..

During the nine-months ended September 30, 2007, other selling, general and administrative expenses we incurred were $535,163 in salaries, wages and related personnel costs; approximately $60,592 in legal fees; approximately $112,787 for various insurance premiums typical of a public company; approximately $45,000 for board of director compensation, approximately $34,389 in management fees from BioChemics, approximately $73,700 in registered accountant fees; approximately $51,362 in rent expense. The remaining selling, general and administrative expenses pertained to our general operations.

RESEARCH AND DEVELOPMENT - Research and development expenses increased by $150 to $150 for the nine-month period ended September 30, 2007 as compared to $0 in the comparable prior period in 2006. Due to working capital constraints, we suspended substantially all research and development activities at the end of 2005.

**STOCK-BASED COMPENSATION -**

During the nine months ended September 30, 2007 and 2006 the Company recorded stock compensation expense of $137,880 and $45,303 for employees and consultants, respectively, in accordance with SFAS 123(R).

INTEREST EXPENSE, net - Interest expense, net decreased by $135,282 to $451,054 during the nine months ended September 30, 2007 from $586,336 in the comparable period in 2006. The decrease resulted from decreased interest charges of approximately $224,000 in connection with debt issuance costs and warrant costs. The debt issuance and warrant costs were fully accreted on May 1, 2007. Accordingly, the nine months ended September 30, 2007 has only five months of charges for these costs while the prior comparable recorded nine months of those charges. This decrease was partially offset by increased interest charges of approximately $83,000 for the nine months ended September 30, 2007 because the interest rate on the Senior Secured Convertible Notes increased to 18% on May 2, 2007.

12

**LIQUIDITY AND CAPITAL RESOURCES**

The Company has incurred substantial operating losses and negative cash flows from operations since inception. In 2004 and 2005, until the completion of our private financing in August 2005, operations were financed primarily from the proceeds of our December 2003 initial public offering and from the exercise of warrants. Net of offering costs, we raised approximately $6.4 million and $450,000, respectively, through these transactions. Prior to our receipt of these proceeds, we relied on BioChemics, together with the proceeds from an offering of convertible notes in early 2003, as the source of our working capital. We have expended all of the funds raised from our initial public offering.

On August 16, 2005, under a Securities Purchase Agreement (the "Purchase Agreement"), we issued a series of Senior Secured Convertible Notes (the "Notes") due May 1, 2007 in the aggregate principal amount of $2,500,000. The Company received approximately $1,700,000 in net cash proceeds from financing after placement fees, legal expenses, other offering costs, and funding of an escrow for future interest payments on the Notes. Placement fees, legal expenses and other offering costs paid were approximately $360,000 and approximately $440,000 was placed into escrow to fund substantially all of the Company's interest payments on the Notes (assuming that the Notes continue to accrue interest at the initial rate of 10% per annum).

THE NOTES. The Notes had a term of 21 months, and the principal of the Notes was due and payable in a single payment on May 1, 2007. Prior to May 1, 2007 the Notes bore interest at the six month LIBOR plus 6% with a floor of 10.0% and a ceiling of 12.0%. As noted below, the Company was not able to repay the amounts outstanding under the Notes on May 1, 2007.

The Notes are secured by all of the assets of the Company. The Notes are convertible at any time into shares of the Company's Class A Common Stock at a price of $0.70 per share (subject to adjustment under certain circumstances, e.g., anti-dilution adjustments).

THE WARRANTS. The investors also received five-year warrants ("Warrants"), which entitle the investors to purchase a total of 1,298,701 shares of the Company's Class A Common Stock at an exercise price of $0.77 per share. The number of shares which may be purchased upon exercise of the Warrants and the exercise price per share of the Warrants are subject to adjustment under certain circumstances, e.g., anti-dilution adjustments.

ADDITIONAL INVESTMENT RIGHTS (AIRS). In addition, the investors received AIRs to purchase up to $1,875,000 in aggregate principal amount of additional Notes at any time through May 1, 2007, which is the maturity date of the notes, together with additional five-year Warrants to purchase a total of 974,026 shares of Class A Common Stock. Any additional Notes would be convertible and any additional Warrants would be exercisable at the same respective initial prices per share as the Notes and Warrants issued on August 16, 2005. The AIRs expired on May 1, 2007 without being exercised.

Under the Purchase Agreement, the Company is required to reserve, and has reserved, for the issuance of a total of 4,870,130 shares of Class A Common Stock, in connection with the possible conversion of Notes (excluding the additional Notes) and the possible exercise of the Warrants (excluding the additional Warrants).

At September 30, 2007, we had unrestricted cash of approximately $7,000 and working capital deficit of approximately $6.45 million. This deficit includes the senior secured convertible notes we sold in 2005 that matured on May 1, 2007. This deficit also includes approximately $2.05 million due to our parent, and approximately $237,000 in legal fees payable to our initial public offering counsel that we are contesting.

We are actively pursuing alternative financing sources for important funding to repay existing debt and to provide working capital, but we are uncertain whether we will be successful in obtaining any such financing, or if we obtain any such financing that it will be on favorable terms to the Company.

On May 1, 2007, the Company failed to pay the principal amount outstanding under the Notes. Under the terms of the Notes, this may be deemed to be an Event of Default, which gives the holders of the Notes the right to require the Company to repurchase the notes at 115% of the outstanding principal, plus interest or, if greater, 115% of the value of the shares that such holder could receive upon conversion of the Notes, based on a five day trading average price, (the "Event Price"). The default rate of interest on any unpaid amounts is 18%. In addition, Iroquois Master Fund, L.P. ("Iroquois"), as collateral agent for the purchasers of the Notes, may assert its rights under the Security Agreement, dated August 16, 2005, among the Company, Iroquois and the purchasers of the Notes.

The Company has been in discussions with representatives of Iroquois regarding the terms of a possible restructuring of these obligations, but no agreements have been reached. If the Company is unable to negotiate a forbearance, extension or other arrangement, may be forced to seek relief from its creditors in bankruptcy, or the holders of such notes might seek to foreclose on the Company assets, liquidate the Company, or have it declared insolvent.

13

On May 18, 2007, the Company received written notice (the "Notice") from Portside Growth and Opportunity Fund, ("Portside") that an Event of Default had occurred under the Portside Note and that Portside had elected to require the Company to redeem the Portside Note at the Event Price.

On July 17, 2007 Portside entered into a Secondary Securities Purchase Agreement (the "Agreement") with Frontier Holdings Company, Inc. ("Frontier") whereby Portside sold to Frontier an interest in its Senior Secured Convertible Note (the "Note") due May 1, 2007, representing $253,771.66 in principal amount of the Note of $341,616.66. John Masiz, a key employee and stockholder of the Company, holds a controlling interest in Frontier.

Simultaneously with the execution of the Agreement, Portside entered into an Amendment to Senior Secured Convertible Note (the "Amendment") with the Company. Under the terms of the Amendment, in exchange for an extension fee in the amount of $43,993.00, payable December 31, 2007, Portside has agreed to extend the original maturity date of its remaining $87,845.00 in principal amount of the Note. The amended maturity date is December 31, 2007. Upon the amended maturity date, the Company agrees to pay Portside (i) $87,845.00 representing the principal amount of the Note outstanding, (ii) any accrued and unpaid interest thereunder, and (iii) the extension fee in the amount of $43,993.00. As part of the Amendment, Portside waived any Default or Event of Default by the Company based on the failure by the Company to repay amounts due under the Note any time prior to December 31, 2007 and rescinds the Notice of an Event of Default previously disclosed in the Form 8-K dated May 18, 2007. Portside also dismissed the lawsuit it had filed in the Supreme Court in the State of New York. The Company also agreed that it would give Portside the benefit of any higher extension fee that it may agree to pay to other holders of the Company's Senior Secured Convertible Notes due May 1, 2007. The Company has recorded debt restructuring expense in the amount of $43,993 for the six months ended June 30, 2007 in connection with the Agreement.

On June 1, 2007, the Company received written notice (the "Smithfield Notice") from Smithfield Fiduciary, LLC ("Smithfield") that an Event of Default had occurred under the Smithfield Note and that Smithfield had elected to require the Company to redeem the Smithfield Note at the Event Price, as defined in the Smithfield Note. The Event Price is equal to 115% of the outstanding principal,plus accrued interest (or, if greater, 115% of the value of shares that such holder could receive upon conversion of the Smithfield Note, based on a five day trading average price). In addition, the default rate of interest on any unpaid amounts is 18%. In connection with receipt of the Smithfield Notice, the Company has recorded a charge for default premium on senior secured convertible notes in the amount of $112,500 during the nine months ended September 30, 2007.

As of November 14, 2007 the Company has not received similar notices from the other note holders. If the Company had received similar notices from all the other remaining note holders, the Company would have recorded an additional charge for default premium on senior secured convertible notes in the amount of approximately $249,000 during the nine months ended September 30, 2007.

The Company issued and/or is obligated to issue an aggregate of $860,000 face amount of 2-year 5% subordinated callable notes convertible at $1.75 per share with a maturity date of December 15, 2007 pursuant to the terms of the settlement agreements with the plaintiffs in the securities class action and shareholder derivative suits previously disclosed. At present, the Company does not have the funds required to pay these amounts when due and no assurance can be given that any forbearance or extension of the maturity date will be agreed to by the holders of these notes. A small group of potential investors has approached the holders of those notes in connection with a possible purchase of the notes at a discount. We understand that if the purchase transaction closes the purchaser group intends to extend the maturity date. Court approval would be required for the purchase of the class members' notes but there can be no assurance that such approval will be obtained. There can be no assurance that the purchase will close or that if it does close that the maturity date will be extended.

Working capital has been provided to the Company by Biochemics, under a verbal agreement, in the form of cash advances and payments made on behalf of the Company. We expect Biochemics to continue to provide working capital although it is under no obligation to do so. There can be no assurance that Biochemics can or will be willing or able to continue to provide working capital to the Company.

Our ability to continue our business activities, including increasing our marketing support for our existing products, funding of the development of our product candidates through BioChemics and the commercialization of these product candidates, will depend upon, among other things, raising capital from third parties or receiving net cash flows from sales of our products. To date we have not generated significant cash flows from the sales of our products. If we successfully generate cash through any of these methods, our priorities will be:
(i) to contribute to support our existing products; (ii) to bring our acne product candidate to market; and (iii) to commence clinical trials for our ibuprofen candidate.

## CONTRACTUAL OBLIGATIONS AND COMMITMENTS

The following table sets forth our contractual obligations and commitments for the next five years, as of September 30, 2007.

14

|  | TOTAL | LESS THAN 1 YEAR | 1-3 YEARS | 3-5 YEARS | 5-7 YEARS |
|---|---|---|---|---|---|
| Long-term debt | $ - | $ - | $ - | $ - | $ - |
| Capital lease obligations | 9,735 | 3,031 | 6,704 | - | - |
| Operating lease obligations | - | - | - | - | - |
| Note maturities | 3,370,000 | 3,370,000 | | | |
| Default premium on note maturities | 112,500 | 112,500 | | | |
| Unconditional purchase obligations | - | - | - | - | - |

```
Employment agreements          2,205,000      315,000      630,000      630,000      630,000
                             --------------  ------------  ----------  -----------  -----------

Total                      $   5,697,235  $  3,800,531  $  636,704  $   630,000  $   630,000
                             ==============  ============  ==========  ===========  ===========
```

In February 2005, we appointed our Chief Financial Officer, Mr. Joseph Frattaroli, as our President. Mr. Frattaroli will continue to serve as Chief Financial Officer and Acting Chief Executive Officer. Mr. Frattaroli is not employed under a written contract and accordingly is omitted from this table. The written employment agreements with Mr. Masiz and Dr. Carter terminate their initial terms on June 30, 2008, but are deemed automatically extended for successive periods of two years under the terms of their respective written agreements through 2012. This table is presented assuming the automatic extensions are reflected.

## OFF-BALANCE SHEET ARRANGEMENTS

We have no material off-balance sheet financing such as a facility lease or other long-term commitments. We have employment agreements with three key employees. Please refer to "Contractual Obligations and Commitments" for a summary of the employment agreement obligations.

## OWNERSHIP STRUCTURE

Through our parent company, Biochemics, John J. Masiz controls approximately 70% of the combined voting power of all classes of stock of the Company and approximately 44% of the combined equity interest of the Company. Biochemics owns 100% of the Class B Common Stock of the Company.

## ITEM 3. CONTROLS AND PROCEDURES

As of the end of the period covered by this quarterly report, our Acting Chief Executive Officer and Chief Financial Officer (the "Certifying Officer") conducted evaluations of our disclosure controls and procedures. As defined under rules 13a-15(e) and 15d-15(e) of the 1934 Act, the term "disclosure controls and procedures" means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the 1934 Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the 1934 Act is accumulated and communicated to the issuer's management, including the Certifying Officer, to allow timely decisions regarding required disclosure. Based on this evaluation, the Certifying Officer has concluded that our disclosure controls and procedures were effective to ensure that material information is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the 1934 Act, and the rules and regulations promulgated thereunder.

Further, there were no changes in our internal control over financial reporting during the quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

15

## PART II - OTHER INFORMATION

**ITEM 6 (A). EXHIBITS**

```
EXHIBIT
NUMBER      DESCRIPTION OF EXHIBIT
------      ----------------------

31.1        Certification of Joseph Frattaroli, Acting Chief Executive Officer
            and Chief Financial Officer, pursuant to Section 302 of the
            Sarbanes-Oxley Act of 2002.(1)

32.1        Certification of Joseph Frattaroli, Acting Chief Executive Officer
            and Chief Financial Officer, pursuant to Section 906 of the
            Sarbanes-Oxley Act of 2002.(1)
```

(1) Filed herewith.

16

**SIGNATURE**

In accordance with Section 13 and 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on November 14, 2007.

**VASO ACTIVE PHARMACEUTICALS, INC.**

```
By: /s/ Joseph Frattaroli
    ---------------------------------
Joseph Frattaroli
President and Acting Chief Executive
Officer Chief Financial Officer
```

17

**EXHIBIT 31.1**

**CERTIFICATION REQUIRED BY SECTION 302(A) OF THE SARBANES-OXLEY ACT OF 2002**

I, Joseph Frattaroli, certify that:

1. I have reviewed this Quarterly Report on Form 10-QSB of Vaso Active Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

November 14, 2007

```
                    By: /s/ Joseph Frattaroli
                        ---------------------------
                    Acting Chief Executive Officer (principal executive officer)
                    Chief Financial Officer (principal financial officer)
```

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of Vaso Active Pharmaceuticals, Inc.(the "Company") on Form 10-QSB for the three month period ended September 30, 2007, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Joseph Frattaroli, Acting Chief Executive Officer and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

```
                         By: /s/ Joseph Frattaroli
                             -------------------------
                         November 14, 2007
                         Acting Chief Executive Officer (principal executive officer)
                         Chief Financial Officer (principal financial officer)
```

This certification is made solely for purpose of 18 U.S.C. Section 1350, subject to the knowledge standard contained therein, and not for any other purpose.



# VASO ACTIVE PHARMACEUTICALS INC

## FORM 8-K
### (Current report filing)

## Filed 05/24/07 for the Period Ending 05/18/07

| | |
|---|---|
| Address | 99 ROSEWOOD DRIVE, #260 |
| | DANVERS, MA 01923 |
| Telephone | 978-750-1991 |
| CIK | 0001232400 |
| Symbol | VAPH |
| SIC Code | 2834 - Pharmaceutical Preparations |
| Industry | Biotechnology & Drugs |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2007, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of report (Date of earliest event reported): May 18, 2007

# VASO ACTIVE PHARMACEUTICALS, INC.

(Exact Name of Registrant as Specified in Charter)

| Delaware | 001-31924 | 02-0670926 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

99 Rosewood Drive, Suite 260, Danvers, MA 01923
(Address of Principal Executive Offices and Zip Code)

Registrant's telephone number, including area code: (978) 750-1991

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**ITEM 2.04. TRIGGERING EVENTS THAT ACCELERATE OR INCREASE A DIRECT OBLIGATION OR AND OBLIGATION UNDER AN OFF-BALANCE SHEET ARRANGEMENT.**

On August 16, 2005, Vaso Active Pharmaceuticals, Inc. (the "Company") sold $2,500,000 in aggregate principal amount of Senior Secured Convertible Notes due May 1, 2007 (the "Notes") to independent institutional investors. As previously reported, on May 1, 2007, the Company failed to pay the principal amount outstanding under the Notes. Portside Growth and Opportunity Fund, ("Portside"), as successor in interest to one of the original independent institutional investors, Omicron Master Trust, holds a Senior Secured Convertible Note (the "Portside Note") in the outstanding principal amount of $341,616.66 (the "Principal Amount").

On May 18, 2007, the Company received written notice (the "Notice") from Portside that an Event of Default had occurred under the Portside Note and that Portside had elected to require the Company to redeem the Portside Note at the Event Price, as defined in the Portside Note. The Event Price is equal to 115% of the outstanding principal and interest (or, if greater, 115% of the value of shares that such holder could receive upon conversion of the Portside Note, based on a five day trading average price). In addition, the default rate of interest on any unpaid amounts is 18%. The applicable Event Price as of May 18, 2007 was $396,394.89.

To date, the Company has not received similar default notices from the other purchasers of the Notes or from Iroquois Master Fund, L.P. ("Iroquois"), a holder and collateral agent for other the purchasers of the Notes. As previously disclosed, the Company has been in discussions with representatives of Iroquois regarding the terms of a possible restructuring of these obligations, but no agreements have been reached.

**FORWARD-LOOKING STATEMENT**

Certain statements contained herein constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations, management's beliefs and certain assumptions made by management. Readers are cautioned that any such forward-looking statements are subject to certain risks, uncertainties and assumptions that are difficult to predict. Because such statements involve risks and uncertainties, the actual ability of the Company to meet its debt obligations may differ materially from the results expressed or implied by such forward-looking statements. Given these uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements. Unless otherwise required by law, the Company also disclaims any obligation to update its view of any such risks or uncertainties or to announce publicly the result of any revisions to the forward-looking statements made here; however, readers should review carefully reports of documents the Company files periodically with the SEC.

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**Vaso Active Pharmaceuticals, Inc.**

By: /s/ Joseph Frattaroli
--------------------------------
Joseph Frattaroli
Acting Chief Executive Officer,
President and Chief Financial
Officer

Dated: May 24, 2007



# VASO ACTIVE PHARMACEUTICALS INC

## FORM 8-K
(Current report filing)

## Filed 06/07/07 for the Period Ending 06/01/07

| | |
|---|---|
| Address | 99 ROSEWOOD DRIVE, #260 |
| | DANVERS, MA 01923 |
| Telephone | 978-750-1991 |
| CIK | 0001232400 |
| Symbol | VAPH |
| SIC Code | 2834 - Pharmaceutical Preparations |
| Industry | Biotechnology & Drugs |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2007, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of report (Date of earliest event reported): June 1, 2007

# VASO ACTIVE PHARMACEUTICALS, INC.

(Exact Name of Registrant as Specified in Charter)

| Delaware | 001-31924 | 02-0670926 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number ) | (I.R.S. Employer Identification No.) |

99 Rosewood Drive, Suite 260, Danvers, MA 01923

(Address of Principal Executive Offices and Zip Code)

Registrant's telephone number, including area code: (978) 750-1991

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**ITEM 2.04. TRIGGERING EVENTS THAT ACCELERATE OR INCREASE A DIRECT OBLIGATION OR AND OBLIGATION UNDER AN OFF-BALANCE SHEET ARRANGEMENT.**

On August 16, 2005, Vaso Active Pharmaceuticals, Inc. (the "Company") sold $2,500,000 in aggregate principal amount of Senior Secured Convertible Notes due May 1, 2007 (the "Notes") to independent institutional investors. As previously reported, on May 1, 2007, the Company failed to pay the principal amount outstanding under the Notes. Smithfield Fiduciary LLC, ("Smithfield"), holds a Senior Secured Convertible Note (the "Smithfield Note") in the outstanding principal amount of $750,000 (the "Principal Amount").

On June 1, 2007, the Company received written notice (the "Notice") from Smithfield that an Event of Default had occurred under the Smithfield Note and that Smithfield had elected to require the Company to redeem the Smithfield Note at the Event Price, as defined in the Smithfield Note. The Event Price is equal to 115% of the outstanding principal and interest (or, if greater, 115% of the value of shares that such holder could receive upon conversion of the Smithfield Note, based on a five day trading average price). In addition, the default rate of interest on any unpaid amounts is 18%.

As previously reported, the Company has received a similar default notice from another other purchaser of the Notes. The Company has been in discussions with representatives of Iroquois Master Fund, L.P. ("Iroquois"), a holder and collateral agent for other the purchasers of the Notes, regarding the terms of a possible restructuring of these obligations, but no agreements have been reached.

**FORWARD-LOOKING STATEMENT**

Certain statements contained herein constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations, management's beliefs and certain assumptions made by management. Readers are cautioned that any such forward-looking statements are subject to certain risks, uncertainties and assumptions that are difficult to predict. Because such statements involve risks and uncertainties, the actual ability of the Company to meet its debt obligations may differ materially from the results expressed or implied by such forward-looking statements. Given these uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements. Unless otherwise required by law, the Company also disclaims any obligation to update its view of any such risks or uncertainties or to announce publicly the result of any revisions to the forward-looking statements made here; however, readers should review carefully reports of documents the Company files periodically with the SEC.

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**Vaso Active Pharmaceuticals, Inc.**

By: /s/ Joseph Frattaroli
--------------------------------------------
Joseph Frattaroli
Acting Chief Executive Officer, President
and Chief Financial Officer


Dated: June 7, 2007



# VASO ACTIVE PHARMACEUTICALS INC

## FORM 8-K
### (Current report filing)

Filed 07/23/07 for the Period Ending 07/17/07

|  |  |
|---|---|
| Address | 99 ROSEWOOD DRIVE, #260 |
|  | DANVERS, MA 01923 |
| Telephone | 978-750-1991 |
| CIK | 0001232400 |
| Symbol | VAPH |
| SIC Code | 2834 - Pharmaceutical Preparations |
| Industry | Biotechnology & Drugs |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://access.edgar-online.com

© Copyright 2007, EDGAR Online, Inc. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of report (Date of earliest event reported): July 17, 2007

# VASO ACTIVE PHARMACEUTICALS, INC.

(Exact Name of Registrant as Specified in Charter)

| Delaware | 001-31924 | 02-0670926 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number ) | (I.R.S. Employer Identification No.) |

99 Rosewood Drive, Suite 260, Danvers, MA 01923

(Address of Principal Executive Offices and Zip Code)

Registrant's telephone number, including area code: (978) 750-1991

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01 Other Events**

On July 17, 2007 Portside Growth and Opportunity Fund, ("Portside"), entered into a Secondary Securities Purchase Agreement (the "Agreement") with Frontier Holdings Company, Inc. ("Frontier") whereby Portside sold to Frontier an interest in a Senior Secured Convertible Note (the "Note") due May 1, 2007, representing $253,771.66 in principal amount of the Note of $341,616.66. John Masiz, a key employee and stockholder of the Company, holds a controlling interest in Frontier.

Simultaneously with the execution of the Agreement, Portside entered into an Amendment to Senior Secured Convertible Note (the "Amendment") with the Company. Under the terms of the Amendment, in exchange for an extension fee in the amount of $43,993.00, payable December 31, 2007, Portside has agreed to extend the original maturity date of its remaining $87,845.00 in principal amount of the Note. The amended maturity date is December 31, 2007. Upon the amended maturity date, the Company agrees to pay Portside (i) $87,845.00 representing the principal amount of the Note outstanding, (ii) any accrued and unpaid interest thereunder, and (iii) the extension fee in the amount of $43,993.00. As part of the Amendment, Portside waives any Default or Event of Default by the Company based on the failure by the Company to repay amounts due under the Note any time prior to December 31, 2007 and rescinds the Notice of an Event of Default previously disclosed in the Form 8-K dated May 18, 2007. Portside also agreed to dismiss the lawsuit it had filed in the Supreme Court in the State of New York. The Company also agreed that it would give Portside the benefit of any higher extension fee that it may agree to pay to other holders of the Company's Senior Secured Convertible Notes due May 1, 2007.

## FORWARD-LOOKING STATEMENT

Certain statements contained herein constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on current expectations, management's beliefs and certain assumptions made by management. Readers are cautioned that any such forward-looking statements are subject to certain risks, uncertainties and assumptions that are difficult to predict. Because such statements involve risks and uncertainties, the actual ability of the Company to meet its debt obligations may differ materially from the results expressed or implied by such forward-looking statements. Given these uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements. Unless otherwise required by law, the Company also disclaims any obligation to update its view of any such risks or uncertainties or to announce publicly the result of any revisions to the forward-looking statements made here; however, readers should review carefully reports of documents the Company files periodically with the SEC.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**Vaso Active Pharmaceuticals, Inc.**

By: Joseph Frattaroli

Joseph Frattaroli Acting Chief Executive Officer, President and Chief Financial Officer

Dated: July 23, 2007